EXHIBIT A

EXHIBIT A

CANADA
PROVINCE OF QUEBEC
DISTRICT OF LAVAL
No.:  540-

**SUPERIOR COURT**
(Class Action)

**CELSO CATUCCI**, residing and domiciled at 89 Elmbrook Crescent, in the city of Toronto, province of Ontario, M9C 5C8

*Representative Plaintiff*

-and-

**VALEANT        PHARMACEUTICALS INTERNATIONAL INC.**, a moral person incorporated pursuant to the laws of British Columbia, having its principal place of business at 2150 boulevard Saint-Elzéar, West, in the city and district of Laval, province of Quebec, H7L 4A8

*Defendant*

---

**MOTION FOR AUTHORIZATION OF A CLASS ACTION AND FOR AUTHORIZATION TO BRING AN ACTION PURSUANT TO SECTION 225.4 OF THE *QUEBEC SECURITIES ACT***

---

**IN SUPPORT OF ITS MOTION FOR AUTHORIZATION, THE PLAINTIFF RESPECTFULLY SUBMITS AS FOLLOWS:**

## I.   INTRODUCTION

1.   Valeant Pharmaceuticals International, Inc. ("Valeant") is a multinational specialty pharmaceutical company with a focus on branded pharmaceuticals, branded generics and over-the-counter products;

2.   Valeant's head office is located in Laval, Quebec, and incorporated under the laws of British Columbia;

3.   Valeant is traded publicly on the New York ("NYSE"), Swiss ("SWX") and Toronto ("TSX") stock exchanges;

4.   Valeant's stock ticker on the TSX is "VRX" and CUSIP 91911K;

5.   The proposed class (the "Class") is composed of the following members:

All persons in Canada who acquired or disposed of Valeant's securities on the Toronto Stock Exchange or the Swiss Stock Exchange, between February 29, 2012 and October 21, 2015,

excluding those persons who acquired or disposed of Valeant's securities on the New York Stock Exchange during that same period.

6.  Plaintiff representative (the "Representative"), purchased three hundred (300) Valeant securities on September 24, 2015, and continued to hold those securities until after October 21, 2015;

## II.   FACTS

7.  On **February 29, 2012**, Valeant filed its Form 10-K for year ended December 31, 2011, and incorporated the material facts and, therefore, the market price or value of the securities, the whole as appears from a copy thereof communicated as **Exhibit P-1A**;

8.  On **March 1, 2012**, Valeant opened up at $52.18 per share on the TSX;

9.  On **May 16, 2012,** the United States Securities and Exchange Commission (the "SEC") sent a letter questioning the following aspects of the information disclosed in Valeant's Form 10-K, Exhibit P-1A:

    a.  Accounting related to write-offs of obsolete inventory; and

    b.  Failure to disclose agreements documenting Valeant's acquisition of iNova and AB Sanitas.

    the whole as appears from a copy of the SEC letter, communicated as **Exhibit P-2**;

10. On **February 28, 2013**, Valeant filed Form 10-K for the year ended December 31, 2012, and incorporated the material facts and, therefore, the market price or value of the securities, the whole as appears from a copy thereof, communicated as **Exhibit P-1B**;

11. On **August 7, 2013**, Valeant filed Form 10-Q for the quarterly period ended June 30, 2013, and incorporated the material facts and, therefore, the market price or value of the securities, the whole as appears from a copy of Form 10-Q, communicated as **Exhibit P-3**;

12. On **September 18, 2013**, the SEC sent a letter questioning why Valeant changed its revenue recognition procedure for several brands acquired in collaboration with an entity called Medics, to now recognise revenue upon shipment to the distributor instead of when this distributor ships the products to physicians; the whole as appears from a copy of this letter, communicated as **Exhibit P-4**;

13. Valeant did not disclose either of the two SEC letters on SEDAR or send those letters to Canadian-based investors;

14. On **February 28, 2014,** Valeant filed Form 10-K for the year ended December 31, 2013, the whole as appears from a copy thereof, communicated as **Exhibit P-1C**;

15. On **October 19, 2015**, Southern Investigation Report published an article questioning Valeant's relationship to Philidor Rx Services ("Philidor"), a speciality pharmacy, and Valeant's relationship to R&O Pharmacy ("R&O"), the whole as appears from a copy of the article, communicated as **Exhibit P-5**;

16. On **October 20, 2015**, Valeant's stock price drops from $213.05 to $190.38;

17. On **October 21, 2015**, Citron Research published a report addressing Valeant's accounting and disclosure practices in relation to questionable acquisitions as well as in relation to Philidor and R&O, the whole as appears from a copy of the report, communicated as **Exhibit P-6**;

18. Shortly after the release of the Citron Research report, Valent's stock price drops from $190.85 to $154.04;

19. On **October 22, 2015**, Bronte Capital published a report addressing Valeant's response to Citron Research's report (Exhibit P-6) highlighting the following issues:

   a. BMO Capital Markets questions Valeant's revenues relating to the sale of Xifaxan and sales and growth from $300M to $460M;

   b. Valeant's disclosure that subpoenas it has received from prosecutors in New York and Massachusetts concern, in part, how Valeant makes disclosures regarding the distribution of its products; and

   c. Philidor's disclosures to the State of California are inaccurate and contain material fact discrepancies.

the whole as appears from a copy of the report, communicated as **Exhibit P-7**;

20. On **October 23, 2015**, Valeant shares open at $153.85 and close at $152.69;

21. The Southern Investigation Report, Citron Research, and Bronte Capital reports refer to issues raised by the two letters sent by the SEC to Valeant;

## III.   THE CRITERIA OF ART. 1003 C.C.P.

**(a)** **the recourses of the members raise identical, similar or related questions of law or fact**

22.   The recourses of each of the members of the Class are founded on Valeant's misleading documents and management's misleading public statements relating to Valeant's business and affairs within the meaning of sections 225.8 to 225.11 of the *Quebec Securities Act*;

23.   It is respectfully submitted, that in this context, the principle questions of fact and law to be dealt with collectively are the following:

   a.   Did Valeant disclose documents or make public oral statements which are misleading within the meaning of section 225.8 to 225.11 of the *Quebec Securities Act*?

   b.   If so, when was the misleading information publicly corrected?

   c.   Accordingly, is the redress sought by the Class members under sections 225.8 to 225.11 of the *Quebec Securities Act*, well founded in fact and law? and

   d.   Collectively determine the damages for all members of the Class pursuant to section 225.28 of the *Quebec Securities Act*.

24.   Consequently, Plaintiff Representative and the members of the Class seek for this honourable Court to authorize the following conclusions to the proposed class action proceedings:

   **DECLARE** that, starting on February 29, 2012 Valeant International Inc. released a series of misleading documents and public oral statements within the meaning of sections 225.8 to 225.11 of the *Quebec Securities Act*;

   **DECLARE** that these misleading documents and public oral statements within the meaning of sections 225.8 to 225.11 of the *Quebec Securities Act* were not publicly corrected until October 21, 2015 upon the release of the Citron Research report;

   **DECLARE** that Valeant has committed a fault and is liable for damages, plus interest, pursuant to sections 225.8 to 225.11 of the *Quebec Securities Act* to the members of the Class.

**CONDEMN** Valeant Pharmaceuticals International Inc. to pay to the Class damages as assessed pursuant to section 225.28 of the *Quebec Securities Act*;

**DECLARE** that the claims of the members shall be recovered collectively;

**(b)  the facts alleged seem to justify the conclusions sought;**

25.  As of February 29, 2012, Valeant has been misleading its investors as to:

    a.   Its policies and accounting in relation to acquisition of new corporate entities;

    b.   Its relationship with Philidor and ultimately, R&O; and

    c.   Its policies and accounting practices in relation to the recognition of revenue.

26.  These materially misleading statements and documents issued by Valeant since February 29, 2012 were only publicly corrected on October 21, 2015 with the release of the Citron Research report;

27.  It is respectfully submitted that all members of the Class are therefore entitled to claim redress from Valeant on the basis of article 225.8  to 225.11 of the *Quebec Securities Act* and to have damages collectively assessed pursuant to section 225.28 of the *Quebec Securities Act*;

**(c)  the composition of the group makes the application of article 59 or 67 difficult or impracticable; and**

28.  Valeant is a multinational company having issued approximately 334,000,000 shares which are publicly traded on three worldwide stock exchanges;

29.  In this context, it would be impracticable for each member of the class to bring a separate action;

**(d) the member to whom the court intends to ascribe the status of representative is in a position to represent the members adequately.**

30.  The Representative understands the requirements of time and dedication required of his role and is prepared to devote the required resources to carry forward this proposed class action on behalf of the Class;

**FOR THESE REASONS, MAY IT PLEASE THE COURT TO:**

**AUTHORIZE** the Class including all persons in Canada who acquired or disposed of Valeant's securities on the Toronto Stock Exchange or the Swiss Stock Exchange, between February 29, 2012 and October 21, 2015, excluding those persons who acquired or disposed of Valeant's securities on the New York Stock Exchange during that same period;

**NAME** Mr. Celso Catucci, as the Class representative;

**DECALARE** that the following questions of fact and law be dealt with collectively:

a. Did Valeant disclose documents or make public oral statements which are misleading within the meaning of section 225.8 to 225.11 of the *Quebec Securities Act*?

b. If so, when was the misleading information publicly corrected?

c. Accordingly, is the redress sought by the Class members under sections 225.8 to 225.11 of the *Quebec Securities Act*, well founded in fact and law? and

d. Collectively determine the damages for all members of the Class pursuant to section 225.28 of the *Quebec Securities Act*.

**AUTHORIZE** the class action proceedings to seek the following conclusions:

**DECLARE** that, starting on February 29, 2012 Valeant International Inc. released a series of misleading documents and public oral statements within the meaning of sections 225.8 to 225.11 of the *Quebec Securities Act*;

**DECLARE** that these misleading documents and public oral statements within the meaning of sections 225.8 to 225.11 of the *Quebec Securities Act* were not publicly corrected until October 21, 2015 upon the release of the Citron Research report;

**DECLARE** that Valeant has committed a fault and is liable for damages, plus interest, pursuant to sections 225.8 to 225.11 of the *Quebec Securities Act* to the member of the Class;

**CONDEMN** Valeant Pharmaceuticals International Inc. to pay to the Class damages as assessed pursuant to section 225.28 of the *Quebec Securities Act*;

**DECLARE** that the claims of the members shall be recovered collectively;

**AUTHORIZE** these class action proceedings under section 225.4 of the *Quebec Securities Act*;

**APPROVE** the notice to the members of the Class in the form submitted to the Court;

**ORDER** the publication of the notice to the members of the Class no later than thirty (30) days after the date of the judgement authorising the class proceedings;

**ORDER** that the deadline for a member of the Class to exclude themselves from the class action proceedings shall be sixty (60) days from the publication of the notice to the members of the Class.

**THE WHOLE WITH COSTS**.

MONTREAL, this 26th day of October, 2015

*(S) Faguy & Co.*

_____

FAGUY & CO. BARRISTERS & SOLICITORS INC.
Attorneys for Representative Plaintiff

**SCHEDULE 1**
**(Art. 119, C.C.P.)**

_____

**NOTICE TO THE DEFENDANT:**

Take notice that the Plaintiff has filed this action or application in the Superior Court of Quebec in the judicial District of Laval.

To file an answer to this action or application, you must first file an Appearance, personally or by advocate, at the courthouse of Laval, located at 2800, boulevard Saint-Martin Ouest, Laval (Québec)  H7T 2S9, within ten (10) days of service of this Motion.

If you fail to file an Appearance within the time limit indicated, a judgment by default may be rendered against you without further notice upon the expiry of the 10-day period.

If you file an Appearance, the action or application will be presented before the Court on **Tuesday, December 1, 2015 at 9:00 a.m. in room 2.02** of the courthouse.  On that date, the Court may exercise such powers as are necessary to ensure the orderly progress of the proceeding or the Court may hear the case, unless you make a written agreement with the Plaintiff or the Plaintiff's advocate on a timetable for the orderly progress of the proceeding.  The timetable must be filed in the office of the Court.

In support of the Motion, the Plaintiff discloses the following exhibits:

- **Exhibit P-1A:**   Form 10-K for year ended December 31, 2011;
- **Exhibit P-1B:**   Form 10-K for the year ended December 31, 2012;
- **Exhibit P-1C:**   Form 10-K for the year ended December 31, 2013;
- **Exhibit P-2:**   United States Securities and Exchange Commission letter dated May 16, 2012;
- **Exhibit P-3:**   Form 10-Q for the quarterly period ended June 30, 2013;
- **Exhibit P-4:**   United States Securities and Exchange Commission letter dated September 18, 2013;
- **Exhibit P-5:**   Southern Investigation Report article;
- **Exhibit P-6:**   Citron Research report; and
- **Exhibit P-7**:   Bronte Capital report.

**Request for transfer of a small claim**

If the amount claimed by the Plaintiff does not exceed $15,000 and if you could have filed such an action as a Plaintiff in Small Claims Court, you may make a request to the clerk for the action to be disposed of pursuant to the rules of Book VIII of the Code of

-9-

Civil Procedure (R.S.Q., c. C-25).  If you do not make such a request, you could be liable for costs higher than those provided for in Book VIII of the Code.

MONTREAL, this 26th day of October, 2015

*(S) Faguy & Co.*

FAGUY & CO. BARRISTERS & SOLICITORS INC.
Attorneys for Representative Plaintiff

EXHIBIT B

EXHIBIT B

Court File No. CV-15-543678-00CP

*ONTARIO*

**SUPERIOR COURT OF JUSTICE**

BETWEEN:

**LORRAINE O'BRIEN**

Plaintiff

—and—

**VALEANT PHARMACEUTICALS INTERNATIONAL INC., J. MICHAEL PEARSON, HOWARD B. SCHILLER, ROBERT A. INGRAM, ROBERT H. FARMER, THEO MELAS-KYRIAZI, G. MASON MORFIT, DR. LAURENCE E. PAUL, ROBERT N. POWER, NORMA A. PROVENCIO, LLOYD M. SEGAL, KATHARINE B. STEVENSON, FRED HASSAN,  COLLEEN GOGGINS, ANDERS LONNER, JEFFREY W. UBBEN and PRICEWATERHOUSECOOPERS LLP**

Defendants

Proceeding under the *Class Proceedings Act, 1992*

<u>AMENDED </u>STATEMENT OF CLAIM

TO THE DEFENDANTS:

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the Plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a Statement of Defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the Plaintiff's lawyers or, where the Plaintiff does not have a lawyer, serve it on the Plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this Statement of Claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your Statement of Defence is forty days.  If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a Statement of Defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure.  This will entitle you to ten more days within which to serve and file your Statement of Defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.  IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

      IF YOU PAY THE PLAINTIFF'S CLAIMS, and $500.00 for costs, within the time for serving and filing your statement of defence, you may move to have this proceeding dismissed by the court.  If you believe the amount claimed for costs is excessive, you may pay the Plaintiff's claims and $100.00 for costs and have the costs assessed by the court.


Date:                          Issued by_____

                                                Local Registrar

                                                Address of court office:
                                                393 University Avenue, 10th Floor
                                                Toronto, Ontario
                                                M5H 2N9


TO:          VALEANT PHARMACEUTICALS INTERNATIONAL INC.
                  International Headquarters
                  2150 Boulevard Saint Elzéar Ouest
                  Laval, Québec H7L 4A8
                  Canada

AND TO:     J. MICHAEL PEARSON
                  c/o Valeant Pharmaceuticals International Inc.
                  International Headquarters
                  2150 Boulevard Saint Elzéar Ouest
                  Laval, Québec  H7L 4A8
                  Canada

AND TO:     HOWARD B. SCHILLER
                  c/o Valeant Pharmaceuticals International Inc.
                  International Headquarters
                  2150 Boulevard Saint Elzéar Ouest
                  Laval, Québec H7L 4A8
                  Canada

AND TO:     ROBERT A. INGRAM
                  c/o Valeant Pharmaceuticals International Inc.
                  International Headquarters
                  2150 Boulevard Saint Elzéar Ouest

Laval, Québec H7L 4A8
Canada

AND TO:      ROBERT H. FARMER
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      THEO MELAS-KYRIAZI
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      G. MASON MORFIT
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      DR. LAURENCE E. PAUL
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      ROBERT N. POWER
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      NORMA A. PROVENCIO
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      LLOYD M. SEGAL
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      KATHARINE B. STEVENSON
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      FRED HASSAN
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      COLLEEN GOGGINS
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      ANDERS LONNER
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:      JEFFREY W. UBBEN
             c/o Valeant Pharmaceuticals International Inc.
             International Headquarters
             2150 Boulevard Saint Elzéar Ouest
             Laval, Québec H7L 4A8
             Canada

AND TO:       PRICEWATERHOUSECOOPERS LLP
              Certified Public Accountant
              300 Madison Avenue
              New York, NY 10017
              United States

## CLAIM

### I.  DEFINITIONS

1.      The following definitions apply for purposes of this Statement of Claim:

  a)   **"Alternative Fulfillment Program"** <u>means a Valeant program providing for an alternative sales channel for its products through Speciality Pharmacies, including Philidor, which was developed and implemented in order to improve Valeant's financial performance by improving both sales volumes and profitability of Valeant's products;</u>

  ~~a)~~b)      **"Class"** and **"Class Members"** means collectively, the Primary Market Class, Primary Market Class Members, Secondary Market Class and the Secondary Market Class Members, all as defined herein;

  ~~b)~~c)      **Class Period"** means the period from and including February 28, 2013 to October 26, 2015;

  ~~c)~~d)      **"CPA"** means the *Class Proceedings Act, 1992*, S.O. 1992, as amended;

  ~~d)~~e)       **"DC&P"** means disclosure controls and procedures;

  ~~e)~~f) **"Defendants"** means, collectively, Valeant, the Individual Defendants, and PricewaterhouseCoopers;

  ~~f)~~g) **"Excluded Persons"** means the Individual Defendants, members of the immediate families of the Individual Defendants, or the directors, officers, subsidiaries and affiliates of Valeant;

  ~~g)~~h)      **"GAAP"** or **"US GAAP"** means United States generally accepted accounting principles;

  ~~h)~~i) **"ICFR"** means internal controls over financial reporting;

  ~~i)~~j) **"IFRS"** means International Financial Reporting Standards;

  k)   **"Impugned Documents"** (each being an **"Impugned Document"**) means, collectively:

(i)    the Press Release titled "Valeant Pharmaceuticals Reports 2012 Fourth Quarter Financial Results," filed on SEDAR and EDGAR on February 28, 2013;

(ii)    the Annual Report on Form 10-K filed on SEDAR and EDGAR on February 28, 2013;

(iii)    the audited annual financial statements for the three month period and year ended December 31, 2012, filed on SEDAR and EDGAR on February 28, 2013;

(iv)    the MD&A for the three month period and year ended December 31, 2012, filed on SEDAR and EDGAR on February 28, 2013;

(v)    Management Information Circular dated April 11, 2013, filed on SEDAR and EDGAR on April 11, 2013;

(vi)    the Press Release titled "Valeant Pharmaceuticals Reports 2013 First Quarter Financial Results," filed on SEDAR and EDGAR on May 2, 2013;

(vii)    the interim financial statements for the three month period ended March 31, 2013, filed on SEDAR and EDGAR on May 3, 2013;

(viii)    the MD&A for the three month period ended March 31, 2013, filed on SEDAR and EDGAR on May 3, 2013;

(ix)    the Press Release titled "Valeant Pharmaceuticals Reports 2013 Second Quarter Financial Results," filed on SEDAR and EDGAR on August 7, 2013;

(x)    the interim financial statements for the three and six month periods ended June 30, 2013, filed on SEDAR and EDGAR on August 7, 2013;

(xi)    the MD&A for the three and six month periods ended June 30, 2013, filed on SEDAR and EDGAR on August 7, 2013

(xii)    the Press Release titled "Valeant Pharmaceuticals Reports 2013 Third Quarter Financial Results," filed on SEDAR and EDGAR on October 31, 2013;

(xiii)    the interim financial statements for the three and nine month periods ended September 30, 2013, filed on SEDAR and EDGAR on November 1, 2013;

(xiv)    the MD&A for the three and nine month periods ended September 30, 2013, filed on SEDAR and EDGAR on November 1, 2013;

(xv)    the Press Release titled "Valeant Pharmaceuticals Reports Fourth Quarter And Full Year 2013 Financial Results," filed on EDGAR on February 27, 2014;

(xvi)    the Annual Report on Form 10-K for the three month period and year ended December 31, 2013, filed on SEDAR and EDGAR on February 28, 2014;

(xvii)    the audited annual financial statements for the three month period and year ended December 31, 2013, filed on SEDAR and EDGAR on February 28, 2014;

(xviii)    the MD&A for the three month period and year ended December 31, 2013, filed on SEDAR and EDGAR on February 28, 2014;

(xix)    Management Information Circular dated April 21, 2014, filed on SEDAR and EDGAR on April 22, 2014;

(xx)    the Press Release titled "Valeant Pharmaceuticals Reports First Quarter 2014 Financial Results," filed on SEDAR and EDGAR on May 8, 2014;

(xxi)    the interim financial statements for the three month period ended March 31, 2014, filed on SEDAR and EDGAR on May 9, 2014;

(xxii)    the MD&A for the three month period ended March 31, 2014, filed on SEDAR and EDGAR on May 9, 2014;

(xxiii)    the Press Release titled "Valeant Pharmaceuticals Reports Second Quarter 2014 Financial Results," filed on SEDAR and EDGAR on July 31, 2014;

(xxiv)    the interim financial statements for the three and six month periods ended June 30, 2014, filed on SEDAR on July 31, 2014 and on EDGAR on August 1, 2014;

(xxv)    the MD&A for the three and six month periods ended June 30, 2014, filed on SEDAR on July 31, 2014 and on EDGAR on August 1, 2014;

(xxvi)    the Press Release titled "Valeant Pharmaceuticals Reports Second Quarter 2014 Financial Results," filed on SEDAR and EDGAR on October 20, 2014;

(xxvii)    the interim financial statements for the three and nine month periods ending September 30, 2014, filed on SEDAR and EDGAR on October 24, 2014;

(xxviii)    the MD&A for the three and nine month periods ending September 30, 2014, filed on SEDAR and EDGAR on October 24, 2014;

(xxix)    the Press Release titled "Valeant Pharmaceuticals Reports Fourth Quarter And Full Year 2014 Financial Results," filed on SEDAR and EDGAR on February 23, 2015;

(xxx)    the Annual Report on Form 10-K for the three month period and year ended December 31, 2014, filed on SEDAR and EDGAR on February 25, 2015;

(xxxi)    the audited annual financial statements for the three month period and year ended December 31, 2014, filed on SEDAR and EDGAR on February 25, 2015;

(xxxii)    the MD&A for the three month period and year ended December 31, 2014, filed on SEDAR and EDGAR on February 25, 2015;

(xxxiii)    Management Information Circular dated April 9, 2015, filed on SEDAR and EDGAR on April 9, 2015;

(xxxiv)    the Press Release titled "Valeant Pharmaceuticals Reports First Quarter 2015 Financial Results," filed on SEDAR and EDGAR on April 29, 2015;

(xxxv)    the interim financial statements for the three month period ended March 31, 2015, filed on SEDAR and EDGAR on April 30, 2015;

(xxxvi)    the MD&A for the three month period ended March 31, 2015, filed on SEDAR and EDGAR on April 30, 2015;

(xxxvii)    the Press Release titled "Valeant Pharmaceuticals Reports Second Quarter 2015 Financial Results," filed on SEDAR and EDGAR on July 23, 2015;

(xxxviii)    the interim financial statements for the three and six month periods ended June 30, 2015, filed on SEDAR on July 27, 2015 and on EDGAR on July 28, 2015;

(xxxix)    the MD&A for the three and six month periods ended June 30, 2015, filed on SEDAR on July 27, 2015 and on EDGAR on July 28, 2015;

(xl)    the Press Release titled "Valeant Pharmaceuticals Reports Third Quarter 2015 Financial Results," filed on SEDAR and EDGAR on October 19, 2015;

(xli)    the **Prospectuses**; and

(xlii)    the **Offering Memoranda**;

in each case, where applicable, including all documents incorporated by reference therein;

l)  "**Individual Defendants**" means the defendants J. Michael Pearson, Howard B. Schiller, Robert A. Ingram, Robert H. Farmer, Theo Melas-Kyriazi, G. Mason Morfit, Dr. Laurence E. Paul, Robert N. Power, Norma A. Provencio, Lloyd M. Segal, Katharine B. Stevenson, Fred Hassan,  Colleen Goggins, Anders Lonner, and Jeffrey W. Ubben;

m)  "**Notes**" means Valeant's:

   (i)      6.75% senior notes due 2018;

   (ii)     7.50% senior notes due 2021;

   (iii)    5.625% senior notes due 2021;

   (iv)     5.50% senior unsecured notes due 2023;

   (v)      5.375% senior unsecured notes due 2020;

   (vi)     5.875% senior unsecured notes due 2023;

   (vii)    4.50% senior unsecured notes due 2023; and

   (viii)   6.125% senior unsecured notes due 2025;

n)  "**Offering Memoranda**" means Valeant's:

   (i)      Offering Circular dated June 27, 2013;

   (ii)     Offering Circular dated November 15, 2013;

   (iii)    Offering Memorandum dated January 15, 2015; and

   (iv)     Offering Memorandum dated March 13, 2015;

j)o) "**OSA**" means the Securities Act, R.S.O. 1990, c. N. 1, as amended;

k)p) _____ "**Other Canadian Securities Legislation**" means, collectively, the Securities Act, RSA 2000, c S-4, Part 17.01; the Securities Act, RSBC 1996, c 418, Part 16.1; The Securities Act, CCSM c S50, Part XVIII; the Securities Act, SNB 2004, c S-5.5, Part 11.1; the Securities Act, RSNL 1990, c S-13, Part XXII.1; the Securities Act, SNWT 2008, c 10, Part 14; the Securities Act, RSNS 1989, c 418, sections 146A-146N; the Securities Act, S Nu 2008, c 12, Part 14; the Securities Act, RSPEI 1988, c S-3.1, Part 14; the Securities Act, RSQ, c V-1.1, Title VIII, Chapter II, Division II; The Securities Act, 1988, SS 1988-89, c S-42.2, Part XVIII.1; and the Securities Act, SY 2007, c 16, Part 14, all as amended;

l)q) "**Plaintiff**" means the proposed representative plaintiff, Lorraine O'Brien

m)r)　　　"**Primary Market Class**" and "**Primary Market Class Members**" mean all individuals and entities, wherever they may reside or are domiciled, other than the Excluded Persons, who purchased ~~stock or~~ shares ~~-~~of Valeant through a primary market prospectus offering in Canada during the Class Period or who purchased Notes pursuant to the Offering Memoranda during the Class Period;

s)　"**Prospectuses**" means Valeant's:

  (i)　　Short Form Base Shelf Prospectus dated and filed on SEDAR on June 14, 2013;

  (ii)　　Prospectus Supplement dated and filed on SEDAR on June 18, 2013;

  (iii)　　Prospectus dated June 10, 2013, filed on EDGAR on June 19, 2013;

  (iv)　　Prospectus Supplement  dated June 18, 2013, filed on EDGAR on June 19, 2013;

  (v)　　Prospectus dated June 10, 2013, filed on EDGAR on March 18, 2015; and

  (vi)　　Prospectus Supplement dated March 17, 2015, filed on EDGAR on March 18, 2015;

n)t) "**PwC**" means PricewaterhouseCoopers;

o)u)　　　"**SEC**" means the U.S. Securities and Exchange Commission;

p)v)　　　"**SEDAR**" means Canada's System for Electronic Document Analysis and Retrieval, the official website that provides access to most public securities documents and information filed by public companies and investment funds with the thirteen provincial and territorial securities regulatory authorities in Canada;

q)w)　　　"**Secondary Market Class**" and "**Secondary Market Class Members**" mean all individuals and entities, wherever they may reside or are domiciled, other than the Excluded Persons, who purchased the publicly traded common ~~stock~~ share of Valeant on the TSX or other secondary market in Canada or elsewhere other than in the United States during the Class Period;

x) "**Specialty Pharmacies**" means Valeant's network of mail-order or otherwise specialty pharmacies including, but not limited to, Philidor, with

which Valeant had undisclosed relationships during the Class Period and through which it implemented its Alternative Fulfillment Program;

r)y) "**TSX**" means the Toronto Stock Exchange;

s)z) **"Valeant"** means Valeant Pharmaceuticals International Inc.; and

t)aa)       "**Valeant Defendants**" means, collectively, Valeant and the Individual Defendants.

## II. RELIEF SOUGHT

2.      The Plaintiff, Lorraine O'Brien on her own behalf and on behalf of Class Members (as defined, infra), claim from the Defendants, jointly and severally:

   a) an order, pursuant to section 138.8 of the OSA and the equivalent provisions of Other Canadian Securities Legislation, granting leave to proceed with the statutory right of action pleaded under section 138.3 of the OSA;

   b) an order pursuant to the CPA certifying this action as a class proceeding and appointing the Plaintiff as representative plaintiff of the Class Members as defined above;

   c) a declaration that the Company is vicariously liable for the misrepresentations communicated by the Individual Defendants;

   d) a declaration that the Defendants are liable for the misrepresentations throughout the Class Period alleged pursuant to s.138.3 of the OSA and the equivalent provisions of the Other Canadian Securities Legislation, and for negligent misrepresentation at common law;

   e) a declaration that the PwC Defendants are liable for misrepresentation pursuant to section 138.3 of the *OSA*;

   f) damages for the Secondary Market Class Members for the statutory right of action under section 138.3 of the OSA and for negligent misrepresentation as determined by the Court

   g) an order pursuant to section 130, or, in the alternative, section 130.1 of the *OSA* for damages for the Primary Market Class Members for misrepresentation in a prospectus/offering memorandum in respect to the public offerings issued by the Company during the Class Period;

h) pre-judgment interest pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended;

i) costs of this action on a full or, alternatively, substantial indemnity basis; and

j) such further and other relief as to this Honourable Court may seem just.

## III. NATURE OF THE ACTION

3.      Valeant is a large Canadian public pharmaceutical company with a significant market capitalization. It carries on business internationally with its shares trading on the Toronto Stock Exchange (TSX) and the New York Stock Exchange (NYSE).

4.      Prior to and especially during the Class Period, Valeant repeatedly made public statements that it was pursuing a strategy of significant growth of revenue and earnings through future increasing cash flows achieved through product development and acquisitions. Valeant reported significantly increasing revenues during the Class Period which resulted in both an increased share price and which sustained a substantial premium in its price earnings multiple as compared to its corporate peers. This apparent continuing dramatic growth was intended by the defendants to, and in fact did, cause the price of Valeant's shares to increase dramatically through the Class Period. It also was intended to facilitate further accretive acquisitions of pharmaceutical assets using the inflated value of Valeant shares as consideration.

5.      In fact, during the Class Period, Valeant and the other defendants were engaged in substantial and repeated misrepresentations in its quarterly and annual financial statements and related Management Discussion and Analysis, (MD&A), filed with securities regulators, through a

Form 10-K, in the case of annual reports, and a Form 10-Q in the case of quarterly reports. These misrepresentations during the Class Period related to:

i)   the repeated overstatement of Valeant's revenue and resultant earnings by adopting improper revenue recognition and revenue generation practices which dramatically overstated revenue and were not compliant with U.S. GAAP which governed Valeant's financial representing;

ii)  the use of improper revenue generation practices such as "channel stuffing" and improper revenue recognition of "sales" to related parties or subsidiaries, which were contrary to US GAAP and appropriate internal financial controls;

iii) the use of unsustainable revenue generation practices such as acquisition of pharmaceutical products followed by exponential price increases;

iv)  the undisclosed use of speciality pharmacies and other related parties or subsidiaries to improperly generate and recognize revenue;

v)   the improper booking of sales and recognition of receivables that did not comply with U.S. GAAP resulting in a significant increase in non-collectible receivables and an significant increase in the ratio of receivables as compared to sales;

vi)  misstatements that Valeant had adequate internal financial controls and was implementing these controls in its financial reporting when in fact it was not;

vii) misrepresentation of the material facts and risks associated with Valeant's business practices and specifically the risks associated with its improper revenue recognition

practices including its improper sales and revenue recognition practices, its use of specialty pharmacies and other related parties and subsidiaries to improperly or illegally generate revenues including Philidor and Isolani, its improper and illegal use of the pharmaceutical licences of related parties or contracting parties such as R&O Pharmacy Inc. to unlawfully distribute products, the increasing regulatory risks and the risks of Department of Justice investigations significantly affecting revenue generating practices and other risks associated with its practices and in particular, Valeant:

    a)      used specialty pharmacies including Philidor & R&O Pharmacy Inc. to create phantom sales to artificially inflate revenue;

    b)      misrepresented revenue by sharing inventory and recording phantom transactions with related parties as "sales";

    c)      used phantom accounts to fabricate sales;

    d)      unlawfully used the licence of related specialty pharmacies such as R&O Pharmacy Inc. to illegally sell its products.

6.      In the summer of 2015, Valeant attracted substantial public criticism after it announced that it was introducing an exponential price increase on an important patented drug that it had acquired. This lead to closer scrutiny by U.S. legislators, justice department officials and market analysts.

7.      Information became publicly available regarding some of the unsustainable and improper revenue recognition practices used by Valeant during the Class Period to inflate revenues. This led to even closer scrutiny which caused the partial disclosure by Valeant of its ownership and use of

specialty pharmacies such as Philidor to increase revenues. Other information about Valeant's improper, and in some cases illegal, practices to generate and recognize revenue was leaked into the market through to October 26, 2015 when Valeant made disclosure of the nature of its relationship with Philidor and its use of Philidor and other specialty pharmacies to generate revenue.

8.      Since mid-August 2015, as information about Valeant's misrepresentation became publicly known, Valeant's market capitalization plummeted nearly $45 billion USD or 52 percent, largely in response to increasing public scrutiny of Valeant's revenue generation practises, drug pricing, business operations, accounting and financial results and guidance. Valeant's success in recent years has been attributed to its numerous accretive acquisitions of rival drug companies and raising the prices of their drugs dramatically.

9.      As the market learned through the corrective disclosure that Valeant had released financial reports throughout the Class Period with inflated and unsustainable revenue, and that as a result of these misrepresentations, its share price was grossly inflated; its share price fell dramatically. The defendants knew of these misrepresentations throughout the Class Period but nevertheless released, signed off on and approved misleading financial statements which misstated Valeant's true financial condition.

10.     The defendants, including Valeant's auditors PwC, approved these financial statements and reports throughout the Class Period with knowledge of the misrepresentations contained therein. They specifically knew that Valeant's revenue generation practices were unsustainable, and that its revenue recognition practices did not comply with its own financial reporting standings, did not result from the reasonable application of its financial controls and were not prepared in accordance with US GAAP.

## IV. THE PARTIES

### i)        The Plaintiff

11.      The Plaintiff, Lorraine O'Brien resides in Edmonton, Alberta. During the Class Period, the Plaintiff purchased common shares of Valeant on the TSX and continues to hold these shares.

12.      The Plaintiff brings this action on her own behalf and on behalf of all other Class Members.

### ii)       Valeant Pharmaceuticals International Inc.

13.      Valeant is incorporated under the British Columbia Business Corporations Act, SBC 2002, c 57 ("BCBCA") with its registered office in Laval, Quebec. The Company develops, manufactures, and markets pharmaceuticals, over-the-counter products, and medical devices worldwide.

14.      Valeant is a reporting issuer under the OSA and its shares have traded on the TSX  during the Class Period under the symbol "VRX". Its shares also traded on the New York Stock Exchange (NYSE). Valeant also issued shares on the primary market in Canada through a short form prospectus in June 2013, during the Class Period.

15.      As a reporting issuer in Ontario, Valeant was required to issue and file with SEDAR quarterly interim financial statements, annual financial statements, MD&A with the quarterly and interim financial statements and an Annual Information Form at the end of the fiscal year. Pursuant to National Instrument 51-102, during the Class Period, Valeant's AIFs were filed as Annual Reports on Form 10-K.  Valeant's Annual Reports on Form 10-K are the equivalent of AIFs for Canadian securities law purposes.

16.      During the Class Period, Valeant completed the Offerings, as follows:

a)  on June 24, 2013, in connection with the acquisition of Bausch & Lomb Holdings Incorporated, Valeant completed a brokered Offering of its common shares for gross proceeds of US$2,300 million.  These Securities were distributed pursuant to a Prospectus Supplement dated June 18, 2013 to a Short Form Base Shelf Prospectus dated June 14, 2013, and a Prospectus Supplement dated June 18, 2013 to a Prospectus dated June 10, 2013, which are Impugned Documents;

b)  on July 12, 2013, in connection with the acquisition of Bausch & Lomb Holdings Incorporated, Valeant issued: (i) US$1,600 million aggregate principal amount of the 6.75% senior notes due 2018; and (ii) US$1,625 million aggregate principal amount of the 7.50% senior notes due 2021.  These Securities were distributed via brokered Offerings that were undertaken pursuant to an Offering Circular dated June 27, 2013, which is an Impugned Document;

c)  on December 2, 2013, Valeant issued US$900 million aggregate principal amount of the 5.625% senior notes due 2021.  These Securities were distributed via a brokered Offering that was undertaken pursuant to an Offering Circular dated November 15, 2013, which is an Impugned Document;

d)  on January 30, 2015, Valeant issued US$1,000 million aggregate principal amount of the 5.50% Senior Unsecured Notes due 2023.  These Securities were distributed via a brokered Offering that was undertaken pursuant to an Offering Memorandum dated January 15, 2015, which is an Impugned Document;

e)  on March 27, 2015, in connection with the acquisition of Salix Pharmaceuticals, Ltd, Valeant issued: (i) US$2,000 million aggregate principal amount of the

5.375% senior unsecured notes due 2020; (ii) US$3,250 million aggregate principal amount of the 5.875% senior unsecured notes due 2023; (iii) €1,500 million aggregate principal amount of the 4.50% senior unsecured notes due 2023; and (iv) US$3,250 million aggregate principal amount of the 6.125% senior unsecured notes due 2025.   These Securities were distributed via brokered Offerings that were undertaken pursuant to an Offering Memorandum dated March 13, 2015, which is an Impugned Document; and

f)   on March 27, 2015, in connection with the acquisition of Salix Pharmaceuticals, Ltd, Valeant completed a brokered Offering of its common shares for gross proceeds of US$1,450 million.   These Securities were distributed pursuant to a Prospectus Supplement dated March 17, 2015 to a Prospectus dated June 10, 2013, which are Impugned Documents.

17.    Valeant's 6.75% senior notes due 2018, 7.50% senior notes due 2021, 5.375% senior unsecured notes due 2020, 5.875% senior unsecured notes due 2023, 4.50% senior unsecured notes due 2023 and 6.125% senior unsecured notes due 2025 were initially issued by certain special purpose vehicle, wholly-owned Canadian subsidiaries of Valeant ("SPVs").   Upon the completion of these Offerings and the related transactions, in each case, the SPVs were voluntarily liquidated, all their obligations were assumed by Valeant, and all their assets including the proceeds of these Offerings were distributed to Valeant.   Herein, the term "Valeant" includes the SPVs (and all other Valeant subsidiaries).   Valeant is liable for the claims particularized against it herein respecting these Offerings by virtue, among other things, of its being the assignee of all of the SPVs' obligations and liabilities.

### iii)     The Individual Defendants

~~14.~~18.  The defendant J. Michael Pearson ("Pearson") was, throughout Class Period, the Chairman of the Board of Directors, and Chief Executive Officer of Valeant. Pearson signed each annual report, the certifications attached to the annual reports and the prospectus.

~~15.~~19.  The defendant Howard B. Schiller ("Schiller") was, throughout the Class Period, an Executive Vice President, the Chief Financial Officer and a member of Valeant's Board of Directors. Schiller signed each annual report, the certifications attached to the annual reports and the prospectus.

~~16.~~20.  The defendant Robert A. Ingram ("Ingram") was throughout the Class Period a member of Valeant's Board of Directors. Ingram signed each annual report.

~~17.~~21.  The defendant Robert H. Farmer ("Farmer") was throughout the Class Period a member of Valeant's Board of Directors. Farmer signed each annual report, as well as the June 2013 Prospectus on behalf of the board.

~~18.~~22.  The defendant Theo Melas-Kyriazi ("Melas-Kyriazi") was throughout the Class Period a member of Valeant's Board of Directors. Melas-Kyriazi signed each annual report and was a member of the Audit and Risk Committee.

~~19.~~23.  The defendant G. Mason Morfit ("Morfit") was through 2012 and 2013, a member of Valeant's Board of Directors. Morfit signed the 2012 and 2013 annual reports, as well as the June 2013 Prospectus on behalf of the board.

20.24.  The defendant Dr. Laurence E. Paul ("Paul") was through 2012, a member of Valeant's Board of Directors. Paul signed the 2012 annual report.

21.25.  The defendant Robert N. Power ("Power") was throughout the Class Period a member of Valeant's Board of Directors. Power signed each annual report.

22.26.  The defendant Norma A. Provencio ("Provencio") was throughout the Class Period a member of Valeant's Board of Directors. Provencio signed each annual report and was the Chairperson of the Audit and Risk Committee.

23.27.  The defendant Lloyd M. Segal ("Segal") was through 2012 and 2013, a member of Valeant's Board of Directors. Segal signed the 2012 and 2013 annual reports.

24.28.  The defendant Katharine B. Stevenson ("Stevenson") was throughout the Class Period a member of Valeant's Board of Directors. Stevenson signed each annual report and was a member of the Audit and Risk Committee.

25.29.  The defendant Fred Hassan was, in 2013, a member of Valeant's Board of Directors.

26.30.  The defendant Colleen Goggins was, in 2014, a member of Valeant's Board of Directors.

27.31.  The defendant Jeffrey W. Ubben was, in 2014, a member of Valeant's Board of Directors.

28.32.  The Individual Defendants, because of their positions with Valeant, possessed the power and authority to control the contents of Valeant's financial reports, press releases and written and public statements to securities analysts, portfolio managers and institutional investors, i.e. the market.  They were provided with copies of Valeant's reports and press releases, alleged herein

to be misleading, prior to their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

29.33.  Because of their positions with Valeant, and their access to material non-public information, the Individual Defendants knew or ought to have known that the non-disclosed material facts described herein were misrepresentations, by commission and omission and that the representations being made were materially false and misleading. During the Class Period, the Individual Defendants were the directors or highest officers of the Company's management who possessed overall responsibility for the Company's financial reporting and internal controls. The Individual Defendants are therefore liable for the material misrepresentations made in Valeant's financial disclosures throughout the Class Period.

**iv)     The PwC Defendants**

34.     The Defendant PricewaterhouseCoopers ("PwC") was throughout the Class Period Valeant's auditor. PwC is a registered public accounting firm with operations in Canada, United States and across with world.  PwC performed engagements for Valeant from its offices in Toronto, Ontario and Florham Park, New Jersey.  PwC was appointed Valeant's auditor effective March 10, 2011, and it continues to hold that position.

35.     PwC was engaged by Valeant's shareholders, including the Class Members, as the outside auditor of Valeant.  Valeant's shareholders voted to appoint PwC as Valeant's outside auditor at annual general meetings of Valeant's shareholders.  PwC earned significant fees for the services it rendered as Valeant's auditor.

36.    ~~They~~PwC audited and approved Valeant's financial statements and reports throughout the Class Period that contained misrepresentations and knew of those misrepresentations as described herein. PwC represented that the consolidated balance sheets and financial statements of Valeant presented fairly, in all material respects, the financial position of Valeant throughout the Class Period when in fact a proper and reasonable audit would have and did disclose that Valeant's financial reporting did not comply with GAAP and there were substantial failures in applying internal controls and the requirement to make necessary disclosures regarding its revenue generation and revenue recognition practices.

~~30.~~37.  PwC is an "expert" within the meaning of section 130 and section 138.1 of the *Securities Act*.

## V.  BACKGROUND

38.    Valeant's core business is developing, manufacturing, and marketing pharmaceuticals, over-the-counter products, and medical devices worldwide. Valeant primarily focuses on therapeutic pharmaceuticals including dermatology, eye health, aesthetics, oral health, neurology, and consumer healthcare.

39.    Since 2012, Valeant has reported significantly growing organic growth rates, utilizing this financial metric to tout its purported success.  Valeant's ever increasing organic growth rates are derived mainly from its sales in the key United States market and are predicated, in significant part, on two main factors.

40.    *First, increasing product prices*.  Valeant has historically increased the prices of its products year-over-year, purportedly contributing to greater revenues.  By way of example, in

the first nine months of 2015, the weighted average price of Valeant's top 10 dermatology branded products was increased by 14% (individual branded drugs' price increases were as much as 61%); revenues from these products represent 62% of Valeant's U.S. dermatology business. Similarly, in the first nine months of 2015, the weighted average price of Valeant's top 10 ophthalmology branded products was increased by 10%; revenues from these products represent 86% of Valeant's U.S. ophthalmology business.

41.    *Second, increasing sales' volumes and profitability*. Valeant's financial results directly derive from revenues that it generates through sales of its products.  Two main factors affect Valeant's revenues from its products' sales: (a) the volume of the sales (i.e. the quantity of products sold); and (b) the amount of money that Valeant is able to actually collect on those sales from payers—generally, insurers; in other words, the profitability of the sales.

42.    These two factors are interrelated: an increase in the price of a Valeant product would only translate into greater revenues if Valeant actually sells its products and collects the revenues from those sales.  In other words, Valeant would realize value from its products only if the products are actually sold and are paid for, therefore generating revenue which contributes to income and profit.

### i.    Valeant's Conduct of Business Through Specialty Pharmacies

~~31.~~43.  In an attempt to ~~achieve~~ increase both product prices and the volume of its sales revenue, Valeant distributes and sells many of its products through specialty pharmacies, some of which were related companies or subsidiaries. Specialty pharmacies, also known as third-party pharmacies, are a channel for pharmaceutical companies to sell high-priced drugs when the drugs are not covered by some consumers' health insurance plans or which demand consumers to pay a

high co-payment. Valeant's use of specialty pharmacies, which Valeant controls, allows it to increase sales of its high-priced drugs and to prevent patients, practitioners and insurance companies from switching to cheaper, generic drugs.

32.44.  Philidor RX Services, LLC ("Philidor") is a specialty pharmacy which has until recently marketed Valeant's products exclusively. Valeant is Philidor's only client. Philidor was incorporated in Delaware on January 2, 2013. Philidor registered as an in-state pharmacy in Pennsylvania on February 19, 2013. It was controlled by Valeant and was incorporated as part of an undisclosed scheme to inflate Valeant's revenues through improper and illegal conduct.

33.45.  R&O Pharmacy Inc. ("R&O") is a licensed pharmacy located in Camarilla, California, licensed to sell pharmaceutical products in California through an agreement with a Valeant controlled subsidiary Isolani (created by Philidor). Valeant had the right to acquire R&O and thus use its license. Philidor had been denied a California license on the basis of fraudulent statements in its application. R&O obtained a retail pharmacy license in 2013. It is owned and operated by Russel Reitz.

46.      Isolani LLC ("Isolani") was incorporated in October 2014 as a single-member company. Isolani was created for the purpose of acquiring ownership of R&O pharmacy from its Pharmacist—in-Charge, Russel Reitz.

47.      The purpose of using Specialty Pharmacies was to induce doctors to prescribe, patients to buy, and insurers to pay for Valeant branded drugs instead of (the usually far less expensive) alternative or generic drugs.  Specialty Pharmacies typically provide services to doctors and patients not provided by conventional retail pharmacies, such as:

(a)     routinely waiving or reducing co-pays (i.e. the portion of the price that the consumer must pay for a drug when it is being covered by insurance) for patients;

(b)     taking responsibility for reimbursement of the drug from the insurers; and

(c)     assisting doctors in completing required paperwork.

48.     In order to maintain and improve the profitability of Valeant's sales, the Specialty Pharmacies network provided for "backdoors" to circumvent the insurers' claim adjudication and reimbursement processes. As known to Valeant, the Specialty Pharmacies engaged in improper practices at Valeant's direction to ensure when Valeant brand medications were sold to patients, the insurers would pay for them. For example:

(d)     Philidor's employees were directed to manipulate the prescriptions and to improperly add to them "dispense as written," a term that would indicate that the physician required or the patient desired that Valeant's branded products (not the less expensive competitive products) be sold to the patient. Without such a term having been indicated on the prescription, typically a pharmacy is required to sell the competitive generic version of the drug, and the insurer would not pay for Valeant's drugs;

(e)     Philidor's employees were directed to improperly use the identification numbers of the pharmacies in its extended network to resubmit claims after they had been denied by the insurers; and

(f)     When a patient was covered by an insurer with which Philidor did not have a contract, Philidor's employees were directed to submit the adjudication claim through certain of Philidor's partners that had such contracts. The partners would then receive payments from the insurers and reimburse Philidor.

49.     Unbeknownst to the Class Members, Valeant directly or indirectly established Philidor in January 2013 and began expanding its extended network of Specialty Pharmacies.  Although the full extent of Valeant's involvement with Specialty Pharmacies has yet to be fully disclosed by the Valeant Defendants, current public information indicates that:

      (g)     Valeant employees were involved in and significantly contributed to setting up and expanding Philidor and the network of the other Specialty Pharmacies in Philidor's channel during the Class Period; and/or

      (h)     Valeant and/or persons or entities affiliated with Valeant directly or indirectly funded or contributed to the funding required for the set-up or expansion of Philidor and/or the network of Specialty Pharmacies in Philidor's channel.

50.     While the full extent of Valeant's relationships with its Specialty Pharmacies has yet to be disclosed, it is clear that at all material times during the Class Period Valeant had a very close relationship with Philidor, including exercising control over it and having the right of de facto and legal control. As the Class Members have recently learned, these relationships culminated in December 2014, where Valeant entered into an agreement providing for an option to acquire Philidor (according to the Valeant Defendants, for $0), for a $100 million upfront payment and milestone payments of up to $133 million, of which as of the end of the Class Period $33 million was paid.  Pursuant to this transaction, Valeant effectively acquired Philidor.

51.     Additionally, at all material times, Valeant controlled, directly or indirectly, contractually or otherwise, the other Specialty Pharmacies through, among other things, Philidor's options or other equity or ownership interests in the other Specialty Pharmacies in its network.

52.      Based on these extensive and close relationships, directly and/or indirectly, contractually or otherwise, at all material times during the Class Period Valeant had and exercised control over Philidor and the other Specialty Pharmacies in Philidor's channel.

34.53.  Under Valeant's management and control, over the course of the Class Period, Philidor and its network of Specialty Pharmacies grew significantly to include a variety of Valeant's key dermatology and ophthalmology drugs in the United States.  According to the Valeant Defendants, in the first nine months of 2015, Philidor generated approximately US$450 million in net sales. Valeant has not disclosed information regarding its gross sales through Philidor, which are expected to be significantly greater.

## VI. MISREPRESENTATIONS DURING THE CLASS PERIOD

35.54.  From at least fiscal 2012, Valeant has misrepresented its revenue and resultant earnings in its quarterly and annual financial statements which were purportedly prepared in accordance with GAAP.  This was as a result of improper and misleading revenue recognition practices which resulted in inflated revenue and earnings throughout the Class Period, and a false impression of sustained revenue and earnings growth. The particulars of Valeant's failures to comply with GAAP in its financial reporting during the Class Period are described herein.

36.55.  On February 28, 2013, Valeant released and made public its annual report, including its financial statements for the 2012 fiscal year ending December 31, 2012.  The financial statements were filed with securities regulators in the U.S. and Canada through a Form 10-K. The 2012 10-K was signed by Pearson and Schiller. Pearson and Schiller signed a certification attesting to the

accuracy of the financial statements, that all material facts were disclosed, and that Valeant had adequate internal financial controls.

37.56.  The 2012 financial statements disclosed revenue in the amount of $3,546,662,000 USD and a net income loss of $116,000,000 USD.  These financial statements contained misrepresentations including that:

      a)  the revenue and income of Valeant was overstated;

      b)  they stated that Valeant's internal financial controls were adequate to generate the financial reports when in fact they were not adequate and were not applied;

      c)  the description of the risks Valeant was facing was inaccurate as it should have disclosed that there were errors in the financial statements resulting from revenue generation and revenue recognition practices, and that were explained risks associated with Valeant's revenue generation practices which were unsustainable; and

      d)  non-disclosure of material facts including details of Valeant's revenue generation and revenue recognition practices, details of Valeant's use of subsidiaries including specialty pharmacies and other Variable Interest Entities, and details of transactions with related parties.

38.57.  Throughout fiscal 2013, Valeant released quarterly financial reports and guidance which repeated these misrepresentations.  In these reports, it did not disclose any material facts relating to its improper revenue generation and revenue recognition practices as described herein.

39.58.  On February 28, 2014, Valeant released and made public its annual report, including its financial statements for the 2013 fiscal year ending December 31, 2013.  The financial statements were filed with securities regulators in the U.S. and Canada through a Form 10-K. The 2013 10-K was signed by Pearson and Schiller. Pearson and Schiller signed a certification attesting to the accuracy of the financial statements, that all material facts were disclosed, and that Valeant had adequate internal financial controls.

40.59.  The 2013 financial statements disclosed purportedly increased annual revenue in the amount of $5,769,605,000 USD and a net income loss of $866,100,000 USD.  These financial statements contained misrepresentations including that:

   a)  the revenue and income of Valeant was overstated;

   b)  they stated that Valeant's internal financial controls were adequate to generate the financial reports when in fact they were not adequate and were not applied;

   c)  the description of the risks Valeant was facing was inaccurate as it should have disclosed that there were errors in the financial statements resulting from revenue generation and revenue recognition practices, and that were explained risks associated with Valeant's revenue generation practices which were unsustainable; and

   d)  non-disclosure of material facts including details of Valeant's revenue generation and revenue recognition practices, details of Valeant's use of subsidiaries including specialty pharmacies and other Variable Interest Entities, and details of transactions with related parties.

41.60.  Throughout fiscal 2014, Valeant released quarterly financial reports and guidance which repeated these misrepresentations. In these reports, it did not disclose any material facts relating to its improper revenue generation and revenue recognition practices as described herein.

42.61.  On February 22, 2015, Valeant issued a press release reporting its fourth quarter and full year 2014 financial results. The press release also included full year guidance for 2015 taking into consideration Valeant's acquisitions. The press release stated that "as well as expected business outperformance" would be "updated on first quarter 2015 earnings call." Pearson's comments included in the press release state in relevant part:

> Valeant's relentless focus on building diversified, durable businesses with strong organic growth platforms, coupled with disciplined business development, is paying off for all of our stakeholders… Outstanding growth in the U.S., most notably dermatology, offset the negative impact from foreign exchange. In addition, we continued to see strong organic growth in several emerging markets such as China, the Middle East and Russia. With our strong finish to the year, we are well positioned for another year of outperformance in 2015.

43.62.  On February 25, 2015 Valeant released and made public its annual report, including its financial statements for the 2014 fiscal year ending December 31, 2014.  The financial statements were filed with securities regulators in the U.S. and Canada through a Form 10-K. The 2014 10-K was signed by Pearson and Schiller. Pearson and Schiller signed a certification attesting to the accuracy of the financial statements, that all material facts were disclosed, and that Valeant had adequate internal controls. The 2014 10-K makes no mention of Philidor or the use of Philidor by Valeant to generate revenue as described herein.

44.63.  The 2014 financial statements disclosed increased revenue in the amount of $8,263,500,000 USD and net income of $913,500,000 USD. These financial statements contained misrepresentations including that:

    a)  the revenue and income of Valeant was overstated;

    b)  they stated that Valeant's internal financial controls were adequate to generate the financial reports when in fact they were not adequate and were not applied;

    c)  the description of the risks Valeant was facing was inaccurate as it should have disclosed that there were errors in the financial statements resulting from revenue generation and revenue recognition practices, and that were explained risks associated with Valeant's revenue generation practices which were unsustainable; and

    d)  non-disclosure of material facts including details of Valeant's revenue generation and revenue recognition practices, details of Valeant's use of subsidiaries including specialty pharmacies and other Variable Interest Entities, and details of transactions with related parties.

45.64.  On April 29, 2015, Valeant issued a press release announcing that Defendant Schiller would be stepping down as Valeant's CFO.

46.65.  In addition to these annual reports, Valeant also released and made public its quarterly report for each quarter in the Class Period, through a Form 10-Q. As with the annual reports, each quarterly report included a signed certification by Pearson and Schiller attesting to the accuracy of

the financial statements, that all material facts were disclosed, and that Valeant had adequate internal financial controls.

47.66.  Each quarterly report contained misrepresentations, including:

    a)  the revenue and income of Valeant was overstated;

    b)  they stated that Valeant's internal financial controls were adequate to generate the financial reports when in fact they were not adequate and were not applied;

    c)  the description of the risks Valeant was facing was inaccurate as it should have disclosed that there were errors in the financial statements resulting from revenue generation and revenue recognition practices, and that were explained risks associated with Valeant's revenue generation practices which were unsustainable; and

    d)  non-disclosure of material facts including details of Valeant's revenue generation and revenue recognition practices, details of Valeant's use of subsidiaries including specialty pharmacies and other Variable Interest Entities, and details of transactions with related parties.

48.67.  On September 28, 2015, Valeant filed a Form 8-K with securities regulators in both Canada and the U.S. attaching a letter from Valeant, signed by Pearson, to Valeant's employees "relating to recent changes in Valeant's stock price." This letter specifically addressed concerns with respect to Valeant's growth being reliant on price increases of pharmaceutical products in the U.S. and issues relating to U.S. government drug price reimbursement.

49.68.  On October 5, 2015, Valeant filed a Form 8-K with securities regulators in both Canada and the U.S. attempting to correct what it claimed to be inaccurate claims about Valeant that were being reported in the media with respect to its revenue and earnings.

## VII.    MISREPRESENTATIONS IN THE JUNE 2013 PROSPECTUS OFFERING

50.69.  On June 17, 2013, Valeant issued a press release announcing that it had filed a preliminary prospectus supplement to its effective shelf registration statement on Form S-3 filed with the U.S. Securities and Exchange Commission ("SEC") and a similar filing with securities regulatory authorities in each Canadian province in connection with a public offering of its common shares.

51.70.  On June 18, 2013, Valeant issued a press release stating that the Company would issue 23,529,412 common shares at a price of US$85 per share, for aggregate gross proceeds of approximately US$2 billion. The same day, the Company filed a Prospectus Supplement to a Short Form Base Shelf Prospectus dated June 14, 2013 with SEDAR for its offering of $2.0 billion of the common shares of Valeant. The Prospectus Supplement stated that shares would be offered at US$85per share. The Prospectus Supplement was certified by Pearson and Schiller.

52.71.  The "Plan of Distribution" contained in the Prospectus Supplement provided that Valeant had applied to list the Offered Shares on the TSX. These shares were distributed in Canada and acquired by the primary market class members.

53.72.  The "Plan of Distribution" further stated that the Company had an underwriting agreement with Goldman, Sachs & CO. and Goldman Sachs Canada Inc. for the purchase of 22,330,412 and 1,199,000 Firm Shares, respectively, on the closing date of the offering. The

Underwriters were also given an option to buy up to US$300 million of Additional Shares from the Company to cover sale of a greater number of Common Shares than those stipulated in the underwriting agreement.

54.73.  The Short Form Base Shelf Prospectus and Prospectus Supplement incorporated a number of documents by reference, including:

   a)  Form 10-K for the year ended December 31, 2012; and

   b)  Audited consolidated financial statements as at and for the year ended December 31, 2012, together with the report of the auditors thereon and management's discussion and analysis in respect of those statements;

55.74.  These documents contained misrepresentations, as described herein, which were repeated by their incorporation by reference in the Short Form Base Shelf Prospectus and Prospectus Supplement.

56.75.  The Short Form Base Shelf Prospectus and the Prospectus Supplement also incorporated by reference Valeant's 2013 First Quarter financial statements, which included the following statements regarding Valeant's revenues, sales, and organic growth:

   a)  Total revenues were $1.068 billion, up 25 percent compared to the first quarter of 2012;

   b)  Product revenues were $1.039 billion, up 38 percent versus the year-ago quarter;

   c)  The 2013 First Quarter Product Sales were $1.039 billion; an increase of 38 percent over the prior year; and

   d)  Organic growth (same store sales) was 6 percent, excluding the impact from generics, primarily BenzaClin and Cesamet.

57.76.  The Prospectus Supplement also contained a section on the risk factors that potential investors "should carefully consider … before purchasing [Valeant's] Common Shares". These risks fell under two categories: "Risks Related to the [Bausch & Lomb] Merger" and "Risks Related to the Offering and Our Common Shares". The Prospectus Supplement identified the following six risks related to the June 2013 offering and Valeant's common shares:

1. The market price of our Common Shares may be volatile, which could cause the value of your investment to decline;

2. Future sales or issuances of our Common shares in the public markets, or the perception of such sales, could depress the trading price of our Common Shares;

3. All our debt obligations, and any future indebtedness we may incur, will have priority over our Common Shares with respect to payment in the event of a liquidation, dissolution or winding up;

4. We may issue Class A Special Shares in the future, which could make it difficult for another company to acquire us or could otherwise adversely affect holders of our Common Shares, which could depress the price of our Common Shares;

5. We have no plans to pay regular dividends on our Common Shares, so shareholders may not receive funds without selling their Common Shares; and

6. If securities analysts do not publish research or reports about our company, or if they issue unfavourable commentary about us or our industry or downgrade our Common Shares, the price of our Common Shares could decline.

58.77.  Absent from this list was any reference to any risks associated with the unsustainability of its purported revenue growth or risks to its prospect of growth in either future cash flows or earnings per share. Nor did it disclose any risks relating to Valeant's revenue recognition practices or Valeant's relationship with specialty pharmacies and the Company's resulting exposure to regulatory scrutiny.

59.78.  On June 24, 2013, Valeant issued a press release announcing the closing of the public offering of its common shares. The press release stated that Valeant had issued 23,529,412

common shares at a price of $85 per share, and, pursuant to the underwriters' exercise of their option to purchase additional common shares, an additional 3,529,412 common shares at a price of US$85.00 per share, for aggregate gross proceeds of approximately US$2.3 billion. A significant portion of these shares were sold in Canada through Canadian dealers.

60.79.  The prospectus contained misrepresentations, including that:

a)   the revenue and income of Valeant was overstated;

b)   Valeant's internal controls were either inadequate or not followed or both;

c)   the description of the risks Valeant was facing was incomplete and inaccurate as it should have disclosed that there were errors in the financial statements resulting from revenue generation and revenue recognition practices; and

d)   non-disclosure of material facts including details of Valeant's revenue generation and revenue recognition practices, details of Valeant's use of subsidiaries including specialty pharmacies and other Variable Interest Entities, and details of transactions with related parties.

## VIII. MISREPRESENTATIONS RELATING TO VALEANT'S UNDISCLOSED RELATIONSHIP WITH SPECIALTY PHARMACIES, INCLUDING PHILIDOR, ISOLANI AND R&O, RESULTING IN IMPROPER REVENUE RECOGNITION AND OVERSTATED INCOME

61.80.  Valeant had created a network of specialty pharmacies that were essentially subsidiaries, however were not treated as such in Valeant's financial statements. Valeant would recognize sales to these specialty pharmacies without disclosing these sales as related-party transactions, and would recognize these sales without any expectation of collecting on these sales.

62.81.  Philidor is one of these specialty pharmacies.  Until recently Valeant was its only client.  It was controlled by Valeant and was incorporated as part of an undisclosed scheme to inflate Valeant's revenues through improper and illegal conduct. It was acquired in early 2013.

63.82.  R&O was licensed to sell pharmaceutical products in California.  Through an agreement with a Valeant controlled subsidiary Isolani (created by Philidor), Valeant had the right to acquire R&O and thus use its license to sell pharmaceutical products. Philidor had been denied a California pharmaceutical license on the basis of fraudulent statements in its application. Isolani was created for the sole purpose of acquiring ownership of R&O in order to provide a channel for the sale of Valeant products. However, it was disclosed in October 2015 that Valeant and its affiliates Philidor and Isolani were unlawfully using R&O's license to sell Valeant's products.

64.83.  Valeant finally disclosed the true nature of its relationship with Philidor in October 2015. During the October 19, 2015 conference call, Pearson revealed that in late 2014, Valeant purchased an option to acquire Philidor. During the same call, Valeant released slides which contained *inter alia*, the following specific disclosures relating Valeant's relationship with Philidor and Valeant's understanding of the services provided by Philidor:

- Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our copay cards and is a dispensary that fills prescriptions. We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor.

- Based on a VIE (variable interest entity) assessment in accordance with ASC 810, we consolidate the financials of Philidor. Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory

- We understand that Philidor

  - Provides services under our programs for commercially insured and cash-paying claims only. Any claim that would be reimbursed in

whole or in part by government insurance is not eligible for our co-pay
subsidy programs
- Does not restrict prescriptions it fills to any particular manufacturers
  (including Valeant)
- Dispenses generic products as specified in patient's prescription or as
  requested by patients.

65.84.  The slides also contained information relating to Valeant's recent letter to R&O inquiring

about the $69 million that the latter allegedly owed to Valeant. The slides stated that R&O is

"one of the specialty pharmacies in our network," which is "improperly holding significant

amounts it received from payers". The slide further stated that "[a]ny products R&O dispensed to

patients were recognized as our revenues and are reflected in our receivables" and "[a]ny

products still held by R&O are reflected in our inventory".

66.85.  On October 21, 2015, Citron Research published a report, further detailed below, that

alleged that Valeant was using its previously undisclosed relationships with specialty

pharmacies, including Philidor and R&O Pharmacy Inc., to create phantom sales of its products.

This report named several pharmacies, including R&O Pharmacy Inc., that share a common

phone number with Philidor and have similar text on their websites.

67.86.  The Report further revealed that R&O Pharmacy has filed a lawsuit against Valeant in the

federal court in California. The lawsuit was filed in response to a September 4, 2015 letter from

Valeant's general counsel, indicating that R&O owed Valeant more than $69 million. The

lawsuit indicated that R&O had never received an invoice from Valeant for any amount and that

R&O believed that either Valeant and R&O are "victims of a massive fraud perpetuated by third

parties" or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud

against R&O and others."

68.87.  Valeant issued a press release on October 21, 2015 in response to Citron's allegations regarding its financial reporting and operations. The press release disclosed that Philidor is a pharmacy licensed in Pennsylvania, which provides back-end services to other pharmacies, including R&O. According to the press release, such back-end services include call centers, claims adjudication, IT and logistics support, as well as compliance/HIPPA regulation guidance.  The press release confirmed that Philidor services a common call center for its network pharmacies.

69.88.  The press release contained the following statements of previously undisclosed information relating to Valeant's practice of recording sales and the timing of its revenue recognition:

- All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient. All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.

- Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – there is no sales benefit from any inventory held at these specialty pharmacies and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.

- The $69 million at wholesaler acquisition cost of products shipped by Valeant to R&O were not recorded as revenue to Valeant when shipped to R&O. When R&O dispensed those products Valeant recognized the net realized amount due from patients and payors (approximately $25 million) and reduced the associated inventory from Valeant's balance sheet. In this case, we estimate the net amount of revenue for the $69 million at WAC would be approximately $25 million.

- the timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.

~~70.~~89.  After the market closed on October 21, 2015, Philidor issued a press release further disclosing for the first time that it had a contractual relationship with "affiliated pharmacies," including R&O, and that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

~~71.~~90.  On October 21, 2015, Veritas Investment Research ("Veritas") published a research report opining that investing in Valeant at this time was extremely risky based on the recent disclosures relating to the investigation by the U.S. Attorney's Offices, scrutiny by US politicians, the unsustainable price increases and the relationship with Valeant and Philidor.

~~72.~~91.  Veritas raised several concerns about Valeant's relationship with the specialty pharmacies in this analyst report.  Specifically, Veritas addressed Valeant's Alternate Fulfillment Program which increases profitability by maximizing fulfillment of Valeant's drugs by working around incentive systems put forward by insurers in the US. Valeant provides subsidies directly to consumers to ensure they are incentivized to purchase Valeant's brand name drugs as opposed to cheaper generic drugs.  The Alternate Fulfillment Program is conducted through Valeant's relationships with specialty pharmacies, especially Philidor which accounts for a substantial portion of Valeant sales.

~~73.~~92.  On October 23, 2015, Veritas published a research report describing the U.S. lawsuits brought by R&O against Philidor and Isolani, specialty pharmacies that have been closely linked with Valeant, alleging improper and potentially fraudulent sales. R&O indicated it refused to pay Valeant the $69 million that was apparently sent to R&O in inventory because it viewed these

transactions as improper. R&O also alleged that Isolani was created by Philidor as a step towards acquiring R&O to gain access to its Californian pharmaceutical licensing.

~~74.~~93.  On October 26, 2015, *The Wall Street Journal* reported that Valeant employees were frequently involved with the operations at Philidor and used fake aliases, including those of comic book characters such as "Peter Parker", to conceal their identity and thus conceal the relationship between Valeant and Philidor.

~~75.~~94.  During a conference call on October 26, 2015, the defendants disclosed for the first time that Valeant paid $100 million for an option to buy Philidor, but maintained that the operations of the two companies were separate. The defendants stated that the option agreement provides for a joint steering committee, composed of members from Valeant and Philidor, the purposes of which includes "the exchange, assessment, and discussion of matters relating to compliance of Philidor with applicable laws, material contractual obligations and Philidor's internal policies and processes". Pearson misrepresented that Valeant has not used Philidor, or any of its affiliated pharmacies, to artificially inflate sales.

~~76.~~95.  During the conference call, the defendants stated that shareholders had not been informed of Valeant's relationship with Philidor because "Philidor is not considered material to Valeant's business for reporting purposes". The defendants denied any wrongdoing, but stated that they were forming a special committee of the board to investigate Valeant's relationship with Philidor.

~~77.~~96.  In a slide included in its investor presentation, Valeant stated that Philidor's year-to-date net sales were $111 million when the purchase option was signed in December 2014. The defendants

stated that the company considered the U.S. Securities and Exchange Commission (SEC)'s guidance in making its disclosure decisions, but "determined at the time that the disclosure was sufficient and that the Philidor option purchase agreement did not meet either the quantitative or subjective tests of materiality." The information slide stated that "revenue from the smallest customer disclosed in 2014 was $0.9-billion."

78.97.   The slide-deck accompanying the October 26, 2015 conference call contained additional disclosures regarding R&O's relationship with Philidor. It stated that Philidor obtained an option to acquire Isolani in November 2014. It also disclosed that Isolani holds a 10 percent equity stake in R&O and has the right to acquire the remaining 90 percent of the equity of R&O. The slide-deck stated that Isolani and R&O entered into a Management Service Agreement ("MSA") in November 2014, under which Isolani provides management and administrative services to R&O. Under the MSA, R&O compensates Isolani with all profits and losses realized by R&O. The contract terminates when Isolani acquiring the remaining 90 percent equity interest in R&O.

79.98.   The October 26, 2015 slides described "the business rationale" for the relationships between Philidor, Isolani and R&O as follows:

a) *We understand that R&O is a pharmacy is California with non-resident licenses in 34 other states*

b) *The relationship, through Isolani, provides Philidor with an additional network pharmacy that can serve patients in California and 24 other states*

80.99.   The slides also addressed allegations by Russel Reitz, the Pharmacist-in-Charge of R&O, that Philidor was improperly using R&O's assigned identification numbers, which are required for pharmacies to interact with payors and claim processors, to fill prescriptions and get

reimbursement from payors in states where Philidor does not have a license to operate. Mr. Reitz alleges that Philidor did not disclose to R&O that its application for a non-resident pharmacy permit was denied by the California Board of Pharmacy in May 2014. According to Mr. Reitz, Philidor wanted to buy R&O to gain access to R&O's multi-state pharmacy licenses and payors contractors, including insurers.

~~81.~~100.        Valeant responded to the allegation that Philidor was misusing R&O's assigned identification number by stating, "[w]e understand that Philidor denies this allegation". Valeant denied that Philidor committed any wrongdoing by shipping products to California residents without a California license. The October 26, 2015 slide-deck states in relevant part:

- ▪ We understand that:
  - • Philidor did not dispense products to patients in California
  - • Philidor only dispenses products to patients in states where Philidor has a non-resident license, and that does not include California
  - • Philidor has agreements with affiliated pharmacies that have California licenses and those pharmacies have dispensed products to patients in California

~~82.~~101.        The slides contained information on the "Revenue Recognition Policies in Effect for R&O". It stated that Valeant consolidates the financials of R&O and that revenue is not recognized when products are shipping to R&O. Rather, Valeant "recognizes revenue only <u>when</u> products are dispensed to patients and records this as revenue at the net realized price for each prescription dispense".

~~83.~~102.        In a slide titled "Philidor Summary and Next Steps", Valeant asserted that "[t]here have been no issue with regards to the accounting or revenue recognition of [Philidor]", adding "[t]o date, we have found no evidence of illegal activity at Philidor".

~~84.~~103.	On October 27, 2015, Veritas published a research report addressing concerns relating to Valeant's dealings with its specialty pharmacies and the accounting related issues associated with the specialty pharmacies. Veritas explained that Philidor's use of other pharmacies licensing numbers, the lack of disclosure in Valeant's financial statements and the apparent lack of internal controls all raised significant concerns about Valeant and its business practices.

~~85.~~104.	On October 29, 2015, CVS Health Corp. and Express Scripts Holding Co., the United States' largest drug-benefits managers, said that they are removing Philidor from their pharmacy networks and reviewing its practices.

~~86.~~105.	On October 30, 2015, Valeant announced it was ending its relationship with Philidor and that the pharmacy was shutting down. This statement was disingenuous since Valeant had controlled Philidor's operations and directed its activities. Pearson said in a statement, "We have lost confidence in Philidor's ability to continue to operate in a manner that is acceptable to Valeant and the patients and doctors we serve."   Pearson took "complete responsibility" for investors questioning Valeant and its integrity as a result of the recent allegations.

~~87.~~106.	Philidor related transactions generated 6.8 per cent of Valeant's revenue in the third quarter, including large quantities of its toenail fungus medication Jublia. The company only distributed medications in the United States.

## IX. PUBLIC DISCLOSURE OF CORRECTIVE INFORMATION RELATING TO THE DEFENDANTS' MISREPRESENTATIONS

88.107.        On September 28, 2015, Bloomberg reported that members in the U.S. House of Representatives sought to subpoena Valeant for documents related to "massive price increases" for two drugs used to treat heart conditions. On this news, the price of Valeant stock dropped $43.20 per share, or 16.30%, from its closing price on September 25, 2015 to close at $221.81 on September 28, 2015.

89.108.        On October 1, 2015, Veritas published a research report expressing concerns with Valeant's growth rate and the impact on further price increases. The Veritas analyst opined that absent substantial price increases on Valeant's products, Valeant would not have met its growth targets in Q2 2015.

90.109.        On October 14, 2015, Valeant disclosed that it had recently received subpoenas from two U.S. Attorney's Offices primarily seeking "documents with respect to our patient assistance programs, and also include requests relating to financial support provided by the company for patients, distribution of the company's products, information provided to the Centers for Medicare and Medicaid Services, and pricing decisions."  Following this news, Valeant stock fell $12.35 per share to close at $216.73 on October 15, 2015.

91.110.        On October 19, 2015, Valeant issued a press release reporting its third quarter 2015 financial results. The press release was followed by a conference call during which the defendants revealed Valeant's previously undisclosed and direct relationship with certain specialty pharmacies including Philidor.

92.111._____During the October 19, 2015 conference call, Pearson revealed for the first time that in late 2014, Valeant purchased an option to acquire Philidor. The slides accompanying the conference call included a list of anticipated questions from investors, including "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor?" As explained above, the slides contained specific disclosures relating Valeant's relationship with Philidor and Valeant's understanding of the services provided by Philidor and information relating to Valeant's recent letter to R&O inquiring about the $69 million that the latter allegedly owed to Valeant.

93.112._____On this news, the price of Valeant common stock fell $14.35 per share, or 6.31%, to close at $213.05.

94.113._____On October 21, 2015, Citron Research published "Valeant: Could this be the Pharmaceutical Enron?" a report written by activist short-seller Andrew Left. As explained above, the Report alleged that Valeant was using its previously undisclosed relationships with specialty pharmacies, including Philidor and R&O Pharmacy Inc., to create phantom sales of its products and thus were improperly recognizing revenue.

95.114._____Following the publication of Citron's Report, Valeant's stock price fell an additional $36.64 or 19.20% per share, to close at $154.21 on October 21, 2015, on extremely heavy trading volume.

96.115._____Valeant issued a press release on October 21, 2015 in response to Citron's allegations regarding its financial reporting and operations. The press release disclosed that Philidor is a pharmacy licensed in Pennsylvania, which provides back-end services to other

pharmacies, including R&O, as well as specific information regarding Valeant's practice of recording sales and the timing of its revenue recognition which had previously been undisclosed, as is described above.

97.116.      After the market closed on October 21, 2015, Philidor issued a press release further disclosing for the first time that it had a contractual relationship with "affiliated pharmacies" as described above.

98.117.      During a conference call on October 26, 2015, the defendants disclosed for the first time that Valeant paid $100 million for an option to buy Philidor, but maintained that the operations of the two companies were separate. Pearson misrepresented that Valeant has not used Philidor, or any of its affiliated pharmacies, to artificially inflate sales, as described herein.

99.118.      During the conference call, the defendants stated that shareholders had not been informed of Valeant's relationship with Philidor because "Philidor is not considered material to Valeant's business for reporting purposes". The defendants denied any wrongdoing, but stated that they were forming a special committee of the board to investigate Valeant's relationship with Philidor.

100.119.      Following the conference call, Valeant's share price closed at $145.34.

101.120.      On October 27, 2015, at 6:52 a.m.,  Bill Ackman, the founder of Pershing Square Capital Management, Valeant's largest hedge fund shareholder and its third-largest shareholder overall, allegedly sent a strongly worded email to Pearson. The email stated in relevant part, "Your reputation is at grave risk. Valeant has become toxic. Even we are very concerned."

~~102.~~121.       On October 29, 2015, CVS Health Corp. and Express Scripts Holding Co., the United States' largest drug-benefits managers, said that they are removing Philidor from their pharmacy networks and reviewing its practices.

~~103.~~122.       On October 30, 2015, Valeant announced it was ending its relationship with Philidor and that the pharmacy was shutting down. This statement was disingenuous since Valeant had controlled Philidor's operations and directed its activities. Pearson said in a statement, "We have lost confidence in Philidor's ability to continue to operate in a manner that is acceptable to Valeant and the patients and doctors we serve."   Pearson took "complete responsibility" for investors questioning Valeant and its integrity as a result of the recent allegations.

~~104.~~123.       Valeant's share price plunged to $122.04 on October 30, 2015, a $26.19 drop per share from $148.23 on October 29, 2015.

~~105.~~124.       In an interview published on November 4, 2015, investor Bill Ackman told the Wall Street Journal that he had pressed Valeant's executives for answers and told the company's lead director that CEO Pearson may need to leave. Ackman told the newspaper that he had pushed Valeant to hold a conference call to "come clean" and disclose the full extent of executives' knowledge about Philidor, and that he was disappointed the company did not comply.

~~106.~~125.       On November 4, 2015, U.S. Senators Claire McCaskill and Susan Collins announced the launch of a bipartisan investigation into Valeant and other pharmaceutical firms for price gouging. On this news, Valeant's share price dropped to $121.20.

~~107.~~126.        On November 6, 2015, Valeant issued a news release, stating that Goldman Sachs Group Inc. sold 1.3 million of Pearson's Valeant shares that it held as collateral for his loans against Pearson's consent. According to the news release, Pearson had borrowed the $100 million from Goldman Sachs to make charitable donations, meet tax obligations and purchase Valeant shares. However, as Valeant's stock plummeted in the face of allegations and investigations, the firm required repayment of the loan. Pearson pledged a total of two million shares to cover the loan, representing about 20 per cent of the 10 million shares he owned. On this news, Valeant's share price fell further to $109.19.

~~108.~~127.        On a conference call on November 10, 2015, Pearson stated that he expected the company to recover by the second half of 2016 at the latest. Pearson said the company was pursuing relationships with other specialty pharmacies and hopes to establish a new access program in the next 90 days. Pearson stated that he was unaware of any other issues within Valeant, but added that it is impossible to provide a complete assurance given Valeant's large size and geographic reach. Pearson said he expects that the company will "regain momentum" by Q1 2017 and said no other aspects of the business should be affected by the controversies. Valeant's share price closed at $110.76.

128.    On November 12, 2015, Valeant share prices hit a two-year low closing at $98.14 after a United States judge held that Valeant and Bill Ackman must face a lawsuit alleging that they engaged in insider trading before Valeant attempted to acquire Botox-maker Allergan.

129.    Additionally, Valeant has announced that its Board has established an ad hoc committee to investigate Valeant's relationship with Philidor.  The results of these investigations are yet to be released to the public.

130.    Following the revelations regarding Valeant's relationships with Specialty Pharmacies and the manner in which it had used them to purportedly generate revenue, the market price or value of Valeant's common shares declined by approximately 50%.  The market price or value of Valeant's Notes was also negatively affected as a result of these revelations. As a result, the Class Members suffered billions of dollars in damages.

131.    The entire truth about Valeant's relationships with Specialty Pharmacies, its impact on revenue generation and revenue recognition practices, the activities of Valeant or Philidor within this network and the impact of these relationships and activities on Valeant's past, current or future operations and results has not as yet been revealed to the public.

132.    That the Specialty Pharmacies were material to Valeant is further evident from, among other things:

> a) the significant decline in the market price of Valeant's Securities resulting in a damage to Valeant's market capitalization of tens of billions of dollars upon the disclosure of these relationships;
>
> b) Valeant's management's deliberate choice to not disclose these relationships due, in their words, to "competitive advantages";
>
> c) Valeant's management's taking steps to secure a replacement for Specialty Pharmacies immediately after Valeant terminated its relationships with them; and
>
> d) the market's negative reaction to the disclosure of previously undisclosed information regarding Valeant's relationships with Specialty Pharmacies, and the

<u>many questions that have arisen regarding Valeant's past, current and future operations including its revenue generation and revenue recognition practices in light of the recent revelations.</u>

## X.  THE MISREPRESENTATIONS

~~109.~~133.     The statements referenced above were materially misleading because they misinterpreted and failed to disclose the following material facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them.

~~110.~~134.     Specifically, during the Class Period, the Defendant Valeant made the following actionable misrepresentations:

   a)  it overstated revenue and overstated receivables, which caused a resultant overstatement of earnings and retained earnings in its financial statements released during the Class Period, in both annual and quarterly financial reports, as a result of improper and misleading accounting policies and procedures which did not comply with required accounting standards;

   b)  it adopted improper revenue recognition practices and policies that were not in accordance with GAAP and which resulted in an overstatement of revenue, income and earnings throughout the Class Period;

   c)  it failed to consolidate the financial results of Philidor, a Variable Interest Entity, into its financial statements until Q4, 2014, as required by GAAP from the date of its acquisition of an interest and of rights to exercise control over the business of Philidor in early 2013, and improperly  recognized revenue from transactions

related to Philidor prior to Q4 2014, which caused an overstatement of revenue and earnings,

d)  it stated in its financial statements that it had tested and verified its internal controls and that they were "effective" when they were in fact materially deficient and yielded inaccurate and materially misleading financial statements;

e)  it failed to comply with GAAP in making all necessary disclosures relating to its connection to and contractual inter-relationship with Philidor and other related parties;

f)  it failed to disclose, as required by GAAP and by statements made in its public disclosures during the Class Period (both oral and in core documents and other written statements) ("its public disclosures"), material facts necessary and required to be stated for investors to fully understand and assess the risk exposure of Valeant and the sustainability of its revenue and earnings growth;

g)  it failed to disclose, as required by GAAP and by statements it made in its public disclosures, material facts necessary and required to be stated regarding the complex relationship it had with Philidor and with other related specialty pharmacies it was using to generate revenue, and material facts relating to the sustainability of revenues generated through Philidor and other related specialty pharmacies;

h)  It failed to disclose material facts related to the full extent of its dealing with Philidor, Isolani and other such related specialty pharmacies and the issues and

irregularities arising out of their dealings with R&O in California, which relate to its revenue generation and recognition practices and the risks associated with the sustainability of such revenues;

i)   it failed to disclose, as required by GAAP, its complete financial and business relationship with Philidor, including payments made to acquire control of Philidor and its ability to control the business of Philidor including the power to appoint and "advisor" to the CEO, the Head Compliance Officer, the in house lawyer, the Head IT officer, and other employees, and the fact that many Valeant employees worked for Philidor although on a surreptitious basis using pseudonyms in order to keep the connection secret;

j)   it failed to disclose the material risks of being unable to sustain its revenue and income as a result of the risks associated with the practice of Valeant, Philidor, Isolani and other related and associated specialty pharmacies including the use of the NPI of such other pharmacies to achieve and maintain sales and revenue, especially in States where Philidor and other related Variable Interest Entities were not licensed to dispense prescriptions;

k)   it failed to disclose the practices used by Valeant, Philidor and other related Variable Interest Entities to deal with prescriptions in order to ensure that they were filled with Valeant name brand products by pharmacists instead of much cheaper generic brands, and to engage in "co-pay arrangements", all to ensure that insurers  would cover the cost of much higher Valeant name brand drugs rather than much cheaper generic medication;

l)  it failed to disclose the significant and material risks associated with its dependence on substantial and unsustainable price increases for organic products and for products acquired as a result of corporate or asset acquisitions, and the extent to which its growth projections in its public disclosures were unsustainable;

m)  it failed to implement proper internal controls as required by GAAP;

n)  it failed to disclose that Valeant had a relationship with a network of specialty pharmacies used to boost Valeant's sales of its high-priced drugs; and

o)  it failed to disclose that the use of specialty pharmacies left Valeant vulnerable to increased regulatory risks.

### A.  Failure to Disclose Material Facts

135.   As particularized above, at all material times during the Class Period, Valeant had close and extensive relationships with, and conducted business through, Specialty Pharmacies.   The circumstances of these relationships involved material facts and information that the Valeant Defendants were required by securities law and GAAP to disclose in the Impugned Documents, but they failed to do so. Valeant failed to disclose its improper revenue generation and revenye recognition practices which did not comply with GAAP, were illegitimate, and were unsustainable.

### B.  Insufficient and Defective Risk Disclosures

136.   At all material times, the Valeant Defendants had an obligation at law to disclose all risk factors relating to Valeant and its business, including any matter that would be most likely to influence an investor's decision to purchase Valeant's Securities.   These defendants in fact

purported to disclose such risk factors in the Impugned Documents that were MD&As, AIFs and Offering Documents.  However, the Valeant Defendants' risk disclosures fell short of the required standards.

137.    Valeant's relationships with Specialty Pharmacies and its conduct of business through this network exposed Valeant's business and operations to specific and identifiable risks that the Valeant Defendants had to, but failed to, disclose during the Class Period.  These risks included:

(a)     actual or alleged breaches of contracts with the payers (*e.g.*, insurers) with whom Valeant and/or Specialty Pharmacies had contractual arrangements or other business relationships;

(b)     litigation arising from such breaches of contract or other improper business practices;

(c)     the termination of Valeant's and/or Speciality Pharmacies' relationships with the payers (*e.g.*, insurers) as a result of actual or alleged improper business practices and/or breaches of contract;

(d)     compliance issues, investigations and/or enforcement, civil or criminal proceedings arising from actual or alleged violations of the laws and regulations applicable to Valeant, including health and securities laws;

(e)     that laws and regulations governing Valeant's business may change adversely as a result of the disclosure of these improper activities; and

(f)     the risks that Valeant reported revenue generation and revenue increases both were overstated and unsustainable.

138.   Notably, although these risks arose principally from Valeant's relationships with, and its conduct of business through, Specialty Pharmacies, they were reasonably expected to affect Valeant's overall current and future operations beyond Specialty Pharmacies.

### C. Misrepresentations Regarding Valeant's Organic Growth and Sustainability of Its Business

139.   At all material times during the Class Period, the Valeant Defendants falsely represented that Valeant's business were growing sustainably and organically and had strong growth prospects.

140.   All Impugned Documents that are MD&As, AIFs and Offering Documents contained statements similar to the below (reproduced from Valeant's MD&A for Q2 2015):

> Our strategy is to focus our business on core geographies and therapeutic classes that offer attractive growth opportunities while maintaining our lower selling, general and administrative cost model and decentralized operating structure. Within our chosen therapeutic classes and geographies, we primarily focus on durable products which have the potential for strong operating margins and sustainable organic growth. . . . We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

141.   Additionally, Valeant's press releases issued in conjunction with Valeant's quarterly and annual financial results during the Class Period contained statements regarding:

(g)   Valeant's achieved organic growth rates and its expected organic growth rates for future reporting periods;

(h)   the sustainability of Valeant's business and its organic growth rates: for example,

(i)   in a Valeant press release dated February 28, 2013, which accompanied Valeant's fiscal 2012 disclosures, the defendant Pearson was quoted as saying: "The continued overall robust organic growth of our business,

coupled with our strong cash flow generation, puts us in a solid position for another outstanding year in 2013";

(ii)     in a Valeant press release dated February 27, 2014, which accompanied Valeant's fiscal 2013 disclosures, the defendant Pearson was quoted as saying: "We are particularly pleased with the outperformance of the Bausch + Lomb businesses, coupled with the fact that the Company returned to positive organic growth. Valeant's focus on cash pay businesses, diversification, durable assets, key geographies, and lower risk R&D will continue to benefit our shareholders as we look forward to continuing our track record of outperformance in 2014"; and

(iii)    in a Valeant press release dated February 22, 2015, which accompanied Valeant's fiscal 2014 disclosures, the defendant Pearson was quoted as saying: "Valeant's relentless focus on building diversified, durable businesses with strong organic growth platforms, coupled with disciplined business development, is paying off for all of our stakeholders"; "Outstanding growth in the U.S., most notably dermatology, offset the negative impact from foreign exchange. In addition, we continued to see strong organic growth in several emerging markets such as China, the Middle East and Russia. With our strong finish to the year, we are well positioned for another year of outperformance in 2015"; and

(i)      guidance and/or outlook information with respect to Valeant's future reporting periods.

142.    All such statements were false and/or misleading when made.

143.    Unbeknownst to the Class Members, Valeant's claimed financial performance and its stated "robust" and "sustainable" organic growth rates during the Class Period were derived, in a significant part, from Valeant's relationships with and its conduct of business through Specialty

Pharmacies. Specialty Pharmacies, in turn, engaged in improper activities in order to enhance Valeant's products' sales and their profitability levels, including conduct in violation of their contracts with the insurers. Without those improper activities, Valeant would have been unable to "achieve" the financial results that the Valeant Defendants claimed during the Class Period.

144. As the Valeant Defendants knew or ought to have known, it would have been unsustainable for Valeant to conduct its business through Specialty Pharmacies, and its stated "robust" growth rates based on those relationships and Specialty Pharmacies' improper activities would never been sustainable.

### D. Misrepresentations in Financial Statements and Accompanying MD&As

145. The Valeant Defendants were required to accompany Valeant's financial statements with MD&As and to provide therein information regarding trends, risks or events that affect the quality or variability of Valeant's earnings and cash flow, and such other information that was reasonably expected to affect Valeant's financial statements in the future.

146. Valeant's MD&As issued during the Class Period failed to provide material information regarding Valeant's relationships with and its conduct of its business through Specialty Pharmacies, which were reasonably expected to affect Valeant's financial statements, rendering Valeant's financial statements false and/or misleading.

147. Additionally, Valeant's financial statements issued during the Class Period contained the following misrepresentations.

148. *The financial statements failed to disclose material related party transactions.* Philidor was a related party of Valeant by virtue, among other things, of Valeant's control over it whether

contractually or otherwise.  Accordingly, Valeant's financial statements were required under GAAP to disclose all material transactions with Philidor including, *inter alia*: (a) sales to and through Philidor and/or the related intercompany transactions between Valeant and Philidor; and (b) the Option Purchase Agreement.  Valeant's financial statements issued during the Class Period failed to disclose these related parties and material related party transactions.

149.   *The financial statements failed to provide requisite disclosure regarding Philidor as a variable interest entity ("VIE").*  At all material times, Philidor was considered to be a VIE in relation to Valeant, according to the defendant *Rosiello* on the conference call held on October 26, 2015.

150.   The term VIE refers to an entity in which the investor (here, Valeant) has a controlling and/or significant financial interest.  *Under* GAAP when such an investor is the primary beneficiary of the VIE it must consolidate the VIE's financial statements.  Notably, a primary beneficiary need not be a party with the majority or even any of the voting interests in an entity; rather, it would suffice that it has the power to direct the activities that most significantly impact the VIE's economic performance, or the obligation to absorb losses or the right to receive benefits that could potentially be significant to the VIE.

151.   As of December 2014, Valeant consolidated Philidor's financial statements, because Valeant purportedly determined that it was the primary beneficiary of Philidor.

152.    Valeant's financial statements failed to comply with GAAP for reasons which are set out in paragraphs 54-68. Valeant's financial statements also failed to comply with GAAP disclosure requirements regarding Philidor as a VIE, in that:

(a)    Valeant's financial statements for year-end 2014 and thereafter had to disclose the methodology for determining Valeant as the primary beneficiary of Philidor, the significant judgments and assumptions in making that determination, and the primary factors underlying the consolidation of Philidor's financial statements;

(b)    all of Valeant's financial statements issued during the Class Period had to disclose, beyond carrying amounts of the assets and liabilities related to Philidor as a VIE, qualitative and quantitative information about Valeant's involvement with Philidor including, but not limited to, the nature, purpose, size and activities of Philidor, including how Philidor was financed; and

(c)    all of Valeant's financial statements issued during the Class Period had to disclose whether Valeant had provided financial or other support to Philidor that it was not previously contractually obligated to provide or whether Valeant intended to provide support to Philidor, including the type and amount of support and the primary reasons for providing the support;

the Impugned Documents that are financial statements and their accompanying MD&As violated these GAAP requirements.

153.    *False revenue recognition*.  At all material times, Valeant purported to recognize revenue in accordance with GAAP, and only when revenue was realized or realizable and earned, persuasive evidence of an arrangement existed, delivery had occurred or services had been rendered, the price to the customer was fixed or determinable, and collectability was reasonably assured.

154.    However, at all material times during the Class Period, revenues recognized on sales made to or through Philidor were based on improper activities that, at a minimum, violated the contracts between Philidor and the payers; due to such contract breaches, Valeant recognized revenues on sales made to or through Specialty Pharmacies when: (a) persuasive evidence of an arrangement did not exist; (b) revenue was not measurable; and/or (c) collectability was not reasonably assured,

contrary to GAAP's revenue recognition requirements.   These revenues were false, and were recognized in violation of GAAP and Valeant's stated revenue recognition accounting policies.

155.    The false revenues that Valeant recognized through Specialty Pharmacies were significant and material to Valeant, whether qualitatively or quantitatively, or both.

156.    *Violation of fair presentation requirement under GAAP.*   At all material times, Valeant purported to present its financial statements in accordance with GAAP, which required that the financial statements present fairly Valeant's as well as its subsidiaries' financial position, financial performance and cash flows.  Due to: (a) the failures to disclose related parties and material related party transactions with Philidor; (b) the failures to comply with GAAP's disclosure requirements in respect of Philidor as a VIE; and (c) false revenue recognition on sales made to or through Philidor, Valeant's financial statements that were issued during the Class Period failed to present fairly financial position, financial performance and/or cash flows of Valeant and the Valeant subsidiaries involved with Specialty Pharmacies, in violation of GAAP.

### E.  Misrepresentations Regarding Valeant's Internal Controls

157.    At all material times during the Class Period, the Valeant Defendants represented that Valeant's disclosure controls and procedures, including such internal controls that related to Valeant's subsidiaries, were effective.  Such statements, included in the Impugned Documents, were false and/or misleading.

158.    At all material times during the Class Period, the Valeant Defendants and PwC represented that Valeant's internal control over financial reporting, including such internal controls that related

to Valeant's subsidiaries, were effective.  Such statements, included in the Impugned Documents, were false and/or misleading.

159.    At all material times, Valeant's internal controls were ineffective or defective in respect of Valeant's relationships with Philidor and the other Specialty Pharmacies.

160.    In addition, and/or in the alternative, Valeant's internal controls in relation to Philidor and the other Specialty Pharmacies were overridden by management, rendering such internal controls ineffective or defective.

161.    Furthermore, that Valeant's internal controls were overridden by management constituted a material fact that the Defendants ought to have but failed to disclose.

## A.F.   The Individual Defendants' False Certifications

111.162.        Pursuant to NI 52-109, the defendants Pearson and Schiller certified the 10-Qs and 10-Ks signed during the Class Period, attesting to the accuracy of the financial statements, that all material facts were disclosed, , and that Valeant had adequate internal financial controls.

112.163.        Among other things, the Individual Defendants certified, at the relevant times, that:

a)      such documents did not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made;

b)      they were responsible for establishing and maintaining DC&P and ICFR;

c)      they had designed DC&P, or caused it to be designed under their supervision, to provide reasonable assurance that material information relating to Valeant was made known to them by others, particularly during the period in which the documents were being prepared, and information required to be disclosed by Valeant in its annual filings, interim filings or other reports filed or submitted under securities

legislation was recorded, processed, summarized and reported within the time periods specified in securities legislation;

d)      they had designed ICFR, or caused it to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP or IFRS, as applicable; and

e)      in respect of Valeant's annual filings, the Individual Defendants had evaluated, or caused to be evaluated under their supervision, the effectiveness of Valeant's ICFR and DC&P at the financial year end and Valeant had disclosed in its annual filings their conclusions about the effectiveness of Valeant's ICFR and DC&P.

164.   The Plaintiff and Class Members plead that the Individual Defendants oversaw the preparation and reporting of Valeant's disclosures to the market and knew or should have known of the misleading statements. The Individual Defendants authorised, permitted or acquiesced to the release of the core documents (the financial reports) released during the Class Period by Valeant which contained the misrepresentations.

### G.  Misrepresentations Regarding Ethical Business Conduct

165.   At all material times during the Class Period, Valeant maintained written and stated Standards of Business Conduct applicable to Valeant's directors, officers and employees and a Code of Ethics for CEO and Senior Financial Executives.

166.   All Impugned Documents that were Management Information Circulars and AIFs represented that the Valeant Defendants and other Valeant directors, officers and employees complied with these policies.   For example, Valeant's Management Information Circular dated April 9, 2015, stated:

### Ethical Business Conduct

*Standards of Business Conduct (including the Code of Ethics for CEO and Senior Financial Executives)*

The Board has adopted a written code of business conduct and ethics entitled the Standards of Business Conduct (the "Standards") for our Directors, officers and employees that sets out the Board's expectations for the conduct of such persons in their dealings on behalf of the Company. Employees, officers and Directors are required to maintain an understanding of, and ensure that they comply with, the Standards. Supervisors are responsible for maintaining awareness of the Standards and for reporting any deviations to management. In addition, the Standards require the Company to conduct regular audits to test compliance with the Standards. Subject to Board approval, responsibility for the establishment and periodic update and review of the Standards falls within the mandate of the Audit and Risk Committee.

Employees, officers and Directors are required to immediately report violations of the Standards to their supervisors, our human resources department, our Chief Compliance Officer or our General Counsel. The Board has established reporting procedures in order to encourage employees, officers and Directors to raise concerns regarding matters addressed by the Standards on a confidential basis free from discrimination, retaliation or harassment. Employees and officers who violate the Standards may face disciplinary actions, including dismissal. The Board is not aware of any breach of the Standards by any Director or officer during the period from January 1, 2014 through the date hereof.

*Code of Ethics*

We also have a Code of Ethics for the CEO and Senior Finance Executives (the "Code"), which is designed to deter wrongdoing and promote (i) honest and ethical conduct in the practice of financial management, (ii) full, fair, accurate, timely and understandable disclosure, and (iii) compliance with all applicable laws and regulations. Violations of the Code are reported to the Chief Compliance Officer. Failure to observe the terms of the Code may result in disciplinary action, including dismissal. The Board is not aware of any breach of the Code by the CEO or any Senior Finance Executive during the period from January 1, 2014 through the date hereof.

167.    Such representations were false and/or misleading.

168.    Among other things, Valeant's Standards of Business Conduct required as follows:

(a)      "We will engage only in fair and open competition in compliance with applicable laws, rules and regulations";

(b)      "We will record and report all data and information accurately, honestly, and in sufficient detail";

(c)      "We will ensure that we comply fully with all applicable securities laws, rules and regulations, including with respect to press releases, disclosure and trading in the Company's shares"; and

(d)      "While recognizing the need to be commercially effective in the marketplace, we will maintain our commitment to be ethically and medically responsible and to comply with the laws that apply to our business."

169.   Among other things, Valeant's Code of Ethics required CEO and Senior Financial Executives of Valeant to:

(a)      "Act with honesty and integrity";

(b)      "Observe both the form and spirit of technical and ethical accounting standards";

(c)      "Ensure that Valeant's disclosure is full, fair, accurate, complete, objective, relevant, timely and understandable, including in Valeant's disclosures and filings with, and other submissions to, the U.S. Securities and Exchange Commission, the Canadian securities regulatory authorities and any exchange on which Valeant's securities are listed";

(d)      "Comply with all applicable laws, rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies";

(e)      "Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting facts or allowing your independent judgment to be subordinated"; and

(f)      "Promptly report violations of this Code of Ethics."

170.   Valeant's directors, officers and employees violated the above policies in their dealings with, and in conducting Valeant's business through, Specialty Pharmacies.  They further violated these policies by failing to disclose material information regarding the circumstances of Valeant's relationships with Specialty Pharmacies as required by securities law.

### B.H.        Liability of PwC

113.171.        PwC audited the financial statements and authorized each of Valeant's 2012, 2013 and 2014 Annual Reports and financial statements. These reports contained the opinion of PwC that Valeant's financial reporting was GAAP-compliant, that the reporting complied with Valeant's internal controls and that PwC's audits were conducted in accordance with generally accepted auditing standards (GAAS).  Specifically, PwC, in its opinion that Valeant's financial statements were prepared according to GAAP:

   a) misrepresented that Valeant's revenue recognition practices were in accordance with GAAP,  which resulted in an overstatement of revenue, income and earnings throughout the Class Period;

   b) misrepresented that Valeant's internal controls were effective when they were in fact materially deficient and yielded inaccurate and materially misleading financial statements and misrepresented that Valeant's financial statements had been prepared based on Valeant's maintenance and application of appropriate internal financial controls;

c) misrepresented Valeant's relationship with specialty pharmacies, specifically Philidor and Isolani by failing to make proper disclosure, and failed to appropriately recognize the related party transactions; and

d) misrepresented that Valeant's financial statements accurately described, fairly presented and disclosed the true financial condition of Valeant.

172.   As part of its audit responsibilities, PwC had the responsibility according to GAAS to review Valeant's revenue recognition practices, its related party transactions including those with Philidor, Isolani and other related parties, to determine that they complied with GAAP and were consistent with the appropriate internal financial controls. PwC knew throughout the Class Period that Valeant's revenue recognition practices did not comply with GAAP but failed to conduct its audits in a manner consistent with GAAS and misrepresented that Valeant's financial statements and quarterly financial reports prepared during the Class Period were GAAP-compliant and not misleading.

173.   In performing its audits and other engagements, the Auditors' Professional Standards required PwC to: (a) ensure disclosure in accordance with GAAP of all material information regarding Valeant's revenue generation and revenue recognition practices including information regarding Valeant's dealings with Philidor as a VIE and/or a related party; (b) identify, assess and address the risks of material misstatements due to fraud or error arising from Valeant's relationships with and its conduct of business through Specialty Pharmacies; and (c) evaluate the overall presentation of Valeant's financial statements in light of the material facts relating to Valeant's revenue generation and revenue recognition practices including relationships with Specialty Pharmacies.  PwC failed to comply with these standards.

174.     Throughout the Class Period, PwC had the obligation as auditors to carefully review and analyze Valeant's reported revenue including its revenue generation and revenue recognition practices to ensure that the reported revenue was legitimate, complied with appropriate and effective internal controls, was collectible and receivable, and that all material risks arising from such revenue recognition practices and the sustainability of such revenue was properly and accurately disclosed. PwC failed to fulfill this obligation reasonably throughout the Class Period, resulting in misleading financial reports released throughout the Class Period.

175.     Material information regarding Valeant's relationships with, and its conduct of business through, Specialty Pharmacies was at all material times available to PwC; at all material times, PwC knew or ought to have known of the facts relating to these relationships.  Notably, as of year-end 2014, pursuant to the Option Purchase Agreement, Valeant acquired the right to audit Philidor's accounting books and records, among other rights, and such an audit would have been carried out by PwC.

114.176.       Contrary to PwC's assertions: a) the accompanying balance sheets and financial statements of Valeant and/or its subsidiaries released during the Class Period  were not compliant with GAAP; (b) Valeant's internal controls in relation to its conduct of business with and through Specialty Pharmacies were ineffective or defective; and (c) PwC failed to comply with applicable Auditors' Professional Standards in auditing Valeant and its subsidiaries and in issuing an unqualified audit report to Valeant's shareholders on those financial statements.

115.177.       PwC's misrepresentations in its audit report dated February 25, 2015 were included or incorporated by reference on PwC's consent in Valeant's Offering Memorandum dated March 13, 2015 and Prospectus Supplement dated March 17, 2015, which are Impugned Documents.

Additionally, PwC's audit report dated February 25, 2015 and the accompanying balance sheet and financial statements of Valeant contained the misrepresentations described herein, which were included or incorporated by reference on PwC's consent in Valeant's Offering Memorandum dated March 13, 2015 and Prospectus Supplement dated March 17, 2015, which are Impugned Documents.

## XI. VIOLATIONS OF GAAP THROUGHOUT THE CLASS PERIOD

~~116.~~178.      Valeant's revenue recognition practices and procedures violated GAAP throughout the Class Period. First, Valeant improperly recognized revenue by using misleading accounting polies that have inflated its revenue by improperly recognizing sales to closely related companies, including Philidor Rx Services LLC, Isolani LLC and R&O Pharmacy LLC. It also used revenue recognition practices, as described herein, to inflate revenues through "channel stuffing", phantom sales and phantom accounts to improperly increase receivables. It also failed to implement and/or follow reasonable financial controls.

~~117.~~179.      Further, Valeant failed to properly disclose its related party transactions between Valeant, its subsidiaries and affiliates. This is a violation of GAAP and resulted in misrepresentations in Valeant's financial statements.

~~118.~~180.      Valeant also used the following revenue recognition practices, which are contrary to GAAP:

    a) overstated receivables that were known to be uncollectable;

    b) use of specialty pharmacies to book phantom revenue;

    c)  created inflated revenue by storing inventory and recording phantom transactions with related parties as "sales" creating false revenue; and

    d)  used phantom accounts to fabricate sales

~~119.~~181.     As such, the company has misrepresented the strength of its internal control system as it should have brought to the surface the material revenue recognition GAAP and disclosure problems.

~~120.~~182.     The PwC Defendant misrepresented to the market that Valeant's financial statements were compliant with GAAP and all applicable internal controls. The PwC Defendant knew Valeant's revenue recognition practices were contrary to GAAP, and specifically that the receivables were overstated and known to be uncollectable, and the revenue and earnings were overstated. Despite this, PwC failed to audit the financial statements in accordance with GAAP.

## XII.   ~~CAUSES~~ RIGHTS OF ACTION

### A. Primary Market Liability <u>for Misrepresentations in Prospectuses and the Offering Documents</u> – Part XXIII of the OSA

~~121.~~183.     During the Class Period and specifically in June 2013, Valeant raised capital through the primary markets. The Plaintiff plead the statutory cause of action of misrepresentation in the primary market, pursuant to section 130 of the OSA or, (in the alternative, section 130.1 of the OSA) and the equivalent provisions of Other Canadian Securities Legislation, on behalf of primary market Class Members who acquired Valeant securities offered by the various prospectuses referred to herein and in the distributions to which those prospectuses related <u>and on behalf of those Class</u>

Members who acquired Valeant's Notes offered by way of the Offering Memoranda during the period of distribution.

~~122.~~184.    In relation to these primary market distributions, the Valeant Defendants released offering documents that made misrepresentations as defined in section 1(1) of the OSA and the equivalent provisions of Other Canadian Securities Legislation. These misrepresentations, as previously described herein, were not within the knowledge of the Plaintiff and Class Members, and which caused depreciation in the value of the securities purchased by the Plaintiff and Class Members. Those included a short form prospectus which incorporated by reference Valeant's misleading 2012 Annual Report and the financial statements contained therein, and its misleading Q1 2013 financial report which contained misrepresentations as described herein and the Offering Documents referred to herein.

~~123.~~185.    The Valeant Defendants, by commission and omission in the Prospectus and the Offering Documents, misstated material facts and failed to state material facts necessary and required to be stated, as are described herein.

~~124.~~186.    The Plaintiff and Class Members plead that the Defendants are jointly and severally liable to the Class for the above-mentioned misrepresentations. Each of the Individual Defendants was a director and/or officer of Valeant when the documents were released. The defendants Farmer and Morfit signed the June 2013 Prospectus on behalf of the Board.

~~125.~~187.    The Individual Defendants were aware and consented to the release of the documents while knowing the documents contained the misrepresentations alleged herein. The Individual Defendants did not conduct, and did not cause to be conducted, reasonable

investigations, nor did they have reasonable grounds to believe that the prospectuses and offering memoranda referred to above did not contain misrepresentations.

~~126.~~188.        In addition, the Plaintiff pleads the following pursuant to the OSA and Other Canadian Securities Legislation:

(a)    Valeant was an "issuer" within the meaning of Part XXIII of the *OSA*;

(b)    Pearson was a "director" within the meaning of Part XXIII of the *OSA* at the time that the distribution was completed; and

(c)    Pearson and Schiller signed certificates contained in the prospectuses.

189.   The Plaintiff and Class Members plead that the PwC Defendant is jointly and severally liable to the Class Members for misrepresentations contained in the prospectus and the Offering Document. The PwC Defendant knew that, consented to and authorized the prospectus being filed, including the financial statements which contained misrepresentations as described herein. PwC did not conduct, and did not cause to be conducted, reasonable investigations, nor did it  have reasonable grounds to believe that the prospectuses and offering memoranda referred to above did not contain misrepresentations.

190.    Valeant and, by virtue of their specified roles in making continuous disclosure under the Securities Legislation and their authority within or special relationship with Valeant, the other Defendants owed a duty to ensure that the Offering Documents made full, true and plain disclosure of all material facts relating to Valeant's Securities that were distributed by way of the Offering Documents.  They failed to do so.

191.    The Individual Defendants and PwC were privy to material information about Valeant and its business and affairs that was not available to the Class Members.

74

## B.  Secondary Market Liability – Part XXIII.1 of the *OSA*

~~127.~~192.      The Plaintiff, on her own behalf and on behalf of the Class Members, plead that during the Class Period Valeant released "core documents" as well as other documents, as described above, which contained misrepresentations as defined in section 1(1) of the OSA and the equivalent provisions of Other Canadian Securities Legislation.

~~128.~~193.      Each of the Individual Defendants was a director and/or officer of Valeant when the documents were released. The Individual Defendants authorized, permitted, or acquiesced in the release of the documents while knowing the documents contained the misrepresentations alleged herein.   The Individual Defendants failed to conduct, and did not cause to be conducted, a reasonable investigation and had reasonable grounds to believe that Valeant had filed documents and had made public oral statements containing the misrepresentations.

~~129.~~194.      Valeant is a reporting issuer within the meaning of the OSA and the Other Canadian Securities Legislation.

~~130.~~195.      With respect to the Certifications, the Individual Defendants permitted, authorized or acquiesced in the release of the Certifications, and knew that the Certifications contained the misrepresentations that are alleged above to have been contained therein or, in the alternative, deliberately avoided acquiring such knowledge or, in the alternative, was guilty of gross misconduct in connection with the release of the Certifications.

~~131.~~196.      With respect to the core documents, non-core documents and public oral statements (collectively the "Representations"), the Individual Defendants permitted, authorized or acquiesced in the release of the Representations, and knew that the Representations contained the

misrepresentations that are alleged above to have been contained therein or, in the alternative, deliberately avoided acquiring such knowledge or, in the alternative, was guilty of gross misconduct in connection with the release of the Representations.

~~132.~~197.      Pursuant to section 138.3(1) of the OSA and the equivalent provisions of the Other Canadian Securities Legislation, the Individual Defendants are liable in respect of the misrepresentations alleged to be contained in the Certifications.

~~133.~~198.      On the basis of the foregoing, the Plaintiff pleads that the Valeant Defendants are liable to Class for damages under Part XXIII.1 of the OSA and the equivalent provisions of Other Canadian Securities Legislation.

~~134.~~199.      The Plaintiff, on her own behalf and on behalf of the Class Members, plead that Valeant's quarterly interim financial statements, audited annual financial statements, and management's discussion and analysis issued during the Class Period made misrepresentations as that term is defined in section 1(1) of the OSA.  These misrepresentations included, *inter alia*:

a)  the revenue and income of Valeant was overstated;

b)  they stated that Valeant's internal financial controls were adequate to generate the financial reports when in fact they were not adequate and were not applied;

c)  the description of the risks Valeant was facing was inaccurate as it should have disclosed that there were errors in the financial statements resulting from revenue generation and revenue recognition practices, and that were explained risks

associated with Valeant's revenue generation practices which were unsustainable; and

d)  non-disclosure of material facts including details of Valeant's revenue generation and revenue recognition practices, details of Valeant's use of subsidiaries including specialty pharmacies and other Variable Interest Entities, and details of transactions with related parties.

~~135.~~200.     The Plaintiff, on her own behalf and on behalf of the Class Members, pleads that during the Class Period the PwC Defendants prepared reports, statements and opinions that contained misrepresentations, as defined in section 1(1) of the OSA and the equivalent provisions of Other Canadian Securities Legislation, and that were incorporated by reference in the core documents released by Valeant as described herein.

~~136.~~201.     Specifically, the Plaintiff, on her own behalf and on behalf of the Class Members, pleads that pursuant to section 138.3(1) of the OSA and the equivalent provisions of the Other Canadian Securities Legislation, the PwC Defendants are liable in respect of the misrepresentations contained in their reports and opinions relating to the financial statements and reports released during the Class Period and the effectiveness of Valeant's internal financial controls throughout the Class Period.

~~137.~~202.     The Plaintiff, on her own behalf and on behalf of the Class Members, pleads that PwC is liable for misrepresentations contained in the financial reports relating to the consolidated financial statements of Valeant in 2012, 2013 and 2014, and other financial reports released during the Class Period.

### C.  Negligent Misrepresentation

~~138.~~203.        On behalf of the Class, the Plaintiff pleads negligent misrepresentation against all of the Defendants for the documents listed above on the basis that these documents contain misrepresentations as described herein.

~~139.~~204.        In addition, on behalf of the Class, the Plaintiff pleads negligent misrepresentation as against the Individual Defendants for the Certifications.

~~140.~~205.        The Individual Defendants who were directors of Valeant during the Class Period were required to review and approve each of the documents.  As such, each of them authorized, permitted or acquiesced in the release of such documents containing misrepresentations.

~~141.~~206.        The Individual Defendants certified the accuracy of all of the documents described herein.  They certified that such documents did not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made.  The Individual Defendants authorized, permitted or acquiesced in the release of such documents and adopted the statements contained therein by certifying their accuracy.

~~142.~~207.        The Individual Defendants signed the Certifications and, as such, they authorized, permitted or acquiesced in the release of the Certifications.

~~143.~~208.        The documents described herein and the Certifications were prepared for the purpose of attracting investment and inducing Class Members to purchase Valeant securities.  The Valeant Defendants knew and intended at all material times that those documents were prepared for

that purpose, and that the Class Members would rely reasonably and to their detriment upon such documents in making the decision to purchase Valeant securities.

~~144.~~209.        The Defendants further knew and intended that the information contained in the documents described herein and the Certifications would be incorporated promptly into the price of Valeant's publicly traded securities, such that the trading price of those securities would at all times reflect the information contained in such documents. Valeant shares traded in such volumes, and the market was so efficient and so immediately responsive to Valeant's disclosure of information, that all Class Members relied in making their purchases on the public disclosure of information, such that reliance can be deemed based on the facts and issues of this case.

~~145.~~210.        Throughout the Class Period, the Defendants had exclusive access to information about Valeant's business and operations.  As such, they were the primary source of information specifically related to Valeant's business which was relevant to the decision to acquire Valeant's securities and the price at which they would be acquired.

~~146.~~211.        The Defendants owed the Class Members a duty of care, based on their proximity to the Class Members and the foreseeability that their negligence would cause the Class Members damage, to ensure that the documents described herein and the Certifications did not misrepresent the facts pertaining to Valeant's business and operations.  That duty was informed by the OSA and the Other Canadian Securities Legislation as well as subsidiary instruments cited herein, including NI 51-102 and NI 52-109.

147.212.    The Defendants breached that duty by making misrepresentations in the core documents, other documents, press releases, earning conference calls and other documents described herein.

148.213.    Further, on their own behalf and on behalf of the Class, the Plaintiff pleads negligent misrepresentation as against the PwC Defendants for the reports relating to the financial statements, the financial statements schedule, and representations relating to the effectiveness of Valeant's internal control over financial reporting in its Form 10-K during the Class Period.

149.214.    The PwC Defendants are liable for the misrepresentations contained in report relating to the financial statements, the financial statement schedules of Valeant during the Class Period, and the effectiveness of Valeant's internal control over financial reporting, which were incorporated by reference in the June 18, 2013 Prospectus Supplement.

150.215.    The PwC Defendants knew about and consented to the incorporation of their reports relating to the financial statements, financial statement schedule and the effectiveness of Valeant's internal control over financial reporting by reference in the Company's Registration Statement on Forms S-8 and the June 18, 2013 Prospectus Supplement.

151.216.    The PwC Defendants knew that the documents described herein were prepared for the purpose of attracting investment and inducing Class Members to purchase Valeant securities.

152.217.    The PwC Defendants further knew or ought to have known that the Plaintiff and the putative Class Members would reasonably rely on the representations contained in their reports to their detriment in making the decision to purchase Valeant securities.

153.218.      The PwC Defendants owed a duty of care to the Plaintiff and the Class Members based on their proximity to the Class Members and the foreseeability that the Class Members would rely on the audited financial statements of PwC for the precise purpose for which they were prepared.

219.    The PwC Defendants breached their duty of care to the Class Members by failing to act in accordance with the standard of care required to ensure that the documents described herein did not misrepresent facts pertaining to the adequacy and effectiveness of Valeant's internal controls.

220.    The Defendants had a duty to the Class Members to exercise care and diligence to ensure that the Impugned Documents did not include untrue statements of material facts or omissions to state such material facts that were required to be stated so that those disclosure documents would not be false and misleading.

221.    The Defendants' duties were informed by the Securities Legislation, subsidiary instruments including NI 51-102, NI 52-108, NI 52-109, NI 45-106, NI 52-110 and their related rules and policies, U.S. securities laws, sections 142 and 212-220 of the *BCBCA*, the Auditors' Professional Standards and Valeant's own stated policies, including the charters of its Board's Audit and Risk Committee and Nominating and Corporate Governance Committee.

222.    The Valeant Defendants breached their duty of care to the Class Members who acquired Valeant's Securities in the secondary market by making or adopting the misrepresentations referred to herein. PwC breached its duty of care by making the misrepresentations referred to herein. The misrepresentations were made negligently and/or recklessly.

223.   At all material times, the Defendants had exclusive access to information regarding Valeant's business and operations.  As such, they were the primary source of information relevant to the Class Members' decision to acquire Valeant's Securities and the price at which those Securities would be acquired.

224.   The Impugned Documents were prepared for the purpose of attracting investment and inducing members of the public, including the Class Members, to purchase Valeant's Securities. The Defendants knew and intended at all material times that those documents had been prepared for that purpose, and that the Class Members would rely reasonably upon such documents and their misrepresentations included therein in making the decision to purchase Valeant's Securities.

225.   The Defendants further knew and intended that the information contained in the Impugned Documents would be incorporated into the price of Valeant's publicly-traded Securities such that the trading price of those Securities would at all times reflect the information contained in the Impugned Documents.

226.   The Defendants knew an intended that Valeant's Securities be traded in the secondary market, including on the TSX and NYSE.  The Defendants knew of the total number of Valeant's Securities that were available for trading in the secondary market, and the class of the investors who would acquire Valeant's Securities in the secondary market.  Moreover, some of the Class Members were already securityholders of Valeant before they acquired more of Valeant's Securities in the secondary market, thereby adding to their positions relying on the Defendants' misrepresentations.

227.   The Plaintiff and the Class Members who acquired Valeant's Securities in the secondary market directly or indirectly relied on the misrepresentations described herein in making a decision

to purchase Valeant's Securities, and suffered damages when the falsity of the these misrepresentations was revealed.

228.   Alternatively, the Plaintiff and those Class Members relied upon misrepresentations described herein by the act of purchasing Valeant's Securities in an efficient market that promptly incorporated into the price of those Securities all publicly-available, material information regarding the Securities of Valeant.  As a result, the repeated publication of the misrepresentations described herein in the Impugned Documents caused Valeant's Securities to trade at inflated prices during the Class Period, thus directly resulting in damages to the Plaintiff and the Class Members.

~~154.~~229.        The Plaintiff and the other Class Members directly or indirectly relied upon, or can be deemed to have relied upon, the misrepresentations in making a decision to purchase the securities of Valeant, and suffered damages.

230.   Alternatively, the Plaintiff and the other Class Members relied, or can be deemed to have relied, upon the misrepresentations by the act of purchasing Valeant securities in an efficient market that promptly incorporated into the price of those securities all publicly available material information regarding the securities of Valeant.  As a result, the repeated publication of the misrepresentations in the documents described herein and the Certifications caused the price of Valeant's shares to trade at inflated prices during the Class Period, thus directly resulting in damage to the Plaintiff and the other Class Members.

## XIII.  THE RELATIONSHIP BETWEEN VALEANT'S DISCLOSURES AND THE PRICE OF VALEANT'S SECURITIES

~~155.~~231.       The price of Valeant's securities was directly affected during the Class Period by the issuance of the documents containing the misrepresentations particularized herein.  The Defendants were aware at all material times of the effect of Valeant's disclosure documents upon the price of its securities.

~~156.~~232.       The documents were filed, among other places, with SEDAR and the TSX, and thereby became immediately available to, and were reproduced for inspection by, the Class Members, other members of the investing public, financial analysts and the financial press throughout the Class Period.

~~157.~~233.       Valeant routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of Valeant securities throughout the Class Period.  Valeant provided either copies of the above referenced documents or links thereto on its website.

~~158.~~234.       Valeant regularly communicated with the public investors and financial analysts via established market communication mechanisms, including through regular disseminations of their disclosure documents, including press releases on newswire services in Canada, the United States and elsewhere throughout the Class Period.  Each time Valeant communicated that new material information about Valeant financial results to the public the price of Valeant securities was directly affected.

~~159.~~235.       Valeant was the subject of analysts' reports that incorporated and/or analysed and interpreted certain of the information contained in the disclosure documents, with the effect that any

recommendations to purchase Valeant securities in such reports during the Class Period were based, in whole or in part, upon that information throughout the Class Period.

160.236.        Valeant's securities were and are traded, among other places, on the TSX, which is an efficient and automated market, throughout the Class Period. The price at which Valeant's securities traded promptly incorporated material information from Valeant's disclosure documents about Valeant's business and affairs, including the misrepresentations alleged herein, which was disseminated to the public through the documents referred to above and distributed by Valeant, as well as by other means.

## XIV.   DAMAGES

237.    The Plaintiff and the other Class Members suffered damages as a result of the Defendants' conduct and the misrepresentations in the Impugned Documents.

238.    As a result of the Defendants' conduct and the misrepresentations in the Impugned Documents, the Class Members acquired Valeant's Securities at artificially inflated prices. Had the Defendants not made those misrepresentations, the Plaintiff and the other Class Members would not have suffered losses.

239.    The Plaintiff and the other Class Members suffered losses as a result of the decline in the market price or value of the Securities when the misrepresentations in the Impugned Documents were corrected.

## XIV.XV.     VICARIOUS LIABILITY

161.240.	Valeant is vicariously liable for the acts and omissions of the Individual Defendants particularized herein.

162.241.	At all material times, the Individual Defendants were officers and/or directors of Valeant.  As their acts and omissions are independently tortious, they are personally liable for same to the Plaintiff and the other Class Members.

## XV.XVI.	REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO

163.242.	The Plaintiff plead that this action has a real and substantial connection with Ontario because, among other things:

(a)(g)	Valeant is a reporting issuer in Ontario;

(b)(h)	Valeant's shares trade on the TSX, which is located in Toronto, Ontario;

(c)(i)	the Valeant disclosure documents referred to herein were disseminated in Ontario;

(d)(j)	a substantial proportion of the Class Members reside in Ontario;

(e)(k)	Valeant carries on business in Ontario; and

(f)(l)	a substantial portion of the damages sustained by the Class were sustained by persons and entities domiciled in Ontario.

## XVI.XVII.	SERVICE OUTSIDE OF ONTARIO

164.243.	This originating process may be served without court order outside Ontario in that the claim is:

a)  in respect of a tort and statutory misrepresentation committed in Ontario (rule 17.02(g));

b)  in respect of damages sustained in Ontario arising from a tort wherever committed (rule 17.02(h));

c)  against a person outside Ontario who is a necessary or proper party to a proceeding properly brought against another person served in Ontario (rule 17.02(o)); and

d)  against a person carrying on business in Ontario (rule 1 7.02(p)).

## ~~XVII.~~XVIII.   RELEVANT LEGISLATION

~~165.~~244.          The Plaintiff pleads and relies on the *OSA*, the Other Canadian Securities Legislation, the *Negligence Act*, R.S.O. 1990, c. N.1, the *CPA*, and the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended.

## ~~XVIII.~~XIX.   PLACE OF TRIAL

~~166.~~245.          The Plaintiff proposes that the trial of this action be in the City of Toronto.

Date: ~~December 23, 2015~~——January 29, 2016——————        **ROCHON GENOVA LLP**
                                                            121 Richmond Street West
                                                            Suite 900
                                                            Toronto ON   M5H 1K2

                                                            **Joel P. Rochon (LSUC #28222Q)**
                                                            **Peter R. Jervis (LSUC #22774A)**
                                                            **Remissa Hirji (LSUC #62207Q)**

Tel:  (416) 363-1867
Fax:  (416) 363-0263

**<u>Siskinds LLP</u>**
<u>Barristers & Solicitors</u>
<u>680 Waterloo Street</u>
<u>P.O. Box 2520</u>
<u>London, ON  N6A 3V8</u>

**<u>Michael G. Robb (LSUC#: 45787G)</u>**
<u>Tel: 519-660-7872</u>
<u>Fax: 519-660-7873</u>

<u>302-100 Lombard Street</u>
<u>Toronto, ON  M5C 1M3</u>

**<u>Daniel E. H. Bach (LSUC#: 52087E)</u>**
**<u>Serge Kalloghlian (LSUC#: 55557F)</u>**
**<u>S. Sajjad Nematollahi (LSUC#: 62311B)</u>**
<u>Tel: 416-594-4376</u>
<u>Fax: 416-594-4377</u>

Lawyers for the Plaintiff

EXHIBIT C

EXHIBIT C

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/valeant-pharmaceuticals-under-investigation-by-federal-prosecutors-1444874710

BUSINESS

# Valeant Pharmaceuticals Under Investigation by Federal Prosecutors

Federal prosecutors asked Valeant for information on drug pricing, distribution and patient assistance



Valeant Pharmaceuticals, its headquarters in Laval, Quebec, shown in May, said late Wednesday it had received subpoenas from federal prosecutors. *PHOTO: CHRISTINNE MUSCHI/REUTERS*

By JONATHAN D. ROCKOFF

Updated Oct. 15, 2015 12:11 a.m. ET

Valeant Pharmaceuticals International Inc.  said late Wednesday it had received subpoenas from federal prosecutors seeking information related to how it prices drugs, distributes them and helps patients afford the medicines.

The subpoenas also seek information and documents from the Canada-based drug company regarding information it provided to the Centers for Medicare and Medicaid Services.

Valeant, which received the subpoenas recently, says they mostly requested information about its programs to help patients pay for the company's drugs. "The company is reviewing the subpoenas and intends to cooperate with the investigations," Valeant said in a statement.

Like many other drug companies, Valeant provides help to patients covering the out-of-pocket costs imposed by private health insurers. In 2014, Valeant spent $544 million on patient assistance, and expects to spend $630 million this year, according to a letter Valeant sent to Sen. Claire McCaskill (D., Mo.) on Wednesday.

---

MORE ON VALEANT

---

- Valeant Probe Reprises Federal Focus on Drug Pricing (http://www.wsj.com/articles/valeant-probe-reprises-federal-focus-on-drug-pricing-1444952138)
- Biotech Stocks: Analysts Say Investors Just Don't Understand (http://blogs.wsj.com/moneybeat/2015/10/08/biotech-stocks-analysts-say-investors-just-dont-understand/) (Oct. 8)
- Valeant's Stock Continues to Fall (http://blogs.wsj.com/moneybeat/2015/10/05/valeants-stock-continues-to-fall/) (Oct. 5)
- Heard on the Street: Valeant Has More to Fear Than Congress (http://www.wsj.com/articles/valeant-has-more-to-fear-than-congress-1443468931) (Sept. 28)
- Lawmakers Seek Answers on Valeant's Price Increases (http://www.wsj.com/articles/congressional-democrats-seek-subpoena-of-valeant-over-drug-prices-1443468385) (Sept. 25)
- Pharmaceutical Companies Buy Rivals' Drugs, Then Jack Up the Prices (http://www.wsj.com/articles/pharmaceutical-companies-buy-rivals-drugs-then-jack-up-the-prices-1430096431) (April 26)

Under federal law, companies can't provide such assistance to patients insured by Medicare or other government insurance programs because the help is considered an illegal kickback. To help patients afford their drugs and get reimbursed by payers, Valeant and other companies give funding to private foundations that independently help Medicare patients.

Valeant said it recently received subpoenas from U.S. Attorney's offices in New York City's southern district and in Boston. Neither office could be immediately reached for comment late Wednesday night.

The company's drug pricing has drawn scrutiny from doctors, hospitals and Democrats in Congress after The Wall Street Journal reported in April about how it and some other companies buy and then significantly raise the prices of drugs. The article featured two drugs used in cardiac care, Nitropress and Isuprel, whose prices Valeant increased by 525% and 212%, respectively, after acquiring the medicines in February.

Citing the article during a Senate hearing in July, Sen. McCaskill asked Howard Schiller, a Valeant board member who is the company's former chief financial officer, about the price increase for Isuprel.

Since the hearing, Sen. McCaskill has sent letters asking Valeant to explain how it decided to raise the prices for both Isuprel and Nitropress and what kind of financial impact that had on the company's performance. Valeant's letter on Wednesday, which was reviewed by the Journal, was in response to the questions.

RELATED READING

- Read a Copy of the Letter (http://online.wsj.com/public/resources/documents/valeantpdf.pdf)

In the letter, signed by CEO Michael Pearson, Valeant said that while it was buying the two drugs, it hired a consultant to review their pricing and reimbursement by the Centers for Medicare and Medicaid Services. Valeant said the consultant found that hospitals considered both drugs to be valuable to hospitals and patients after previous price increases.

The consultant found that "there was considerable room to increase the price of both drugs without unduly depleting the funds available to the hospitals from payers" even after price increases taken by previous owners, Valeant said in the letter.

After Valeant acquired the drugs, the list price of a 1 milliliter vial of Isuprel, a treatment for abnormal heart rhythms, jumped to $1,346.62 from $215.46, according to Truven Health Analytics, which publishes average wholesale prices based on information from drug companies. A 2 milliliter vial of Nitropress, which combats dangerously high blood pressure and acute heart failure, increased from $257.80 to $805.61.

The consultant also found that raising the prices "should not reduce patient access," Valeant said. In addition, the company said the cost of the drugs is covered by payments for the cost of the larger care given to patients, which further reduces the impact of the price increases.

Valeant said it is moving to help any hospitals whose budgets have been unduly impacted by the Nitropress and Isuprel price increases, though hospitals on average spend just $325,000 on the two drugs out of $150 million in typical yearly expenses.

Valeant said sales of Nitropress and Isuprel amounted to $247 million of the $4.9 billion in revenue it notched in the first half of this year. Its shares have been battered in recent weeks amid investor concerns whether the company could keep increasing the prices of its drugs.

Since 2007, Valeant's drug prices have grown by a compounded annual rate of 48%, and the increases have offset declines in the volumes of drugs the company has sold, resulting in a net prescription-drug sales gain of 32%, analysts at Sector & Sovereign Research LLC said in a research note Wednesday.

These price hikes have made Valeant "one of the five largest contributors to" drug market inflation in the U.S. over the past 1½ years, Sector & Sovereign analysts wrote.

A Valeant spokeswoman said the Sector & Sovereign numbers "are not accurate." The spokeswoman said the company on Monday would give price and volume data for all its brand-name prescription drugs for the last four months.

In its letter, Valeant said increasing sales "contributes significantly more than price" to the growth of the company's U.S. branded pharmaceuticals business. Valeant said its drug prices rose 13% between the third quarter of 2014 and the same period this year, while sales volume of the products increased about 20%.

Write to Jonathan D. Rockoff at Jonathan.Rockoff@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008    or visit www.djreprints.com.

**EXHIBIT D**

**EXHIBIT D**

M

UNCATEGORIZED                                          October 19, 2015

# The King's Gambit: Valeant's Big Secret

By **Roddy Boyd**

If the name Valeant Pharmaceuticals International doesn't ring a bell, its business practices should. The Quebec-based drug manufacturer's policy of implementing regular price increases that often run north of 100% has generated plenty of anger, a congressional investigation, constant press coverage and a subpoena from the U.S. Attorneys offices in both the Southern District of New York and the District of Massachusetts.

But as strange as it may seem, a slim legal filing in California federal court is poised to make Valeant's world rockier still.

The story starts 50 miles northwest of Los Angeles in Camarillo, Ca. with R&O Pharmacy, a modestly-sized operation co-owned by veteran compounding pharmacists Russell Reitz and Robert Osbakken.

According to a lawsuit filed by R&O, Russell Reitz got a letter from Robert Chai-Onn, Valeant's general counsel and director of business development, requesting repayment of $69.8 million for "invoiced amounts." This apparently struck Reitz as odd since R&O had done no business, at least in any direct fashion, with Valeant. Moreover, he had never received a single invoice from Valeant or its subsidiaries.

Reitz forwarded the letter to Gary Jay Kaufman, his lawyer down in Los Angeles, who sent a letter to Chai-Onn on September 8 noting that the lack of invoices from Valeant indicated to him one of two things was happening: Valeant and R&O were being jointly defrauded by someone, or Valeant was defrauding R&O. He suggested they talk it over by phone.

Chai-Onn never responded and on October 6, Kaufman filed suit, seeking a determination from the court that R&O owes Valeant nothing.

There is, however, a hook and as these things go, it's a big one: the Southern Investigative Reporting Foundation has confirmed that Reitz was indeed doing business of some sort through a company called Philidor Rx Services and a man named Andrew Davenport.

Which makes Valeant's demand letter very interesting.

To understand why, it's important to understand what Philidor is. To the public, it describes itself as a "pharmacy administrator" and, according to a call service operator last Thursday, Valeant is its only client. Located in Hatboro about 30 miles outside Philadelphia, its corporate filings indicate both companies are independent of the other.

Pharmacy administrator appears to be, in Philidor's case, a term of art.

A better description is a "specialty pharmacy," filling, shipping and getting insurance approval for prescriptions of the more complex drugs Valeant makes. In its third quarter conference call last year, the only instance where Philidor has been publicly mentioned by an analyst, Valeant chief executive Mike Pearson said that perhaps 40% of its business flows through specialty pharmacies. In July, he reiterated the company's guidance for up to $11.1 billion in 2015 revenue, implying that as much as $4.4 billion in product could move through this channel.

(Note that specialty pharmacies are exempt from reporting the drugs they sell to IMS Health, the tracking service used by companies and analysts to monitor drug sales and inventory channels.)

Like many private companies, Philidor's financials are hard to come by but it is unmistakably an operation of some mass, with around 900 employees and its own legal unit. A Pennsylvania State Senator posted an April 6 interview with company CEO Andy Davenport where he stated the company was on track to process between 12,000 and 15,000 prescriptions daily by December. With prescription costs regularly running into the hundreds and even thousands of dollars, the company could potentially handle upwards of $1.5 billion in product this year.

A key cog in Valeant's "patient access" program, patients referred to Philidor often receive coupons for reduced or waived co-pay requirements--given to the prescriber by Valeant's sales representatives--and in turn, Philidor would appear to attempt to recoup the cost of the drug from private insurers or Medicare. Theoretically, this makes price increases less risky for Valeant given that a sizable population of a drug's users frequently won't observe them. Still, the patient access program is central to the company's distribution program, and one of the issues the U.S. Attorney subpeonas specifically sought information on.

Philidor's business practices have generated mixed reviews (at best) on consumer message boards -- including numerous instances of alleged unwanted refills and an allegation of the improper removal of HSA funds. Another message board account alleges that to get reimbursement approvals, prescriptions already denied at larger insurers were "pushed through" their sister pharmacies. (To be sure, comments on these sites can be gamed, both by consumers and the company, and the Southern Investigative Reporting Foundation was unable to verify these accounts.)

Several questions remain unanswered: On the assumption that there is

$69.8 million due someone, why wouldn't Philidor's two in-house attorneys have issued a demand letter to R&O? Similarly, why wouldn't Valeant's high-profile general counsel, when challenged, not provide support for his demand and avoid the risk and expense of litigation? Additionally, if Valeant does have some sort of claim to that nearly $70 million, what then is their real relationship to Philidor?

————————————————-

The Southern Investigative Reporting Foundation was able to uncover Valeant's financial connection to Philidor--one that it hasn't disclosed to investors--as laid out below.

The first task was to establish who owns Philidor. What we discovered was indeed revealing, albeit probably not in the way its owners intended.

Put bluntly, Philidor has gone to great lengths to conceal its ownership. Start with a man named Matthew Davenport, the listed principal on most of Philidor's state registrations; additionally, several states list David Wing, John Carne and Gregory Blaszczynski as officers, and a few more have an End Game Partnership LLP listed as an assistant treasurer.

Given Andy Davenport's video above, his role as Philidor's chief executive is clear. Plugging the address of End Game Partnership LLP (which in turn is owned by End Game LLC, a Las Vegas-based entity) from its filings into a search engine turns up a match to a house Andy Davenport owns in Horsham.

A Southern Investigative Reporting Foundation phone call to Philidor's administration revealed that there is no Matthew Davenport, David Wing, (Edward) John Carne or Gregory Blaszczynski working at Philidor. On the other hand, all four work at BQ6 Media, a pharmaceutical marketing company located about 2.5 miles from the company. At one

point, prior to Philidor, Andy Davenport was its CEO. Both BQ6 and Philidor share the same domain registrar, Perfect Privacy LLC. The company's LinkedIn profile lists 28 employees but the majority are consultants or contract workers, with several listing time spent at Philidor.

The Philidor state registration in North Carolina was particularly helpful in that it listed a broader array of owners than other states.

David Cowen is a former hedge fund manager and Elizabeth Kardos is general counsel for restructuring consultants Zolfo Cooper who are married and own Four Beads LLC; they did not return a message left at their house or reply to an email sent to Ms. Kardos. Nick Spuhler is a BQ6 alum who could not be reached, David Ostrow is a Physical Therapist and golf swing coach who did not return multiple calls to his house and residence, Jeffrey Gottesman is an insurance agent who has a sideline as a competitive poker player; reached on his mobile phone, he declined comment. The address listed for Gina Miller tracked to a code inspection business with no apparent connection to Philidor. Alternatively, a Gina Milner works at BQ6, but it couldn't be determined if she is involved. Fabien Forrester-Charles of Hatboro, Pa. and Francis Jennings of Naples, Fla. could not be reached, and Michael Ostrow of Bala Cynwyd, Pa. did not return a voice message left at his house. Paula Schuler of Old Greenwich, Ct., listed as an owner along with her husband Timothy, said she couldn't talk at that moment; she never returned two follow-up calls.

It is not readily apparent if there are any specific relationships among group members, beyond the general ties to Matthew and Andy Davenport (according to an online database they appear to be brothers), BQ6 and Philadelphia. One that does jump out is David Cowen and Andy Davenport's tenure together at hedge fund Quasar Financial between 2004 and 2008; Davenport also donated to the Museum of American

Finance, where Cowen is the president.

Not every state looked kindly upon the way Philidor went about securing out-of-state pharmacy operation privileges. California took exception to Matthew Davenport's attempt to register as Philidor's principal and rejected the company's application for a Non-Residency Pharmacy Permit in May 2014. The state's Department of Consumer Affairs Board of Pharmacy cited a series of disclosure-related problems, specifically his swearing to what was termed "false statement of facts" on the application, several of which involved the failure to disclose Philidor's ownership group, as well as Andrew's 27% ownership stake.

(A brief aside: Francois-Andre Philidor was an 18th century French Chess master, writing a book about it, The Analysis of Chess. BQ6 Media is named after the chess shorthand for Bobby Fisher's legendary move against Russian chess master Boris Spassky in 1972. Another popular chess move is the King's Gambit Accepted, or as it's often referred to in chess notation, KGA.)

Establishing the economic connection between Valeant and Philidor was less time-consuming.

As it happens, Valeant has a wholly-owned unit named KGA Fulfillment Services Inc., that was formed in Delaware in November, 2014. Its only mention in any Valeant filings is that sole line in last year's annual report. An exhaustive search didn't turn up any references to it in trade publications, nor state and federal databases. (What the initials stand for, apart from the similarity to the chess strategy, is unknown.)

The Southern Investigative Reporting Foundation found KGA Fulfillment Services listed  as the "secured party" on UCC-1 liens placed this January and February against the members of Philidor's ownership group. These liens are the public notice that a lending entity may have an interest in

the debtor's personal property. In this case, Valeant/KGA lent money to Philidor's ownership group and per the rules, is announcing that their equity stakes in Philidor are potentially collateral.

The UCC-1 financing statements for the group are: David Cowen and Elizabeth Kardos, Timothy and Paula Schuler, Nick Spuhler, Andrew Davenport Trust, David Ostrow, David Wing, John Carne, Matthew Davenport, Fabien Forrester-Charles, End Game Partnership LLP, End Game LP and Michael Ostrow.

That an important financial relationship exists between Philidor and Valeant's KGA unit is inarguable; why it exists is much less clear. From the standpoint of rational self-interest, the owner of a rapidly growing business would almost never want to borrow against their equity stake, let alone from the newly launched subsidiary of the enterprise's sole customer.

------------------------

Over several days, since coming across the California lawsuit, the Southern Investigative Reporting Foundation made repeated phone calls to every person or company discussed above. With the exception of Jeffrey Gottesman from the Philidor ownership group and R&O Pharmacy's lawyer, Gary Jay Kaufman--both of whom declined comment--every other person did not return our calls.

Robert Chai-Onn did not reply to a call to his office; a call to a mobile phone registered to his name was answered by his wife, who said she was on the West Coast and was unsure where her husband was at that moment.

Meghan Gavigan of Sard Verbinnen & Co., an outside spokeswoman for Valeant Pharmaceuticals, was unable to secure a response from the

company.

## READ NEXT

### The Pawn Isolated: Valeant, Philidor and the Annals of Fraud

The Southern Investigative Reporting Foundation's story looking at Valeant Pharmaceuticals' well-concealed relationship with Philidor Rx Services, struck a nerve. Briefly, the story explored the ways in which Philidor, a specialty pharmacy whose sole customer is Valeant, used opacity and some misdirection to try and build a national pharmacy network.

## SUPPORT SOUTHERN INVESTIGATIVE REPORTING FOUNDATION

We depend on your support. A generous gift in any amount helps us continue to bring you this service.

**PREVIOUS STORY**

SIRF Wins Lawsuit And Strikes A Sharp Blow For Journalistic Freedom

**NEXT STORY**

The Pawn Isolated: Valeant, Philidor and the Annals of Fraud

# 13 thoughts on "The King's Gambit: Valeant's Big Secret"

Karl Davies on October 19, 2015 at 2:15 pm said:

If they sell inventory to this group and lent them money to get started, that seems very suspicious. Do they disclose how much inventory this group has? Could this just serve as a way to "record sales" for Valeant? Sell inventory to this group?

Reply ↓

> JSmith
> on October 21, 2015 at 12:42 am said:
>
> It seems according to reports, Philidor is consolidated into Valeant's financials so inventory remains Valeant's inventory either way. Also revenue is only recognized when patient prescriptions are filled so cannot really stuff the channel through specialty pharmacies if revenue only recorded when scripts are filled.
>
> Reply ↓

>> Francis Shaft
>> on October 21, 2015 at 11:11 pm said:
>>
>> "Revenue is recognized when patient prescriptions are filled."
>> That's great, but there is NO REVENUE. Just accounts receivable that will never be collected, which is why VRX sued R&O. So VRX books phantom revenue, that they will have to write off some day.
>>
>> Reply ↓

>>> Bob Dole
>>> on October 22, 2015 at 9:04 pm said:
>>>
>>> In the end, what does this mean for Philidor and Valeant? Is this a smack on the wrist, or something far worse?

Reply ↓

tomas rader
on October 26, 2015 at 10:05 pm said:

Or borrowed against the AR with no intention of repayment.
Seize the empty AR account entry? OK … go ahead.

Reply ↓

JSmith on October 21, 2015 at 12:38 am said:

Based on the transcript cited, Mr. Pearson cited 40% of revenues were processed through alternative fulfillment channels in response to a question about Jublia. So this 40% is only as a % of Jublia not the overall revenues. On recent call, Mr. Pearson indicated it is roughly 10 – 15% of US revenue ($700mm – $1bn) and not quite the $4.4 billion suggested. I am not sure that it makes any difference in your work but did want to point that out.

Question-David Steinberg: Thanks very much. I had some questions on Jublia. The first thing is, it looks like in the prescription graph that you added up the Walters data and the specialty pharmacy data. I was just curious, what's the rough breakout between the prescription audit information and that now you get through your specialty pharmacy Philidor?

And, secondly, is sampling still a significant part of your program? And if so, perhaps how much would it understate TruScripts by? And then could you give us an update on how managed care discussions are going on that product? Thanks.

Answer-J. Michael Pearson: Sure. Thanks, David. In terms of the breakdown, the specialty pharmacy channels are multiple specialty pharmacies throughout the United States. But the rough script breakdown is about 40% of the volumes going through specialty pharma and 60% is going through traditional pharmacies.

Reply ↓

D Brown on October 21, 2015 at 7:29 pm said:

Not an expert on drugs but I have extensive experience with electronic components. Apparently, in both fields, it is common for manufacturers to `consign`inventory to distributors. Let us assume something has a manufacturing cost of $5 and sells to distributors for $12.50. The manufacturer carries the item it inventory at $5 and, when they ship it to the distributor, there is not accounting transaction – under consignment the manufacturer retains ownership and has simply changed the inventory location from its plant to the destributor`s warehouse. When the distributor has a demand for the item from an end customer it `pulls`the item from the consigned inventory – title has then passed under the consignment agreement. At that point the manufacturer records a sale and receivable of $12.50 and records a cost of sales and inventory reduction of S5. The distributor may then sell the item to the end customer for $15 and record a sale and receivable for that amount and record a cost of sales and inventory reduction of $12.50. When Valeant says it consolidates Philidor they are referring to the first set of transactions. Unless Valent has direct ownership of Philidor then it would not record the sales at the distributoréend custyomer level. This is typically how consignment agreements work.

Reply ↓

Stacey on October 22, 2015 at 6:15 am said:

Wow, interesting research – I'm a (very small) shareholder in Valeant from a while back. My father introduced me to them after they purchased the company that he worked for and he was "retired" (he was Head of R&D so no surprise there!). I bought when the shares were about $130 and on the rise.

What do you make of the Philidor "network?" When R&O's lawyer confirmed that R&O's website was http://r-opharmacy.com, I initially thought that someone (maybe at Philidor since they're hosting) had set up all of these network pharmacy websites a few months ago as part of a Valeant smear / short selling scheme – particularly in connection with the R&O claim. I thought it would be odd for Philidor to create new websites with altered logos simply as part of their "back-end services" to these pharmacies. And I couldn't find any mention online by these pharmacies of their presence in the network. But then Philidor confirmed that they have a "right to acquire" the pharmacies, including R&O. I suppose the websites are part of the eventual consolidation plan? Like a Valeant mirror on the pharmacy side?

Right now, I'm just hoping that enough of Valeant's revenue is legit/sustainable for it to change out management and start afresh on a realistic, transparent valuation.

Reply ↓

Aaron on October 22, 2015 at 6:13 pm said:

You say the GC "never responded" but the R&O complaint only says that there was no "substantive written response." Like you, I think it is a big deal if the GC never responded, but "never responded" is very different from no "substantive written response," especially given that the R&O counsel asked for a phone call.

Why do you think that VRX GC never responded?

Reply ↓

D Brown on October 22, 2015 at 7:05 pm said:

Stacy – I'm guessing but the "network" may be regulatory related. I believe pharmacies have to have licenses to ship to other states. If that is true then Philidor may not be licensed to ship to all states. Hence, let us say they are not licensed in Alaska, they find someone who can be licensed in Alaska and set them up as a pharmacy there. To get it up and running they would "mirror" the Philidor computer systems. website etc. At some future date, when regulatory hurdles are surmounted, Philidor would buy the AlaskaNewco and presumably collapse it into its core operation. I imagine it is all technically legal but they would presumably be reticent about going into too many details for both competitive reasons and to avoid upsetting regulators (for example the Alaskan regulators might deem unlicensed Philidor to have too many ties, effectively controlling, the licensed AlaskaNewco). It is not clear whether Philidor sold the inventory to R&O or whether it re-consigned the Valeant owned inventory to R&O. Under the latter scenario Valeant would be sending letters to R&O demanding payment when the goods R&O sold the goods to an end customer.

Reply ↓

JasonC on October 22, 2015 at 8:30 pm said:

Does anyone else notice the "end game" aspect, and the alternate explanation? What if all the related private entities are not (merely) ways to book revenue, but are actual places to park net worth? The "if the stock crashes and the game ends" insurance policy being to shift financial resources to the shadow penumbra of Vegas LLCs and such, before the bondholders can demand and attach them. Valeant has a tangible book of negative $40 odd billion. Somehow I doubt everyone in its loose orbit has negative

tangible book value, themselves.

Reply ↓

> tomas rader
> on October 26, 2015 at 10:09 pm said:
>
> Endgame … these guys are dual citizens with israel and will run with billions. Israel won't extradite with that mucho $$$ parked in tel aviv. Watch CNBCs "Greed … most wanted' in the future. LOL
>
> Reply ↓

Brian Huang on October 28, 2015 at 7:31 pm said:

Hey how's Jon Carnes doing?

http://www.nyggroup.com/wp-content/uploads/2013/08/IPOresearch.pdf

Reply ↓

# Leave a Reply

Your email address will not be published. Required fields are marked *

*

*

Comment

Post Comment

**The Infernal Machine: From Powder to Dust**

Go

Select Month

About Us

Contact

Donors

Built with the Largo WordPress Theme from the Institute for Nonprofit News.

© Copyright 2015, Southern Investigative Reporting Foundation

**EXHIBIT E**

**EXHIBIT E**



October 21, 2015

# Valeant: Could this be the Pharmaceutical Enron?

## Citron Publishes the Smoking Gun!!
## Price Target lowered to $50

Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about the company focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development.  But no one had discussed how these drugs were distributed….until this week.

On Monday morning before earnings, a report came out of SIRF, uncovering undisclosed relationships with specialty pharmas, namely Philidor RX.  **Most importantly, the article introduced Wall Street to a court filing made by a company called R&O Pharmacy, filed with the California District Court in September, in which this small regional pharmacy claims it had received an improper demand for payment from Valeant to the tune of $69 million.**

Just yesterday, the New York Times increased its scrutiny on Philidor by questioning if its operation was the target of subpoenas recently served on Valeant over its pricing strategy, covered the prior week.

## This is Not Where the Story Ends; it is Where the Story Begins

With its quarterly earnings report scheduled for first thing Monday morning, Valeant was well aware of the scrutiny that was about to come down on Philidor and the R&O lawsuit, as both SIRF and the NYT had contacted management. Valeant came prepared for the conference call with pre-written questions and answers -- one about Philador, and one about R&O -- in its slide deck.   This is where the cover up begins.

We will let the New York Times start:

"Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports."

An **option**?  To acquire a company to which you are the only customer?  **Why** would Valeant, a major **big cap pharma**, a **darling** of the hedge fund crowd, a **suitor** of Allergan and an aggressive acquirer of **pharmas** like Salix, Bausch & Lomb, etc., etc., be secretly maneuvering to buy a little known pharmacy with a dubious ownership structure? And then consolidate its financials?  Why was this entity NEVER disclosed in any prior company disclosure?  (See Valeant Slides on Philador here.)

## What is being covered up??

In the same slide presentation we read Valeant's explanation of a mysterious court document. R&O Pharmacy filed for pre-emptive relief in California District Court for having received a demand for $69 million from Valeant, stating it had no invoices from Valeant.  Valeant's explanation was this one slide:



So we are to believe that Valeant putatively owns Philidor and is acting as its "protector" in sending the demand letter to R&O for payment?  The story seemed

a bit far-fetched, but it was somewhat plausible if you wanted to suspend all disbelief.

But after a fair amount of due diligence Citron is about to post the line that should send alarm through all Valeant shareholders:

## Philidor Owns R&O Pharmacy.

Citron believes the whole thing is a fraud to create invoices to deceive the auditors and book revenue.  PHANTOM ACCOUNTS.  Here is the reasoning.

# The Smoking Gun!!

From the links below, it is obvious that Philidor and R&O are **ARE THE SAME COMPANY AND SHARE MANAGEMENT.**  The two companies have the same patient privacy disclosure, in fact formatted identically, on both companies' websites.  Note the R&O website refers to themselves as Philidor.



http://randopharmacy.com/downloads/ro_npp.pdf



**PHILIDOR RX SERVICES, LLC NOTICE OF PRIVACY PRACTICES**

THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.

**It's Your Information.** This Notice describes your rights concerning your health record.
The law requires health organizations, such as Philidor Rx Services, LLC, to:
-maintain the privacy of your health information
-provide you with this Notice of our legal duties
-describe our privacy practices
-notify you if we have an information breach
We know your health information is very personal and we are committed to protecting your privacy.

**YOUR RIGHTS**
When it comes to your health information, you have certain rights. This section explains your rights and some of our responsibilities to help you.

http://www.philidorrxservices.com/downloads/philidor_npp.pdf

(Yes we've archived these pages and will republish them in case the links are down by the time you click on them.)

And look!  The pharmacies **-- R&O, in Camarillo California**, and **Philidor RX in Horsham PA**, have **the identical toll free number to reach their Privacy Officer** (at the bottom.)
Now that's some service!

**CONTACT**
We have designated the Privacy Officer as our contact person for all issues regarding patient privacy and exercising your rights under the Federal privacy standards. You may contact this person at:  Privacy Officer, R&O Pharmacy, 651 Via Alondra, Suite 708, Camarillo, CA 93012, privacy@randopharmacy.com or toll free at (855) 815-7688.

Effective Date June 1, 2015

http://randopharmacy.com/downloads/ro_npp.pdf

**CONTACT**
We have designated the Privacy Officer as our contact person for all issues regarding patient privacy and exercising your rights under the Federal privacy standards. You may contact this person at:  Philidor Rx Services, LLC, 330 S. Warminster Rd., Suite 350, Hatboro, PA 19040, privacy@philidorrxservices.com or toll free at (855) 815-7688.

Effective Date June 1, 2015

http://www.philidorrxservices.com/downloads/philidor_npp.pdf

**If you dial the fax # on the R&O website and press 1, you will get Philidor RX.  It does not stop at an R&O phone.**

And as if this isn't enough, it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies ...  the same privacy notice appears on several other "ghost ship" putative pharmacy websites.

http://westwilshirepharma.com/downloads/ww_npp.pdf

http://saferxpharma.com/downloads/saferx_npp.pdf

http://orbitpharmacy.com/downloads/orbit_npp.pdf

Oh, and as by mere coincidence, these all have the same Privacy Officer contact phone number:  **(855) 815-7688**.  And these domains were all registered on the same day!  **[ Click Here to See them all ]**

It is apparent to Citron that Valeant has created a network of "pharmacies" as clones of Philidor.  Why do these exist?   Citron believes it is merely for the purpose of  phantom sales or stuff the channel, and avoid scrutiny from the auditors.

## How Can This Be, Citron ?  Doesn't the Head of the Audit Committee have Any Responsibility Here?

Let us not forget that the head of the Valeant audit committee is Norma Provencio.  Mrs. Provencio herself was a director of Signalife which was run by now convicted stock fraudster Mitchell Stein. She was in fact his close associate for years -- information now conveniently omitted from her biography.  Mrs. Provencio's integrity was first challenged by Bronte Capital in this posting you should read for yourself.  Now the relevance of its full context becomes clear.

## Is this Enron part Deux??

These similarities are too close to ignore.  Does everyone remember during the Allergan takeover battle, when Allergan chose the words "house of cards" ?  Look at the following similarities between statements by Valeant and those of Enron:

Enron CEO Jeff Skilling, phone call with *Fortune*, 2/14/2001: "It is unfair to us and unethical if you don't take the time to understand our business... we are doing it purely right... people who raise questions are people who have not gone through our business in detail..."

vs.

Valeant Chairman, CEO Michael Pearson, investor presentation, 5/28/2014: "So again, it is unfortunate that Allergan has not taken the time to understand our business... There is a number of inaccuracies in the report that was put out yesterday... They are just factually incorrect..."

---

Enron CEO Jeff Skilling, phone call with *Fortune*, 2/14/2001: "[Enron] is a very simple model... it is a logistics company, not a trading company."

vs.

Valeant Chairman, CEO Michael Pearson, Sanford Bernstein conference, 5/28/2014: "[Valeant] is more like a professional services firm than a sort of traditional pharmaceutical company."

---

Enron CFO Andy Fastow, meeting with *Fortune*, 2/15/2001: "[Enron's] disclosure is more complete than anyone's."

vs.

Bill Ackman, conference call hosted by Pershing Square, 7/17/2014: "I will also point out that Valeant gives massively more disclosure about its business and did so prior to this transaction than Allergan."

---

Enron Chairman, Ken Lay, email to employees August 2001: "I have never felt better about the prospects of the Company... our growth has never been more certain."

vs.

Valeant Chairman, CEO Michael Pearson, 2Q 2014 earnings press release, 7/31/2014: "As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

**This is just too much of an eerie coincidence**

<u>Jeff Skilling Bio</u>
Experience running a business before joining Enron in 1990: **0 years**
Job before joining Enron: <span style="color:red">Head of the Global Energy Practice and Head of North American Chemical Practice of McKinsey & Company, 11 year tenure at McKinsey</span>
vs.
<u>Michael Pearson Bio</u>
Experience running a business before joining Valeant in 2008: **0 years**
Job before joining Valeant: <span style="color:red">Head of the Global Pharmaceutical Practice and Head of mid-Atlantic region of McKinsey & Company</span>, 23 year tenure at McKinsey

Citron has seen this movie before.  In 2008, Arthrocare, a successful medical device company, was doing its dirty deeds through Discocare, an undisclosed captive "independent company".  When Citron exposed the relationship, Arthrocare tried to make it all go away by **announcing it was buying Discocare**. At the time, virtually every investment banking house on the Street had a "buy" or "strong buy" on Arthrocare, and Goldman-Sachs had been engaged to "explore strategic alternatives".  The entire thing began to unravel when <u>Citron discovered -- and published -- that Arthrocare and Discocare -- ostensibly separate companies, **had the same fax number**</u>.

The CEO of Arthrocare is now doing 20 years.

While it is impossible for Citron to state for certain at this point, this has the distinct aroma of product being jammed into a channel.  It had to have started small, and now it's just too big.  "We have an option to purchase Philidor"  is simply ... **trying to put the genie back in the bottle.**

#  Conclusion 

***All truths are easy to understand once they are discovered; the point is to discover them……Galileo Galilei***

Citron Research has delivered the proof that something really stinks at Valeant and it is goes beyond their egregious price hikes

All of a sudden, one thread unravels this whole web of deception. From the moment of the first public mention of Philidor, within 72 hours, Valeant is now holding an option to acquire Philidor and investors find out only in retrospect that Valeant has been consolidating Philador financials?

Let's get the explanation -- Certainly Mr. Lay and Skilling had one all the way down to the trial -- and in which they still blamed the short sellers.

**Extremely Cautious Investing to All**

EXHIBIT F

EXHIBIT F

M

UNCATEGORIZED                                October 25, 2015

# The Pawn Isolated: Valeant, Philidor and the Annals of Fraud

By **Roddy Boyd**

The Southern Investigative Reporting Foundation's story looking at Valeant Pharmaceuticals' well-concealed relationship with Philidor Rx Services, struck a nerve.

Briefly, the story explored the ways in which Philidor, a specialty pharmacy whose sole customer is Valeant, used opacity and some misdirection to try and build a national pharmacy network. Additionally, SIRF uncovered how Valeant had sought to conceal its control of Philidor.

A Valeant conference call scheduled for Monday morning, October 26 is designed to explain these previously hidden relationships and, more importantly, calm the very frayed nerves of its battered shareholders.

But recently uncovered documents from a litigation between Philidor and R&O Pharmacy are probably going to have the opposite effect, in that they illuminate what can only be described as a bizarre effort to circumvent California regulations. Moreover, R&O's allegations have been known to Valeant management for a month.

Additional SIRF reporting reveals that Valeant has been closely involved with Philidor at every stage of its life-cycle, controlling it in all but name, since day one.

This pain isn't being borne for no reason, however.  Our reporting indicates that Philidor is almost certainly one of the most important parts of Valeant's business.

---------------------------------

On July 21 Russell Reitz, a 64-year old pharmacist and the "R" in R & O Pharmacy, was working in his office when a visitor dropped in unannounced. It was Eric Rice, an executive with Isolani, the company that had struck, what he thought, was a deal to buy the small compounding pharmacy back in December.

Rice had flown in from Philadelphia with several of the ranking executives of Philidor Rx Services. Which Reitz found odd since when he questioned Rice about it, he insisted he worked for Isolani.

It was a tense but professional meeting and both sides left it unfulfilled.

Eric Rice was unable to come to an agreement over securing $3 million in payments he felt were due his enterprise. Reitz, for his part, had a startlingly basic question that Rice hadn't satisfactorily answered, both in a series of emails, and in person.

Reitz wanted to clear up once and for all, why despite his insistence that he worked for Isolani, he was always professionally connected to someone from Philidor. What was the difference between the two companies, or were they one and the same?

Rice's colleagues, Phildor's CEO Andy Davenport, general counsel

Gretchen Wisehart and controller Jamie Fleming, were to Reitz's eyes, in the middle of everything Isolani did.

Rice, whose LinkedIn profile left little doubt about where he worked, still couldn't answer to Reitz's satisfaction why, if he had agreed to sell his company to Isolani LLC, was Philidor the entity he always had to deal with? And what was Philidor's real agenda anyway?

Moreover, neither Rice nor his colleagues, whose emails to him were getting increasingly strident, had ever answered another question Reitz had posed: Where was Isolani's pharmacy permit? That they obtain their own, and not rely on R&O's was a core component of the sale agreement. (It does not appear they ever applied for one.)

To Reitz, the huge volume of Philidor's prescription drug sales, using R&O's National Council for Prescription Drug Programs number, was infuriating; that a good deal of the millions of dollars in volume were in states where R&O had no registration to operate in, with drugs he never had dispensed, and filled by a pharmacy he did not own, was nauseating. To pile insult upon injury, he had refused to sign the pharmacy's audit only to learn it was signed by Eric Rice.

This dispute had transcended the "he said-she said" realm of most business disputes a few weeks prior and was something Reitz hadn't supposed existed apart from movies featuring the mafia taking over a business. Apart from Ray Liotta and Joe Pesci's absence from this drama, it was in every sense a bust out.

Not that there weren't signs that R&O was more to Isolani than just a platform for compound pharmaceutical sales. Back in mid-December, shortly after the deal was inked, Reitz was surprised to see Jamie Fleming, Isolani's controller, show up at his office with boxes of inventory. He had a man with him who introduced himself as Gary

Tanner, and who was clearly in charge. It all seemed on the up and up, if a bit sudden.

After meeting Tanner, Reitz went back and looked him up. He couldn't understand what Gary Tanner, a specialty pharmacy expert with Valeant's Medicis Pharmaceuticals unitwas doing involved with R&O. In July, Tanner's signing of an employment contract was something the company would later find it important enough to disclose to investors.

Reitz couldn't have possibly known that a few months prior to approaching R&O, Philidor executive Sheri Leon had signed a California State Board of Pharmacy Change of Permit request for West Wilshire Pharmacy, despite providing inaccurate answers to standard questions. Under oath, she answered "no" to questions asking if she had ever worked for an entity that had been denied a California permit, and if any other entity owned more than 10% of her company.

That May, Philidor had been denied a nonresident pharmacy permit and like Isolani, it controlled Lucena Holding LLC, the entity used to buy West Wilshire Pharmacy.

On January 7 Eric Rice would sign a similar document seeking transfer of R&O's license to Isolani.

Something Reitz might have looked into, was the origin of the word Isolani. It comes from the world of chess. To simplify a complex theory, it centers around isolating the pawn, the weakest and least consequential figure in the game.

Given Reitz's refusal to pay, Isolani sued him in September to obtain a judicial order to preserve what it alleged was at least $15 million out of a total of $19.3 million worth of checks written to it. In response, his lawyer Gary Jay Kaufman filed a 68-page declaration. The next court

date is set for the middle of December.

--------------------------------

What Gary Tanner was doing at R&O was his job, which includes being the overseer, for want of a better term, of Philidor and its network of affiliated (or captive) pharmacies.  Tanner's exact title is unclear but an ex-Medicis executive said that he is Valeant chief executive Michael Pearson's primary contact about Philidor's operations.

This source said that Tanner has often worked in conjunction with a lawyer, Michael Dean Griffen, and another (now apparently former) Medicis employee, Bill Pickron, to source these types of pharmacy transactions for Medicis and Valeant.

SIRF's reporting suggests that there is little to separate Valeant and Philidor beyond corporate word-smithing. Indeed, former Philidor employees said Valeant's executives were such a constant presence at the Hatboro, Pa. headquarters facility, that it was commonly supposed they had a block of rooms permanently reserved at local hotels.

Consider Philidor's launch in June of 2013. It's a safe bet that Valeant heavily underwrote or otherwise subsidized the company given the long lead times of insurance reimbursement, coupled with the stress on working capital of starting a business with rapid expansion plans.

According to former employees, Philidor places heavy productivity demands on its call-center and data-entry personnel, but pays them decently: SIRF found most employees earned between $20-$25 per hour, but in return a near 60-hour week was mandatory.

This is where the stress on working capital management factors in, since overtime would add at least $400 extra per employee paycheck. On top of that, from a late 2013 headcount of 250, Philidor added an average of

100 employees per quarter, as well as a 28,000 square foot lease, utilities, health care, insurance and the frequent "extras," like free lunches and coffee, to incentivize employees to stay at their workstations.

Eventually, of course, the reimbursements for the thousands of prescriptions roll in, but until then those bills have to be paid. Nothing about the economic profiles of Philidor's management group suggests they have the ability to personally absorb the millions of dollars it cost each month to get the company off the ground.

For example, Philidor chief executive Andy Davenport, while the owner of a five bedroom, 3,500 square-foot house in nearby Horsham, has had a series of municipal liens placed against him for unpaid county and state property taxes.

----------------------------

At bottom, pharmacies like R&O were a way for Philidor to surmount the very big hurdle resulting from the California Board of Pharmacy rejection, in May 2014.

(It is quite a read, referring to several "false statements of fact" by Matthew Davenport--the CEOs brother--including the non-disclosure of Philidor's true owners and their real equity stakes.)

The headache existed because, as ex-Philidor employee Taylor Geohagan put it when interviewed last week, "Billing from a [pharmacy's] license in one state, but shipping from a California location, is against the rules."

He would add, "Pretty much everything we did in the [Philidor] Ajudication department was use the [National Provider Identifier] codes from the pharmacies we bought out to get something [approved] in a pinch."  He described his Philidor experience in a website posting at

PissedConsumer.com that said that paper copies of the NPI numbers of "sister pharmacies" were rarely handed out, and if they were, they were soon taken away and shredded.

Geohagan said that when he left the company in late summer, the practice of using multiple NPI numbers had stopped. (At least part of his animus toward the company, he wrote, resulted from resigning with two weeks notice and being fired the next day.)

The Philidor billing department manual actually has a page that discusses using the NPIs of these so-called captive pharmacies called "Our Back Door Approaches," according to another former employee. For example, when attempting to secure approval for a prescription with an insurance company Philidor did not have a relationship with, employees were instructed to use West Wilshire's NPI.

Two ex-Philidor employees from the adjudication and billing departments told SIRF that the volume of prescriptions flowing into the company was massive, with billing unit workers expected to process at least 100 prescriptions daily. The former adjudication unit employee showed SIRF internal documents from November trumpeting the fact that 22,299 prescriptions were filled in the prior week. Additional documents showed other weeks that came in above 23,000.

-----------------------

A strategic distancing from the controversial unit doesn't appear to be an option for Valeant.

The Isolani vs Reitz litigation reveals that Philidor's use of these captive pharmacies is a vital revenue stream for Valeant. Some digging around in its corporate filings shows that R&O, at least before Russell Reitz began to object in July, was poised to a material contributor to organic growth.

A brief aside: organic growth, or the increase in sales apart from Valeant's acquisitions of other companies, is vital to the debate over its future. Short-sellers and other critics, for example, have argued that the company's drug brands are, in the main, declining; without the torrid pace of acquisitions, shrinking revenues and profits are a foregone conclusion.

Thus the importance of looking at what Philidor's newly exposed captive pharmaceutical network reveals. Here's what it shows: In the second quarter, Valeant's 8-K reported "organic" sales growth of 19%, with revenue growing $691 million, to $2.73 billion from $2.04 billion.

Of this $691 million, however, at least $392 million was attributable to acquisitions, with the $299 million balance organic revenue.

The Kaufman declaration's release of the Philidor/Valeant invoices to R&O imply a prospective quarterly sales run-rate of about $55 million (an average $4.6 million weekly shipment multiplied by 12 weeks.) This would have accounted for 18.5% of Valeant's total organic growth in the second quarter. From there, it's a sure bet that given the prominence of West Wilshire to Philidor's billing unit, its sales volume would easily surpass R&O.

Notionally, organic growth equal to 40% or more of that $299 million could have come from two pharmacies that even the most gimlet-eyed Valeant sleuth didn't suspect existed.

It also becomes much easier to understand why Valeant's management didn't immediately sever the relationship with Philidor.

-----------------------

Renee Soto, a Valeant outside spokeswoman with Sard Verbinen, told

SIRF last week the company would not comment.

A message left for Gary Tanner was not returned, and an attempt to contact Eric Rice and other Philidor employees named in the story by calling the company's administration went into the voicemail of Greg Blaszczynski, the chief financial officer of BQ6 Media, the pharmaceutical marketing effort where both Davenport brothers have served as CEO.

## READ NEXT

### The Curious Case of Mr. Pearson's 502,996 Shares

On Valeant Pharmaceutical's conference call on November 10, embattled chief executive Michael Pearson offered several defenses of his company's internal controls and procedures. Similarly, in defending both himself and Valeant from the now constant drumbeat of controversy, one of Pearson's constant refrains has emphasized his commitment to transparency.

## SUPPORT SOUTHERN INVESTIGATIVE REPORTING FOUNDATION

We depend on your support. A generous gift in any amount helps us continue to bring you this service.

**PREVIOUS STORY**

The King's Gambit: Valeant's Big
Secret

**NEXT STORY**

The Curious Case of Mr. Pearson's
502,996 Shares

# 4 thoughts on "The Pawn Isolated: Valeant, Philidor and the Annals of Fraud"

D on October 26, 2015 at 8:51 pm said:

This is good reporting.

If I could make a suggestion, it would be to include two legal charts with a few boxes and (unfortunately a lot of) lines showing relationships between those boxes, including intercompany loans, shareholdings, and the option Valeant has to buy Philidor for $0– this would give a view on the ownership / capital structure. Another chart with those same entities but different lines (or arrows) connecting them showing sales and purchases, would be very interesting.... If that's too far out of the ordinary for this sort of thing, I am sure readers can do this on their own, though there would be a net work savings if just done once. If I missed said charts in the article (in a link?), apologies.

Valeant's behavior seems to at least be 'pushing the envelope' of what is considered legal and / or acceptable in the US.

Reply ↓

D

on October 27, 2015 at 11:18 pm said:

Btw, I noticed that Matt Levine seems to have taken a shot at putting together the legal structure in a post yesterday. His comical squigly lines may be about as good as can be done at this point.

http://www.bloombergview.com/articles/2015-10-26/valeant-s-pharmacy-relationships-were-complicated

Reply ↓

JCB on October 26, 2015 at 9:20 pm said:

There's another more basic question regarding Philidor that seems to be glossed over or ignored: How plausible is it that these two Davenport characters seemingly come out of nowhere and start a company that in less than two years has a value of at least $133mm, and potentially up to $233mm? They don't seem to have any background in pharmaceuticals or any credible knowledge of drug distribution, and this type of business isn't exactly known to offer potential for such rapid wealth creation. This value creation would be remarkable even by the standards of Silicon Valley. Take a look at the video of the interview by the Pennsylvania Senator of Andy Davenport. Does he strike you as the CEO/entrepreneur of a multi-hundred million dollar enterprise? And Mr. Pearson says he doesn't know the owners of a business he's buying, or buying an option on, or even how many owners there are? There are far too many oddities with the distributor ownership, secrecy, legal questions, personnel, etc., for this to be fully on the up and up. VRX needs to disclose exactly where the $133mm went- who owns Philidor; who got the money; exactly how did they arrive at the option/earn-out price?; are the sellers putting the proceeds into the business?; do they have management contracts?; exactly how are the option payments flowing through VRX's books? Best guess? the $133mm was used to buy VRX product.

Reply ↓

Curious on October 29, 2015 at 5:25 pm said:

Mike Pearson claims he didn't know the owners of Philidor.

Elizabeth Kardos and David Cowen are listed as owners of a Philidor entity in North Carolina.
As someone posted on Bronte Capital, Kardos and Cowen live in New Vernon, NJ — a very small, very wealthy community in NJ where Mike Pearson also happens to live.

http://www.nytimes.com/1999/04/11/style/weddings-elizabeth-kardos-and-david-cowen.html

a little background on the "members" of the LLC, Kardos and Cowen of 56 Anthony Wayne Rd, New Vernon, NJ

Reply ↓

# Leave a Reply

Your email address will not be published.  Required fields are marked *

*

*

Post Comment

The Infernal Machine: From Powder to Dust

About Us

Go

Contact

Donors

Select Month

Built with the Largo WordPress Theme from the Institute for Nonprofit News.

© Copyright 2015, Southern Investigative Reporting Foundation

EXHIBIT G

**EXHIBIT G**

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/valeants-ties-to-pharmacy-scrutinized-1445817449

BUSINESS

# Valeant and Pharmacy More Intertwined Than Thought

Relationship with Philidor draws scrutiny; workers used alternative names



Valeant will host an investor conference call to explain its relationship with Philidor and its network of pharmacies. *PHOTO: CHRISTINNE MUSCHI/REUTERS*

By JONATHAN D. ROCKOFF and JEANNE WHALEN

Oct. 25, 2015 7:57 p.m. ET

Around the Phoenix-area offices of mail-order pharmacy Philidor Rx Services LLC, employees said they often ran into a friendly colleague named Bijal Patel who tracked prescriptions. But when the employees got an email from the colleague, they say he used a different name: Peter Parker, the alter ego of Spider-Man.

He was among a few workers at Philidor offices who went by one name in person and another in emails during the past two years, according to three former employees. Mr. Patel and the other people weren't employed by Philidor, though the emails used a Philidor address, these people said. They were employees of drug company Valeant Pharmaceuticals International Inc.

As late as Sunday afternoon, the LinkedIn page for a man named Bijal Patel identified him as manager of access solutions at Valeant in Scottsdale, Ariz. Mr. Patel didn't respond to requests for comment.

The Valeant employees were placed at Philidor while the pharmacy was in its infancy, to provide help on "structures and processes," said a Philidor spokeswoman. She said in a statement that the Valeant employees set up separate Philidor email accounts, under "clearly distinguishable names," to keep "their internal Philidor communications separate from the Valeant communications, primarily to reduce the risk of incorrectly sharing either company's proprietary information."

Valeant, which is hosting an investor conference call on Monday at 8 a.m. EDT to explain its relationship with Philidor and its network of pharmacies, declined to comment.

The use of alternative names by workers at Philidor is one of a number of new details emerging about the relationship between Valeant and the network of specialty pharmacies it uses to distribute drugs. The relationship is at the center of questions that investors have raised about the strength of the drug company's operations and the disclosures of its business ties.

Last week, a short-selling hedge fund accused Valeant of using the pharmacies in an accounting scheme to inflate revenue. The drug company's shares have lost more than half their value since peaking in early August, partly due to the concerns as well as a federal investigation into how the company prices its drugs and helps patients afford them.

Valeant had generally kept mum on its relationship with Philidor before last week, because Valeant said it considered its use of such pharmacies as "one of our competitive advantages."

Last week, Valeant said that it had an option to buy Philidor. Valeant also "categorically" denied the allegations made by the short seller and said it complies fully with all accounting rules.

---

RELATED

- Valeant Forms Board Committee to Review Philidor Arrangement (http://www.wsj.com/articles/valeant-forms-board-committee-to-review-philidor-arrangement-1445856795)
- Valeant's Disclosure: Why Now? (http://www.wsj.com/articles/valeants-disclosure-why-now-1445645280)
- Heard on the Street: The Valeant Call: Questions It Needs to Answer (http://www.wsj.com/articles/the-valeant-call-what-it-needs-to-address-1445801493)
- Valeant Bears Get Some Satisfaction (http://www.wsj.com/articles/valeant-bears-get-some-satisfaction-1445037514) (Oct. 16, 2015)

Interviews with former employees, doctors who prescribe Valeant drugs and patients indicate that the ties between Valeant and Philidor are more interconnected than previously disclosed. The people gave details of how the companies worked together, with Valeant employees working directly in Philidor offices, sometimes using fictional names. The people said this was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products, which Philidor strongly denied.

The people described how Philidor made it easy for patients to get Valeant drugs, even if insurers balked at the high prices, shedding light on some of the complex efforts used by companies like Valeant to sell drugs that are expensive.

Additional information from interviews and public documents raises questions about the ownership of Philidor, and its ties to another pharmacy in a state where it was denied a permit to do business.

Such pharmacies are one tool Valeant has used to fuel its business, instead of relying on the drug industry's traditional but costly investment in research and development to discover new medicines. The pharmacies can steer patients to Valeant's drugs, rather than less-expensive alternatives, and then help negotiate reimbursement with insurers, analysts say.

Use of specialty pharmacies is legal, but Valeant's efforts to secure reimbursement, and general lack of disclosure until recently, could trigger scrutiny from health insurers and regulators, according to analysts.

Philidor Rx Services was formed in Delaware and lists an office in Horsham, Pa.,
according to corporate registration documents in Delaware and Pennsylvania. It also has
offices in Hatboro, Pa.

Andrew Davenport is Philidor's CEO, according to the Philidor spokeswoman.
Documents filed with California's Board of Pharmacy in December 2014 and June 2015
list Matthew S. Davenport as Philidor's chief executive. A LinkedIn profile for Matthew
Davenport in the Philadelphia area says he works for BQ6 Media Group LLC. The former
Philidor employees say BQ6 consulted for Valeant, among other drug companies.



Activist Investor Report Card

See what happened at large U.S. companies targeted by activist investors.

VIEW INTERACTIVE

Andrew and Matthew
Davenport couldn't be
reached for comment.

The three former
employees said several
people working at
Philidor have Valeant
ties, with some joining
Philidor full-time from
Valeant, while others like
Mr. Patel did work at
Philidor while working
for Valeant. In emails,
one used the name Jack
Reacher, the protagonist
of a series of thriller novels and a Tom Cruise movie, and another went by Brian Wilson,
the name of a member of the Beach Boys, the former employees say.

The Philidor spokeswoman said the Valeant employees' "real identities were well known
to the other Philidor employees."

Mr. Patel sent regular emails to Philidor employees detailing how many prescriptions
Philidor was filling, which drugs were most popular and what doctors were the biggest
prescribers, according to two of the people.

Nearly all of the prescriptions Philidor filled were for Valeant drugs like acne medicine
Solodyn and toenail fungus treatment Jublia, the employees said. A month's supply of
Solodyn on Drugs.com costs $1,112.69, about 2½ times more than generic versions,
which have slightly different dosages.

Valeant has said Philidor doesn't restrict the prescriptions it fills to Valeant.

Doctors who have prescribed Valeant medicines say the company made them well aware of the services provided by Philidor, including financial support available to patients. Three doctors said Valeant sales representatives dropped off brochures and coupons offering help paying for drug copays, and these materials directed patients to call a number for Philidor. The doctors would send prescriptions for Valeant drugs electronically to Philidor.

Once Philidor received the prescription, the pharmacy then called the patients to collect their credit-card number and a mailing address to ship the drug, according to the three former employees. Patients who have a coupon get zero copay. Otherwise the copay is fairly low.

Todd Gribble, a dermatology patient in North Carolina, said he had a coupon for zero copay for his first Valeant prescription. Philidor told him that if he fills it again he'll have a $40 copay, but it will be more reasonable than the $400 he had to pay when using a different pharmacy for a similar drug, he said.

A separate department at Philidor would seek insurance coverage. If the insurer asked a doctor to explain why the patient needed a costlier Valeant drug rather than a less-expensive alternative, Philidor employees would sometimes fill out the paperwork for the doctor, two of the employees said.

Valeant has said Philidor dispenses generics "as specified in patient's prescription or as requested by patient."

Philidor sought to ship drugs so patients got them within days prescriptions were filed, even if the health insurer hadn't yet agreed to pay, the three former employees said. Sometimes, insurers would never pay, and Valeant would pick up the tab, the employees said.

Valeant has said Philidor and other specialty pharmacies it uses "dispense Valeant medications before adjudication of the reimbursement may be finalized. Patients get their medicines more quickly and Valeant takes the risk for nonreimbursement."

In August 2013, Philidor applied for a permit to operate as a pharmacy in California. California's Board of Pharmacy denied the application in May 2014, saying Philidor and the chief executive named in the documents, Matthew S. Davenport, had made "false statements," including some that concealed Philidor's true owners and beneficiaries, according to documents from the pharmacy board.

Three months later, a newly incorporated firm—Lucena Holdings LLC—acquired a 10% stake in California's West Wilshire Pharmacy, which also does business as Brighton Way Pharmacy Inc., according to documents from the pharmacy board, which were first reported by ProPublica.

Delaware corporate records list Matthew S. Davenport as Lucena Holdings' "authorized person."

The California pharmacy board documents list Sherri Diane Leon as Lucena Holdings' CEO, and provide her pharmacist license number in Pennsylvania. A LinkedIn profile lists a Sherri Leon as director of pharmacy operations at Philidor Rx Services in Pennsylvania from 2013 to the present. Ms. Leon didn't return phone calls or emails seeking comment.

Two of the employees said that Philidor makes sure patients in California are shipped drugs from partner pharmacies like West Wilshire because the state board of pharmacy rejected Philidor's license application.

The Philidor spokeswoman said it "established a network in California to extend its reach and more efficiently serve patients. Prescriptions that are filled by a network pharmacy include a written information sheet that identifies the pharmacy as part of the Philidor network of pharmacies."

The Philidor spokeswoman said it has an option to purchase West Wilshire, as well as R&O pharmacies, Safe Rx, of South Plainfield, N.J., and Orbit Pharmacy Inc., of Missouri City, Texas.

Philidor has appealed the pharmacy board's permit denial; a court hearing for that appeal is scheduled for December.

"We are going to court on this case. The board is charged to identify beneficial interests in pharmacies, and when the board believes it does not have accurate information it will deny the permit," says Virginia Herold, executive officer of California's pharmacy board.

*—Peter Loftus and Lisa Schwartz contributed to this article.*

Write to Jonathan D. Rockoff at Jonathan.Rockoff@wsj.com and Jeanne Whalen at jeanne.whalen@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008         or visit www.djreprints.com.

EXHIBIT H

EXHIBIT H

Company Name: Valeant Pharmaceuticals
Company Ticker: VRX CN
Date: 2015-10-26
Event Description: Business Update Call

# Business Update Call

## Company Participants

- Laurie W. Little
- J. Michael Pearson
- Robert Alexander Ingram
- Ari Kellen
- Howard B. Schiller
- Robert L. Rosiello
- Tanya Carro
- Seana-Lyn Carson
- Robert Rosewell Chai-Onn

## Other Participants

- Corey George Davis
- Alan Ridgeway
- Marc Goodman
- Douglas D. Tsao
- Andrew Finkelstein
- Annabel Samimy
- Umer Raffat
- David Breadon Common

# MANAGEMENT DISCUSSION SECTION

## Operator

Good morning. My name is Steve, and I will be your conference operator today. At this time, I would like to welcome everyone to the Valeant Investor Conference Call. All lines have been placed on mute to prevent any background noise. After the speakers' remarks, there will be a question-and-answer session. [Operator Instructions] Thank you.

Head of Investor Relations, Laurie Little, you may begin your conference.

## Laurie W. Little

Thank you, Steve. Good morning, everyone, and welcome to Valeant's investor conference call. In addition to the live webcast, a copy of today's slide presentation can be found on our website under the Investor Relations section.

Before we begin, our presentation today contains forward-looking information. We would ask that you take a moment to read the forward-looking statements mentioned at the beginning of our presentation as it contains important information. In addition, this presentation contains non-GAAP financial measures.

For more information about non-GAAP financial measures, please refer to slide one. Non-GAAP reconciliations can be found in the press release issued earlier today and posted on our website. Finally, the financial guidance in this presentation is effective only as of today. It is our policy to update or affirm guidance only through broadly disseminated public disclosures.



Company Name: Valeant Pharmaceuticals
Company Ticker: VRX CN
Date: 2015-10-26
Event Description: Business Update Call

final

patients. Philidor provides reimbursement support services to comply with managed care formulary restrictions such as prior-authorizations and step-edits. We have designed our programs to improve patient adherence to medications and contribute to improved patient outcomes.

Next slide lays out key elements of the Philidor program. For commercially insured patients, Philidor dispenses Valeant medications before adjudication of the reimbursement may be finalized. Patients get their medicines more quickly and Valeant takes the risk for non-reimbursement.

Affordable cash pay options exist for prescriptions which are not reimbursed by commercial insurance. Co-pay subsidies and cash pay options are designed to be affordable and are not eligible for prescriptions reimbursed in whole or in part by government insurance.

Other companies focused on dermatology utilize specialty pharmacies as shown on the slide. As you can see, a number of companies in the dermatology space use specialty pharmacies. This includes major companies such as Allergan, Galderma, and Novartis.

This slide lists examples of Valeant products offered through Philidor with associated co-pays for commercially insured patients as well as cash pay prices for prescriptions which are not reimbursed by commercial insurance. For example, for commercially insured patients, the first script of Acanya is $35 and the second is $40. For prescriptions not reimbursed by commercial insurance, the cash pay option is $75. Many products have a zero co-pay for the first script for commercially insured patients.

In terms of the economics of the Philidor channel, in Q3 2015, Philidor represented 6.8% of total Valeant revenue and approximately 7% of Valeant EBITA. Prescriptions through Philidor are less profitable than traditional channels due to lower co-pay rates, lower cash pay rates, and more cash pay scripts in Philidor than in retail and other channels.

Now turning to the questions. Question one: what percent of your year-to-date net revenues flow through specialty pharmacies and what percent of year-to-date revenues is through Philidor? The answers: Specialty pharmacies account for 7.2% of Valeant net revenue year-to-date and Philidor accounts for 5.9% of Valeant net revenue year-to-date.

Question two: What percent of Jublia net revenues flow through Philidor in Q3 2015? 44% of Jublia revenue flowed through Philidor in this quarter.

Question three: How are specialty pharmacies compensated? Like retail pharmacies, specialty pharmacies are paid by health insurers and patients, and often also received fees for performing certain additional services on behalf of manufacturers such as refill reminders, processing co-pay assistance or data reporting.

Question four: How do specialty pharmacies interact with the PBMs? Specialty pharmacies like retail pharmacies contract with PBMs to be included in their network. The ability for PBMs to restrict members is dependent on state law. A number of states have Any Willing Provider laws, which ensure all pharmacies have access to PBM networks. PBMs have audit rights with all of their network participants.

Question five: How are specialty pharmacies regulated? Specialty pharmacies are licensed by state regulators and are subject to federal controlled substance regulations.

Question six: Can a manufacturer own a specialty pharmacy? Yes. For example, AbbVie currently owns Pharmacy Solutions, which distributes HUMIRA, Lupron Depot, Lupaneta Pack to patients.

Now, I would like to turn the call over to Howard.

## Howard B. Schiller

Thank you, Ari. In this section, I'm going to give everyone the history of our relationship with Philidor. Philidor originally developed a pilot program for Medicis prior to the acquisition of Medicis by Valeant. This was the next-generation alternative fulfillment program. The pilot was limited to Solodyn and Ziana and in a limited number of

Bloomberg Transcript



Company Name: Valeant Pharmaceuticals
Company Ticker: VRX CN
Date: 2015-10-26
Event Description: Business Update Call

states.

In late-2013, we began to see evidence of success in this pilot program. Doctors and patients were having a very positive experience using Philidor's services, and our team and the Philidor team were working very well together. As a result, we and Philidor agreed to expand our relationship to include many more derm products in additional states.

At this time, Philidor was a start-up with only a few employees. Andy Davenport, the CEO, raised the capital to fund the scale-up. Valeant did not participate as an equity investor nor did it lend money to the owners to fund this expansion. Patients and doctors continue to have very strong positive feedback in the Philidor experience, and this next phase of our alternative fulfillment program saw significant growth over 2014.

In the fall of 2014, Philidor was at an inflection point with their business. It had experienced significant growth and success with Valeant in dermatology, and was now looking to expand into more therapeutic offerings with additional partners.

While we work with a number of specialty pharmacies, we believed that a strategic relationship with a specialty pharmacy would allow us to provide higher service levels to physicians and affordable access to drugs that physicians choose to prescribe to their patients.

We were interested in protecting our successful new platform. If Philidor rapidly expanded with additional partners, we might lose the high service levels to patients and doctors that had driven success and we wanted to maintain access program exclusivity in our key therapeutic areas.

Our primary interest was ensuring that Philidor remained focused on our business. We considered the full spectrum from outright purchase to different exclusivity arrangements. Ultimately, we determined that the structured option acquisition with the oversight rights we negotiated provided the security we were looking and preserve the flexibility to acquire, in the future, a new growth platform.

In the typical Valeant acquisitions, speed is of the essence and we work to integrate an acquisition as quickly as possible. There's typically an existing Valeant manager with operational responsibility starting day one and we work to cut over all the financial and IT systems as soon as possible.

Finally, employees are trained on Valeant policies and programs, including compliance program. In case of Philidor option purchase however there was no day one as we did not buy Philidor. They retained their systems and policies. The Philidor employees did not report to Valeant. Philidor remained an independent company.

Valeant paid an upfront payment of $100 million to acquire an option to purchase Philidor as well as milestones – sales-based milestones of up to $133 million, of which $33 million has already been paid.

Philidor has remained an independent company, while Valeant has retained certain rights that include a Joint Steering Committee, the right to approve certain employees and their positions, the right to audit, adherence to certain covenants with respect to compliance to all applicable laws and the right to conduct HIPAA Security Risk Assessment. Philidor is a separate limited liability entity, and we believe we do not have any legal liability for Philidor.

In the option agreement, Valeant negotiated representations, warranties and covenants, including a covenant that Philidor will operate its business in compliance with all applicable laws. In addition, we received indemnification from the equity holders to Philidor for breaches of fundamental representations and covenants, including for a breach of Philidor's covenant to comply with applicable laws.

The equity holders' indemnification obligation survives indefinitely and is capped at the amount of the upfront fee and all the milestones achieved. Valeant also has the right to set off such amounts against sales-based milestones.

In December 2014, Valeant acquired the option to acquire Philidor. The rationale to acquire the option was to keep Philidor focused on Valeant's business and to ensure continued strong customer service. The option also gave Valeant a level of contractual influence to benefit our business, while providing an option on long-term ownership. The results were high service levels and high customer satisfaction and another strong growth platform for Valeant.



final

Company Name: Valeant Pharmaceuticals
Company Ticker: VRX CN
Date: 2015-10-26
Event Description: Business Update Call

Unless and until Valeant exercises the option to purchase Philidor, Philidor remains an independent company and Valeant has no rights to remove its CEO or management. Valeant has the right to appoint or cause Philidor to hire an advisor to the CEO, Head Compliance Officer, an in-house lawyer, head IT officer, other employees as reasonably requested. Valeant also has a right to appoint persons for the Joint Steering Committee.

Now, I'd like to answer some additional questions that were emailed to us from investors. Firstly, we were asked does Mike Pearson or other senior executives or board members own a stake in Philidor. And the answer to that question is no, neither senior executives nor board members own a stake in Philidor.

Has Valeant lent money to owners of Philidor? As I mentioned earlier, no, Valeant has not lent any money nor did Valeant invest in Philidor. What would be the rationale for a Valeant entity to file the UCC-1 liens on Philidor's members' equity? The UCC-1 liens have nothing to do with any loan. They are in place to secure our rights to the equity we would acquire if we were to exercise that option.

We were also asked who or what is KGA Fulfillment Services. KGA Fulfillment Services is a wholly-owned subsidiary of Valeant, which filed the UCC-1 loans, and owns Valeant's option to acquire Philidor.

Now, I'm going to address Philidor's network and their operations. First: Philidor at a glance. Philidor is a pharmacy headquartered in Pennsylvania and is headed by the CEO Andrew Davenport. It has locations in Hatboro and Horsham in Pennsylvania and Phoenix, Arizona, and is licensed to dispense drugs in 46 states plus the District of Columbia.

Presently, Philidor's network of pharmacy includes pharmacies in California, Florida, New Jersey, South Carolina and Texas. Valeant has retained and discussed the Philidor structure with knowledgeable counsel, and our understanding is that the structure meets the legal requirements, including Philidor's use of an unaffiliated acquisition vehicle.

Originally, Philidor's strategy was to develop a single hub in Pennsylvania and expand by adding state licenses over time. More recently, Philidor has expanded in the new markets by acquiring pharmacies. In addition, they're exploring partnerships with independent pharmacies on a contractual basis. Under these arrangements, Philidor will provide the back-end services, while its partners would run the front of the store.

In the future, we would anticipate that Philidor's growth plans will rely much more on expanding its networking via partnerships. This strategy should allow Philidor to grow faster with fewer regulatory hurdles. This model is also much less capital intensive than acquiring pharmacies. Now, I'm going to address 12 additional questions regarding Philidor's operations that were emailed to us by investors.

First question: How does Philidor distribute drugs in states like California, where they're not licensed? Does Philidor contract with sub-contractors? We understand that Philidor holds non-resident licenses in 45 states, the District of Columbia and its resident license in Pennsylvania. In the few states where it is not directly licensed, such as like California, Philidor does not dispense products to patients. Philidor has agreements with affiliated pharmacies that have California licenses, and those pharmacies have dispensed products to patients in California.

Are competitor products, including generics, available through Philidor? Yes, although the bulk of Philidor's volume is related to Valeant products. How do we compensate Philidor? We pay Philidor a per prescription service fee as consideration for the various services provided by Philidor in the administration of our alternative fulfillment program. However, this fee is eliminated in consolidation and we recognize all of their operating expenses in our consolidated financial statements.

Is the Isolani structure intended to avoid continued review issues in California? Valeant has consulted with experienced and knowledgeable regulatory counsel and we believe that the Isolani structure meets California's legal requirements.

Did Valeant have an ownership interest at the time that Philidor applied for its non-resident license in California? No, we've never had an ownership interest in Philidor. We acquired the option to acquire Philidor after they had submitted their August 2013 application.

Does Philidor auto-refill prescriptions? If so, when? What is the full process? We understand that Philidor patients are contacted by customer service representatives between 24 and 28 days after Philidor dispenses the initial fill on a



Bloomberg Transcript

particular prescription to inquire whether the patient would like to have the prescription refilled. Of course, if there are refills written for the prescription. Patients who agree to refill their prescription and who are eligible for a zero co-pay are offered auto-refill at all subsequent fills left on their prescription. Patients can opt out of the auto-refill program at anytime.

Do other pharmacies have refill programs? Yes. Other pharmacies, including national chains such as Walgreens have auto-refill programs. Does Philidor have contracts PBMs? Yes, Philidor, like other pharmacies, has contracts with PBMs to be included in their networks.

Have these PBMs and managed care organizations audited Philidor? We understand that Philidor and its network pharmacies have complied with several hundred desk audits from many of the payers and have participated in more than two dozen live audits involving most major PBMs.

Why have a number of employees of Valeant recently become employees of Philidor? Philidor decided to hire of field force which would promote their pharmacy service and they hired a number of former Valeant employees.

Do other specialty pharmacies have sales forces? Yes, pharmacies other than Philidor do have sales forces that promote their services. And why was Philidor's California pharmacy application rejected? This is an issue that the ad hoc committee that Mike described plans to review at [indiscernible] (26:56) as soon as it can.

Now with that, I'd like to turn the call over to Rob Rosiello.

## Robert L. Rosiello

Thank you, Howard. The next dozen slides cover accounting and disclosure. Beginning on page 47, Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate.

Third party revenue is not recognized when products are shipped to Philidor and its network. These shipments are recorded as intercompany sales, which are eliminated in Valeant's consolidation process. Valeant recognizes revenue only when products are dispensed to patients and Valeant records this at net realized price.

On the next slide, before purchase of the option agreement, all sales to Philidor were accounted for as Valeant does with any third party. Sales were recognized upon transfer of inventory to Philidor. Since purchase of the option agreement, inventory held at Philidor and its affiliates remains on Valeant's consolidated balance sheet. Revenues are only recognized in Valeant's consolidated income statement when products are dispensed to the patient.

Consolidating financials of Philidor and its affiliates delays revenue recognition relative to third party transactions. There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidate balance sheet until dispensed to patients.

On the next two slides, I'd like to explain how product and funds flow through Philidor and the Philidor network. Philidor for itself or its affiliates sends an order to Valeant. In response to that order, Valeant then ships to Philidor or its affiliates. Valeant records the shipment as intercompany sales, which are eliminated in consolidation, bills Philidor at wholesale acquisition cost, or WAC, and records an intercompany receivable from Philidor or affiliates.

Philidor for itself or affiliates records receipt of inventory and also records an intercompany payable in the appropriate ledger. Philidor and its affiliates dispense prescription to patients and records third-party revenue, which appears in Valeant's consolidated income statement at the net realized price. The difference between WAC inventory value and the net realized price for dispensed prescription is recorded as an intercompany receivable from Valeant, which offsets the intercompany payable to Valeant.

Amounts collected from patients and payors are deposited into Philidor or affiliates' operating accounts. Intercompany payables are repaid bi-weekly to Valeant from Philidor or its affiliates' operating accounts. Amounts outstanding due from payors are reflected in Philidor's or affiliates' accounts receivable and in Valeant's consolidated balance sheet.



EXHIBIT I

EXHIBIT I



CONTACT US    LOCATIONS

HOME      ABOUT VALEANT      OPERATIONAL EXPERTISE      INVESTOR RELATIONS      CAREER OPPORTUNITIES



Search

## Investor Relations

» Investor Relations
» Corporate Fact Sheet
» Stock Information
» News Releases
» Events and Presentations
» Annual Reports
» Analyst Coverage
» SEC Filings
» Advanced Fundamentals
» Corporate Governance
» Shareholder Services
» Information Request
» Email Alerts
» RSS Feeds

» Investor Relations iPad App



🖶 Print Page
✉ E-mail Page
🔗 ShareThis
📶 RSS Feeds

✉ E-mail Alerts
👤 IR Contacts
📄 Financial Tear Sheet

Home » Investor Relations » News Releases » News Release Details

# Valeant To Terminate Relationship With Philidor

10/30/2015

LAVAL, Quebec, Oct. 30, 2015 /PRNewswire/ -- Valeant Pharmaceuticals International, Inc. (NYSE: VRX) (TSX: VRX) announced today that it is severing all ties with Philidor Rx Services, LLC, and that Philidor has informed Valeant that it will shut down operations as soon as possible, consistent with applicable laws.

"The newest allegations about activities at Philidor raise additional questions about the company's business practices," said J. Michael Pearson, Valeant's chairman and chief executive officer. "We have lost confidence in Philidor's ability to continue to operate in a manner that is acceptable to Valeant and the patients and doctors we serve."

"We understand that patients, doctors and business partners have been disturbed by the reports of improper behavior at Philidor, just as we have been," Pearson said. "We know the allegations have also led them to question Valeant and our integrity, and for that I take complete responsibility. Operating honestly and ethically is our first priority, and you have my absolute commitment that we will make it right."

Valeant intends to develop a plan to ensure patients' access to drugs is minimally disrupted. Valeant has informed Philidor that to the extent that managed care plans will no longer reimburse prescriptions in process, Valeant will fill them at the company's expense.

"We are committed to doing everything we can to provide important medicines to the patients and doctors who depend on them, and will continue to explore relationships with the full range of pharmacies to ensure patients have access to the drugs they need," Pearson said.

In the Third Quarter 2015, Philidor represented 6.8% of total Valeant revenue.

### About Valeant

Valeant Pharmaceuticals International, Inc. (NYSE/TSX:VRX) is a multinational specialty pharmaceutical company that develops, manufactures and markets a broad range of pharmaceutical products primarily in the areas of dermatology, gastrointestinal disorder, eye health, neurology and branded generics. More information about Valeant can be found at **www.valeant.com**.

### Forward-looking Statements

This press release may contain forward-looking statements, including, but not limited to, statements regarding the termination of Valeant's relationship with Philidor, the timing of the shutdown of Philidor operations, Valeant's plans to ensure patients' access to drugs and the potential disruption of such access and Valeant's filling of prescriptions not reimbursed by managed care plans.  Forward-looking statements may generally be identified by the use of the words "anticipates," "expects," "intends," "plans," "should," "could," "would," "may," "will," "believes," "estimates," "potential," "target," or "continue" and variations or similar expressions. These statements are based upon the current expectations and beliefs of management and are subject to certain risks and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These risks and uncertainties include, but are not limited to, risks and uncertainties discussed in the Company's most recent annual or quarterly report and detailed from time to time in Valeant's other filings with the Securities and Exchange Commission and the Canadian Securities Administrators, which factors are incorporated herein by reference. Readers are

cautioned not to place undue reliance on any of these forward-looking statements. These forward-looking statements speak only as of the date hereof.  Valeant undertakes no obligation to update any of these forward-looking statements to reflect events or circumstances after the date of this press release or to reflect actual outcomes, unless required by law.

Contact Information:

Laurie W. Little

949-461-6002

**laurie.little@valeant.com**

Elif McDonald

905-695-7607

**elif.mcdonald@valeant.com**

Media:

Renee E. Soto/Meghan Gavigan

Sard Verbinnen & Co.

212-687-8080

**rsoto@sardverb.com** / **mgavigan@sardverb.com**



Logo - **http://photos.prnewswire.com/prnh/20101025/LA87217LOGO**

To view the original version on PR Newswire, visit:**http://www.prnewswire.com/news-releases/valeant-to-terminate-relationship-with-philidor-300169414.html**

SOURCE Valeant Pharmaceuticals International, Inc.

Copyright © 2012 Valeant. All rights reserved.        PRIVACY POLICY        TERMS & CONDITIONS        SITE MAP

EXHIBIT J

EXHIBIT J

 

Home   Profile   My Network   Jobs   Interests                              Business Services   Try Premium for free

Get More Clients - By Adding QualifiedChat to your Website. Free Trail. | **Read More »**

Search for people, jobs, companies, and more...     Advanced

# Gary Tanner, CPA, CISA

Executive Director – Commercial Analytics and Analysis at Medicis

Phoenix, Arizona Area | Accounting

Previous    Medicis, CVS/Caremark, PEM Real Estate Group
Education   Arizona State University - W. P. Carey School of Business

**Send Gary InMail**

**345** connections

https://www.linkedin.com/in/gary-tanner-cpa-cisa-10b6967

**Background**

 **Experience**

### Executive Director – Commercial Analytics and Analysis
Medicis
September 2010 – Present (5 years 6 months) | Scottsdale, Arizona



### Senior Manager/Director - Business Operations
Medicis
September 2010 – June 2012 (1 year 10 months) | Scottsdale, Arizona



### Manager/Director - Underwriting and Pricing
CVS/Caremark
October 2007 – September 2010 (3 years) | Scottsdale, Arizona

### Controller
PEM Real Estate Group
May 2006 – October 2007 (1 year 6 months) | Scottsdale, Arizona



### Advisory and Audit Services
PricewaterhouseCoopers
May 2002 – April 2006 (4 years)



 **Skills**

**Top Skills**

| 20 | Sarbanes-Oxley Act |
| 17 | Auditing |
| 14 | Accounting |
| 11 | Analysis |
| 9 | Financial Reporting |
| 8 | Financial Analysis |
| 5 | GAAP |
| 5 | SEC filings |



**Ads You May Be Interested In**

 **AV Conferencing Solutions**
Best Quality, Easy to Use, Canadian Owned. 14-Day Free Trial!

 **APR Group Starts Soon!**
Start now to study online for your Accreditation in Public Relations (APR).

**Computer Forensics**
Digital wyzdom network and breach forensic investigation services

**People Also Viewed**

 **Alison Pritchett**
Operational & Service Excellence

 **Eric Rice**
Vice President Call Center Operations at Philidor RX Services

 **Bijal Patel**
Manager, Access Solutions - Valeant Pharmaceuticals

 **Brett R. Winters**
EVP Operations at Philidor Rx Services

 **Brad Greenfield**
Director of Sales/Director of Marketing/Dermatology Specialty/Pharmaceutical/Talent Development/Business Analysis

 **Chris Rimer**
Client Relationship Associate at Kforce Inc

 **Bill Pickron**
Senior Vice President, National Sales and Practice Development at UniteRx

 **Matthew Davenport**
Chief Innovation Officer, BQ6 Media Group

 **Fred Hockenjos Jr.**
Senior Product Manager - Marketing Dermatology at Medicis

 **Jacqueline Reedy**
Supervisor at Philidor Rx Services

**People Similar to Gary**




People also viewed              ✕
Francis
cial Planning & Compliance at ST...
Center Operations at Phili...



Gary also knows about...

| 4 | Internal Controls | 4 | Financial Modeling | 5 | Sales Operations | 3 | Analytics |
| 3 | Sarbanes-Oxley | 2 | Project Management | 1 | Strategic Financial... |

1  Business Planning     Information Technology     Business Analysis     Corporate Finance

Operations Management     Change Management     Operational Planning

Problem Solving     See 2+

---

 Education

**Arizona State University - W. P. Carey School of Business**
MS, Accounting and Information Systems
2002 – 2003

**Arizona State University**
Bachelor's degree, Accounting
1999 – 2002

Activities and Societies: Gary Tanner received a B.S. in Accounting and M.S. in Accounting and
Information Systems from Arizona State University.

---

**Recommendations**                                                          Given (2)

 **Heather Meiners**
Sr Administrative Assistant

❝ Heather supported me in a direct capacity as a Sr. Administrative Assistant and proved
to be a valuable resource in improving my efficiency and effectiveness on a daily basis. I
could consistently count on Heather to proactively address and resolve administrative
constraints broadly ranging from scheduling issues to the execution of task oriented
assignments. I relied on... **more**

January 9, 2013, Gary managed Heather at Medicis

**Yani Feller**
Senior Analyst, Financial Systems

❝ I have had the pleasure of working with Yani both from a strategic perspective in
designing solutions and a tactical perspective in the implementation of these solutions. In my
experience with Yani, I was very impressed with her ability to conceptually understand
complex issues, break the issues down into tactical components, and address to full
resolution. Yani has the... **more**

October 6, 2012, Gary worked with Yani at Medicis

---

**Groups**

   

**ASU School of Acco...**     **W. P. Carey School o...**     **W.P Carey Accounta...**     **PricewaterhouseCoo...**
161 members                   11,196 members                  625 members                    75,519 members
Join                          Join                            Join                           Join

 People also viewed          ✕
Eric Rice Vice President Call
Center Operations at Phili...

    Advanced   

Home   Profile   My Network   Jobs   Interests

Business Services   Try Premium for free

**PricewaterhouseCoo...**
61,603 members
Join

**ASU Arizona State U...**
37,242 members
Join

**Following**



**eCornell**
E-Learning
Follow



**Medicis**
Pharmaceuticals
Follow

## Schools



**Arizona State Univer...**
Phoenix, Arizona Area
Follow



**Arizona State Univer...**
Phoenix, Arizona Area
Follow

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2016   | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

People also viewed ✕
**Eric Rice** Vice President Call Center Operations at Phili...

EXHIBIT K

EXHIBIT K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

———————————————

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **December 31, 2012**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from                    to

Commission file number 001-14956

# VALEANT PHARMACEUTICALS INTERNATIONAL, INC.
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **CANADA** | |
| State or other jurisdiction of | **98-0448205** |
| incorporation or organization | (I.R.S. Employer Identification No.) |

**4787 Levy Street**
**Montreal, Quebec**
**CANADA, H4R 2P9**
(Address of principal executive offices)

Registrant's telephone number, including area code **(514) 744-6792**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| **Common Shares, No Par Value** | **New York Stock Exchange, Toronto Stock Exchange** |

Securities registered pursuant to section 12(g) of the Act:

**None**
(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or Section 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the common shares held by non-affiliates of the registrant as of the last business day of the registrant's most recently completed second fiscal quarter was $10,315,067,000 based on the last reported sale price on the New York Stock Exchange on June 29, 2012.

The number of outstanding shares of the registrant's common stock, as of February 22, 2013 was 305,758,623.

### DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates certain information by reference from the registrant's proxy statement for the 2013 Annual Meeting of Shareholders. Such proxy statement will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2012.

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All tabular dollar amounts expressed in thousands of U.S. dollars, except per share data)**

basis for determining whether it is necessary to perform a two-step goodwill impairment test. The more-likely-than-not threshold is defined as having a likelihood of more than 50%. The adoption of this guidance did not have a significant impact on the Company's financial position or results of operations.

In July 2012, the Financial Accounting Standards Board ("FASB") issued guidance intended to simplify indefinite-lived intangible impairment testing, by allowing an entity to first assess qualitative factors to determine whether it is "more likely than not" that the fair value of an asset is less than its carrying amount as a basis for determining whether it is necessary to perform a quantitative impairment test. The more-likely-than-not threshold is defined as having a likelihood of more than 50%.  This guidance is effective for annual and interim tests performed for fiscal years beginning after September 15, 2012. The adoption of this guidance is not expected to have a significant impact on the Company's financial position or results of operations.

In February 2013, the FASB issued guidance to improve the transparency of reporting reclassifications out of accumulated other comprehensive income, by requiring an entity to report the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income if the amount being reclassified is required under U.S. GAAP to be reclassified in its entirety to net income. For other amounts that are not required under U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures required under U.S. GAAP that provide additional detail about those amounts. The guidance is effective prospectively for reporting periods beginning December 15, 2012. As this guidance relates to presentation only, the adoption of this guidance will not have impact on the Company's financial position or results of operations.

## 3.   BUSINESS COMBINATIONS

The Company focuses its business on core geographies and therapeutic classes through selective acquisitions, dispositions and strategic partnerships with other pharmaceutical companies.

*(a)  Business combinations in 2012 included the following:*

**Medicis**

*Description of the Transaction*

On December 11, 2012, the Company acquired all of the outstanding common stock of Medicis Pharmaceutical Corporation ("Medicis") for $44.00 per share ("Per Share Consideration") for cash. Pursuant to the Agreement and Plan of Merger, dated September 2, 2012, among the Company, Valeant, Merlin Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Valeant ("Merger Sub"), and Medicis, on December 11, 2012, Merger Sub merged with and into Medicis, with Medicis continuing as the surviving entity and wholly owned subsidiary of Valeant.  At the effective time of this merger, each share of Medicis Class A common stock, par value $0.014 per share, issued and outstanding immediately prior to such effective time was converted into the right to receive the Per Share Merger Consideration in cash, without interest. Each Medicis stock option and stock appreciation right, whether vested or unvested, that was outstanding immediately prior to the acquisition was cancelled and converted into the right to receive the excess, if any, of the Per Share Consideration over the exercise price of such stock option or stock appreciation right, as applicable. Each Medicis restricted share, whether vested or unvested, that was outstanding immediately prior to the acquisition was cancelled and converted into the right to receive the Per Share Consideration.

Medicis is a specialty pharmaceutical company that focuses primarily on the development and marketing in the U.S. and Canada of products for the treatment of dermatological and aesthetic conditions. Medicis offers a broad range of products addressing various conditions or aesthetics improvements, including acne, actinic keratosis, facial wrinkles, glabellar lines, fungal infections, hyperpigmentation, photoaging, psoriasis, bronchospasms, external genital and perianal warts/condyloma acuminate, seborrheic dermatitis and cosmesis (improvement in the texture and appearance of skin). Medicis' primary brands are Solodyn®, Restylane®, Perlane®, Ziana®, Dysport® and Zyclara®.

*Fair Value of Consideration Transferred*

The following table indicates the consideration transferred to effect the acquisition of Medicis:

EXHIBIT L

EXHIBIT L

VALEANT
Pharmaceuticals International, Inc.

# Valeant Pharmaceuticals International, Inc.

## Q2 2015 Financial Results
## July 23, 2015

# Key Observations from 140+ deals since 2008 (2/2)

- **Captured unmodeled revenue synergies (e.g., Medicis: alternative fulfillment; Bausch + Lomb: consumer scale; Salix: Hospital and Federal account teams)**

- **Retained key organizational talent and expertise:**
  - □ Salix: Philippe Adams, Bill Bertrand, John Temperato
  - □ Bausch + Lomb: Tom Appio, Joe Gordon, Fred Hainsworth, Deb Jorn, Mark McKenna, Sharon Tonetta, Tracy Valorie, Gaelle Waltinger
  - □ Medicis: Erin Browder, Rick Reynolds, Gary Tanner, Dave Wood
  - □ Biovail: Tanya Carro, Seana Carson, Alex Matheson

- **Four deals have not met our IRR hurdle**
  - □ Neotensil (U.S) - discontinued
  - □ Vita Direct (Russia) – trying to resolve
  - □ Vital Science (Canada) - divested
  - □ PFI (Dr.Lewinn's) (Australia) - divested

VALEANT
Pharmaceuticals International, Inc.

EXHIBIT M

EXHIBIT M

EDITION: U.S.

SIGN IN | REGISTER

Search Reuters

HOME   BUSINESS   MARKETS   WORLD   POLITICS   TECH   OPINION   BREAKINGVIEWS   MONEY   LIFE   PICTURES   VIDEO

Breaking News: New Islamic State video threatens attack in Washington »

X

Vehicle(s) may be shown with optional equipment. Dealer may sell or lease for less. Limited time offers.
Offers only valid at participating dealers. Retail offers may be cancelled or changed at any time without notice.
See your Lincoln Dealer for complete details or call the Lincoln Customer Relationship Centre at 1-800-387-

**Markets** | Thu Nov 12, 2015 1:00am EST                    Related: STOCKS, REGULATORY NEWS, MARKETS, FINANCIALS

# INSIGHT-Valeant played a key role in building, operating Philidor RX

NEW YORK | BY CARL O'DONNELL

Nov 12 A small cadre of employees at Valeant Pharmaceuticals International were deeply involved in directing the daily operations of a specialty pharmacy that has drawn scrutiny for its billing practices, according to four former employees at the pharmacy and company documents reviewed by Reuters.

The Valeant employees worked with the founders of the pharmacy, Philidor Rx Services, to set up the business in 2013 and expand its operations, three of the former employees said. The Valeant employees then remained closely involved in details of running the pharmacy.

At different points in the company's evolution, their roles included interviewing job applicants and involvement with billing. And the most senior of the Valeant employees, Gary Tanner, traveled frequently between Philidor's offices in Pennsylvania and Arizona and Valeant's U.S. headquarters in New Jersey, three of the former employees said.

Valeant first disclosed its ties to Philidor late last month, and concerns over the pharmacy's tactics to get insurers to pay for Valeant medications have helped push the drugmaker's shares more than 50 percent lower.

The new accounts of former Philidor employees and two emails provided by one of them raise questions about the degree to which Valeant was aware of the specialty pharmacy's methods.

For example, two Valeant employees were copied on a November 2014 email with an attachment explaining how Philidor employees could bill the highest amount an insurance company was willing to pay by resubmitting rejected claims at different price points. The email, reviewed by Reuters, was sent to Tanner and a colleague, Bijal Patel, who both used pseudonyms for their communications within Philidor, the former employees said.

Two of the former employees said they were sometimes told by their supervisors, also Philidor employees, to change prescriptions from doctors to allow the pharmacy to dispense a Valeant drug instead of a cheaper generic version.

Altering a physician's script to bill a payer for a more expensive drug could fall afoul of some federal and state laws designed to curtail insurance fraud and could also violate regulations established by state boards of pharmacy, according to Nicole Hughes Waid, an attorney at FisherBroyles LLP.

Reuters also reported last week that employees responsible for billing insurers were told to resubmit claims rejected by a major U.S. pharmacy benefits manager by using the billing



SPONSOR CONTENT

Advisor Insights

More Women Controlling Their Wealth
READ MORE

Keep contribution limit money the RRSP vs. TFSA debate
READ MORE

More Women Controlling Their Wealth
READ MORE

Should Canadians spend or save the RRSP vs. TFSA debate
READ MORE

Are employees tuned retirement investing
READ MORE

Smart retirement: spend or save?
READ MORE

TRENDING ON REUTERS

identification numbers of other pharmacies. That practice might violate state pharmacy laws if it were not clear which pharmacy was actually dispensing the drug.

In a statement, Philidor said its employees "behaved ethically and in keeping with the highest business standards" and that it is deeply disappointed that its ties to Valeant have come to an end.

Valeant said that it would not address specific questions about Philidor's practices while it conducts an internal review of the two companies' ties. In October, Valeant told investors it had not invested or lent money to Philidor and said it did not "own or control" the pharmacy, though it did pay $100 million for an option to purchase it.

The former Philidor employees identified Gary Tanner as a key figure in the pharmacy's operations. Tanner joined Valeant in 2012, when the drugmaker bought his employer, Medicis Pharmaceutical Corp, a maker of dermatology products, including acne medications Solodyn and Ziana.

CNBC reported this week that a Valeant spokeswoman had confirmed that Tanner was "Valeant's liaison with Philidor" and that he was supervised by Laizer Kornwasser, a top Valeant executive who reported to Chief Executive Michael Pearson. Reuters could not independently confirm that report or determine whether Kornwasser, who left Valeant in July, had any role in Philidor's operations. Kornwasser could not be reached for comment.

Valeant has said its interest in working closely with a specialty pharmacy to make its drugs available to patients was based on a pilot program run by Medicis before it was acquired.

Tanner and several other Medicis employees retained by Valeant, including Bijal Patel and Alison Pritchet, had been responsible for building relationships with specialty pharmacies for Medicis prior to its purchase. After Valeant took over, all three collaborated with Andy Davenport, who headed a marketing firm that did work for Medicis, to establish Philidor. Davenport is currently Philidor's CEO.

Tanner, Patel, Davenport and Pritchet did not respond to requests for comment.

Tanner had authority "over all the people who worked at Valeant first and then came over to Philidor," said one Philidor former employee. Tanner worked much of the time out of Philidor's Phoenix-area office, though he frequently visited Valeant's offices in Bridgewater, New Jersey, the former Philidor employees said.

In September, Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information about its activities, according to a copy of the agreement reviewed by Reuters.

Valeant provided details of its relationship with Philidor after influential short-seller Citron Research on Oct. 21 accused the drugmaker of using Philidor to inflate revenue from its medicines by stockpiling drugs at the pharmacy.

Valeant denied the allegation and said it was unaware of any illegal activity at Philidor. On Oct. 26, Valeant told investors that a committee of its directors would review the interaction between the two companies. That review is still pending.

A few days after its investor call, Valeant said it was severing ties with the specialty pharmacy, saying it had "lost confidence" in Philidor after questions about its business practices.

At least three major insurers have cut off their business dealings with Philidor, one of them citing violations of their contract with the pharmacy.

France police raid homes, vow it's 'just the beginning' | ▶ VIDEO   1

U.S. maternal mortality rate is twice that of Canada: U.N   2

Guns, God and grievances - Belgium's Islamist 'airbase'   3

Global shares, euro fall, oil and gold up after Paris attacks | ▶ VIDEO   4

France launches air strikes in Syria; Paris investigation widens | ▶ VIDEO   5

Watch your top stories

France launches raid on Islamic State in Syria

ALSO   A manhunt underway for a P...

Your five minute news show of today's top stories
For more visit Reuters.tv

Sponsored Financial Content   ✉ (?)

Get one of our best active trading systems for Forex & Futures - Free   NetPicks

EXCLUSIVE FREE REPORT: Be in the know with our Mobile Payments Report.   Business Insider

A strong US jobs report confuses the interest rate picture   MarketViews

Expert views on the global markets from RMG Wealth Management   MarketViews

Where is the clever money going?   MarketViews

RECOMMENDED VIDEO

Separately, state prosecutors in New York and Massachusetts are investigating Valeant over its drug pricing and programs that provide financial assistance to help patients cover out-of-pocket expenses for their medications.

The U.S. Department of Justice has subpoenaed the company regarding payments and agreements by its Bausch & Lomb division with healthcare providers, while the Federal Trade Commission is looking into whether it illegally cornered the market for certain contact lens components. (Reporting by Carl O'Donnell; Editing by Michele Gershberg and Sue Horton)

Hezbollah chief condemns Paris attacks

Paris attack survivor: phone 'saved me'

## More From Reuters

- China shows unusual pictures of its fight against terror | 14 Nov
- Bodies flew like rag dolls at deadly 2014 Texas SXSW crash: witness | 2 Nov
- French Muslims fear repercussions from Paris attacks | 15 Nov
- Maldives declares state of emergency | 4 Nov
- 'Peak demand' means world may | 5 Nov
- Ex-California cop sentenced to life for | 11 Nov
- Worst-case scenarios that are | 13 Nov
- OPEC, Russia oil battle heats up as | 5 Nov
- Hundreds arrested at California electronic | 2 Nov
- Trump is going nuclear on White | 15 Nov

## Sponsored Financial Content (?)

- Free, get one of our best active trading systems for Forex & Futures  *NetPicks*
- EXCLUSIVE FREE REPORT: Be in the know with our Mobile Payments Report.  *Business Insider*
- Expert views on the global markets from RMG Wealth Management  *MarketViews*
- Which investments to look out for - and which to avoid  *MarketViews*
- Where is the clever money going?  *MarketViews*

## KEY RATES

MORTGAGE   HOME EQUITY   SAVINGS   AUTO   CREDIT CARDS

See today's average mortgage rates across the country.

| TYPE | TODAY | 1 MO |
|------|-------|------|
| 30-Year Fixed | 3.83% | 3.81% |
| 15-Year Fixed | 2.90% | 2.89% |
| 10-Year Fixed | 2.86% | 2.81% |
| 5/1-Year ARM | 3.25% | 2.99% |
| 30-Year Fixed Refi | 3.91% | 3.91% |
| 15-Year Fixed Refi | 2.98% | 2.99% |
| 5/1 ARM Refi | 3.32% | 3.17% |
| 30-Year Fixed Jumbo | 4.20% | 4.39% |

Rates may include points.

Source: Bankrate.com

SEE MORE KEY RATE DATA

## SPONSORED TOPICS

1. 2015 Best SUVs
2. Best Retirement Communities
3. 5 Best Cars to Own
4. Reverse Mortgage Calculator
5. Retirement Annuity Rates
6. Quick Weight Loss Diets



## From The Web

Sponsored Links by Taboola



Why So Many Guys are Loving These Razors
*Harry's*



Sparta : Le Jeu Gratuit Phénomène de 2015
*Sparta - Jeu en ligne*



New Grammar App Can Help You Succeed at Work
*Grammarly*







EXHIBIT N

EXHIBIT N

**Bloomberg**Business

---

▶   Congressman asks for workers alleged to have set up pharmacy

▶   Republicans haven't backed Democratic request to drugmaker

Four people who worked at Valeant Pharmaceuticals International Inc. have been asked by Democrats to come to Washington and answer questions about the company's relationship with a mail-order pharmacy.

U.S. Representative Elijah Cummings, a Maryland Democrat, wrote Valeant Chief Executive Officer Michael Pearson on Monday requesting he make the employees available for transcribed interviews. Workers at the pharmacy, Philidor Rx Services, sometimes changed codes on doctors' prescriptions to ensure they were filled with the brand name instead of the generic, according to the former employees. Philidor said that it only filled prescriptions with medications that doctors and patients requested, but Valeant has said it's cutting ties with the pharmacy.

Republicans haven't backed an earlier request by Cummings to subpoena the drugmaker over its pricing practices, though have said they will hold a hearing on the topic early next year.

Separately, Quebec's securities regulator is examining whether Valeant breached its obligations to provide information to investors, Louis Morisset, CEO of the authority, said Monday. Valeant has its legal domicile in Laval, Quebec, and its principal executive offices in New Jersey.

Cummings wants to interview Gary Tanner, Bijal Patel and Alison Pritchett based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations," according to the letter. Cummings also asked for contact information for former employee Laizer Kornwasser. Tanner left Valeant in September and joined Philidor, Bloomberg reported earlier this month.

"We are reviewing the Congressman's letter and will respond as appropriate," Laurie Little, a spokeswoman for Valeant, said in an e-mailed statement. "As we have said previously, Valeant's board of directors has formed an ad hoc committee to review allegations related to the company's business relationship with Philidor and related matters."

None of the people Cummings is requesting to interview returned requests for comment.

Valeant declined 1.5 percent to $74.28 at 2:44 p.m. in New York.



Watch Next: Why Do Drug Prices Keep Going Up?

Why Do Drug Prices Keep Going Up?

The letter is part of Cummings's ongoing investigation into Valeant and Turing Pharmaceuticals AG for acquiring older drugs and then significantly raising their prices. Drug pricing has received intense scrutiny in Washington lately. The U.S. Senate's Special Committee on Aging plans to hold a hearing next month on drug-pricing practices by Valeant, Turing and two other pharmaceutical companies.

Cummings, who is the top Democrat on the House Oversight and Government Reform Committee, has tried to get Committee Chairman Jason Chaffetz to hold a hearing as well as subpoena Valeant and Turing to compel them to hand over information on price increases. All the Democrats on the committee signed on to Cummings's letter Monday, said Aryele Bradford, a spokeswoman for the congressman. Cummings wrote Chaffetz earlier this month asking for a panel vote Tuesday to subpoena Pearson and Turing Chief Executive Martin Shkreli.

MJ Henshaw, a spokeswoman for Chaffetz, said the chairman doesn't have any immediate plans to issue a subpoena. Republican and Democratic staff members have had multiple conversations on drug pricing and will continue to do so, and Chaffetz is working toward holding a hearing early next year, Henshaw said.

Valeant raised the prices of two heart drugs, Nitropress and Isuprel, by 212 percent and 525 percent the day the drugmaker acquired the rights to sell them. Closely held Turing bought a decades-old anti-parasitic treatment and increased the price to $750 a pill from $13.50.

Before it's here, it's on the Bloomberg Terminal.

• Elijah Eugene Cummings

EXHIBIT O

EXHIBIT O

**Bloomberg**Business

▶  Philidor said to be used for some prescription eye products

▶  Former Valeant employees, manager later hired by pharmacy

Weeks before Valeant Pharmaceuticals International Inc. said it would cut ties with Philidor Rx Services, the drugmaker was planning to expand its use of the mail-order pharmacy, said three people familiar with the matter.

Philidor was on the brink of becoming a larger part of Valeant's operations as the drugmaker planned to widen the pharmacy's role beyond dermatology to other lines of medications, the people said. Those plans were squelched after reports about tactics Philidor allegedly used to sell Valeant medicines, including altering doctors' prescriptions to gain more insurance reimbursements. Valeant -- whose stock has fallen more than 40 percent since questions first emerged about Philidor's business practices -- said on Oct. 30 that it would cut ties with the pharmacy and that Philidor would shut down.

Philidor also hired a number of former Valeant employees, according to an outside spokeswoman for Valeant. The workers, part of a group of about 30 people that helped show doctors how to direct patients to Valeant products, were dismissed by the drugmaker, with severance, before being subsequently hired by Philidor, the spokeswoman said. They followed a Valeant manager named Gary Tanner who, before leaving Valeant in September, led the drugmaker's so-called Access Team, she said.

"Gary will be assisting with our continued effort to build a national network of pharmacy partners, as well as continuing in the role as a liaison to Valeant," Philidor said in an Aug. 28 memo announcing Tanner's role building an Access Team at the pharmacy.

Patrick Ryan, an outside spokesman for Philidor with Hill & Knowlton Strategies, declined to comment for this story. On Monday, Philidor issued a statement saying that the pharmacy "adhered not only to all applicable laws but to the highest standards of ethical business practice."

## Limited Use

Valeant has previously described its use of specialty pharmacies including Philidor as limited. "It's really, primarily our dermatology brands and then some of our specialty products," Chief Executive Officer Michael Pearson said on an Oct. 19 conference call, mentioning an antibiotic for gum disease

and a drug for a rare genetic disease. Philidor made up 6.8 percent of Valeant's third-quarter sales, the drugmaker has said.

Prescription eye drugs made up 5.8 percent of Valeant's third-quarter sales. This year Valeant began a program to use Philidor for some of Valeant's Bausch & Lomb eye drug products, according to two of the people. The initiative began as a pilot program, with plans to expand it more widely, according to the people, who asked not to be identified discussing internal business matters.

Specialty pharmacies are common in the drug industry, where they handle complex drugs, aid drugmakers with obtaining reimbursement from insurers, and ship products directly to patients, cutting out distributors.

## Close Ties

Valeant's relationship with Philidor was closer than what most drug companies have with the pharmacies. It had paid $100 million for an option to buy Philidor for nothing any time in the next 10 years, and consolidated Philidor's financials into its own.

Bloomberg reported on Oct. 30 that Philidor modified doctor's orders in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs instead of less expensive generic versions, according to former employees and an internal document.

In response, Philidor said the pharmacy "serves both patients and physicians by delivering the medications that physicians want their patients to have and which patients request. When questions arise, physicians and patients confirm their request for a branded drug."

Valeant has since worked to distance itself from Philidor. "The newest allegations about activities at Philidor raise additional questions about the company's business practices," Pearson said on Oct. 30. "We have lost confidence in Philidor's ability to continue to operate in a manner that is acceptable to Valeant and the patients and doctors we serve."

Philidor is working with Valeant for the next 30 to 90 days to help patients transfer their prescriptions to other pharmacies. Philidor will fill prescriptions for the next week, and possibly beyond, as part of that process, the pharmacy said.

## Employees Move

Case 2:16-mc-00015-DJH   Document 2-1   Filed 02/12/16   Page 181 of 181

In August, Philidor announced that after five years with Valeant, Tanner would join the pharmacy as an executive vice president and member of the management team. "Gary has been our client liaison with Valeant since the very beginning in January 2013 and has made an immeasurable contribution to Philidor's success," Philidor's CEO Andrew Davenport said in the memo.

Tanner "will be responsible for our new Philidor Access team which will consist of as many as 40 field representatives who will be responsible for ensuring our prescribers continue to receive the exceptional customer service," Davenport said in the memo.

Neither Davenport nor Tanner could be reached for comment.

Before it's here, it's on the Bloomberg Terminal.